UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SUMOTEXT CORP., <br><br> Plaintiff, <br><br> v. <br><br> ZOOVE, INC., et al., <br><br> Defendants. | Case No. 16-cv-01370-BLF <br><br> **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION; AND DISSOLVING TEMPORARY RESTRAINING ORDER** <br><br> [Re: ECF 15] |

Plaintiff Sumotext Corporation seeks a preliminary injunction to prevent Defendants Zoove, Inc. and Virtual Hold Technology ("VHT") from terminating Sumotext's leases of forty-two "StarStar" leases pending resolution of this lawsuit.

On March 31, 2016, this Court granted Sumotext's application for a temporary restraining order ("TRO") prohibiting termination of its StarStar leases pending fuller development of the record and a hearing on its motion for a preliminary injunction. *See* Order Granting Application for Temporary Restraining Order; and Setting Hearing on Motion for Preliminary Injunction, ECF 27. The Court requested supplemental briefing and set a hearing date of April 14, 2016. *Id.* The Court extended the TRO an additional fourteen days, through April 28, 2016, to ensure adequate time to evaluate the parties' arguments and evidence. *See* Order Extending Temporary Restraining Order, ECF 34.

Now that the record has been more fully developed, the Court concludes that Sumotext has not established grounds for enjoining termination of its StarStar leases. Accordingly, Sumotext's motion for preliminary injunction is DENIED and the TRO is DISSOLVED.

## I. BACKGROUND[1]

Zoove has the exclusive rights to operate StarStar numbers – vanity mobile dial codes such as "**LAW" and "**MOVE" – for AT&T, Verizon Wireless, T-Mobile, and Sprint. For several years, Zoove's business model has relied on "middleman" companies to lease StarStar numbers from Zoove and then sublease them to customers. Sumotext, a provider of mobile marketing software and services, stepped into that role in 2012 when it began leasing StarStar numbers from Zoove and then subleasing them to its clients along with other services. A large part of Sumotext's business now depends upon its ability to continue leasing and subleasing StarStar numbers.

In 2014, non-party Mblox Inc. acquired Zoove as a wholly owned subsidiary. In 2015, Mblox and Sumotext entered into a number of written agreements, summarized as follows. The parties' arguments regarding the proper construction of the agreements and their effect upon Sumotext's current StarStar leases are discussed in greater detail below.

<u>Terms of Service</u>

The Terms of Service ("TOS"), executed by Mblox and Sumotext in April 2015, was the master agreement governing those parties' relationship. TOS, ECF 22-3. It "contains the legal terms and conditions" governing Mblox's provision of services and Sumotext's access to Services. *Id.* at Intro. Importantly for purposes of the present motion, the TOS contains a mutual termination provision granting either Mblox or Sumotext the right to terminate the TOS "for convenience, upon notice," provided that no service order is within an applicable minimum period. *Id.* ¶ 5. When VHT acquired Zoove from Mblox in December 2015, the TOS was "partially" assigned to and assumed by Zoove "solely to the extent that [Zoove] can perform the applicable services described in the respective service orders entered into in connection with each agreement." Assignment and Assumption Agreement, ECF 31-2. The parties dispute the meaning of this assignment language as well as other language in the TOS.

---

[1] The facts set forth in the Background section are undisputed unless otherwise noted by the Court.

StarStar Toolkit Service Order

The StarStar Toolkit Service Order ("Toolkit Agreement") was executed by Mblox and Sumotext in April 2015 "pursuant to the Terms of Service." Toolkit Agreement, ECF 22-4. The Toolkit Agreement describes "Toolkit services" that Mblox will provide to allow customers to obtain and manage StarStar leases through a web portal, and it expressly "covers all leases of SarStar Number(s) that are registered by Customer through the MyMblox web portal or the StarStar API." *Id.* When the Toolkit Agreement was executed in April 2015, the web portal described therein was not yet operational. After the portal became operational in September 2015, all of Sumotext's StarStar numbers were moved into the portal. Email, Exh. 1 to Ticktin Decl., ECF 31-5. Sumotext also began using the portal to lease StarStar numbers. Importantly for purpose of the present motion, the Toolkit Agreement provides for lease of StarStar numbers on a monthly basis with automatic monthly renewal but grants both Mblox and Sumotext the right to terminate by providing a one-month written notice of an intent not to renew. Toolkit Agreement, ECF 22-4. As is discussed below, Sumotext claims that the express mutual termination provision of the Toolkit Agreement was orally modified to grant only Sumotext the right to terminate its StarStar leases.

StarStar Toolkit Product Specification

The Toolkit Agreement incorporates the terms of the StarStar Toolkit Product Specification ("Toolkit Product Specification"), a document that provides information regarding use of the Toolkit. *See* Toolkit Product Specification, ECF 16-8. The Toolkit Product Specification provides step-by-step instructions in sections with subheadings such as "How It Works," and "StarStar Toolkit Set-Up and Configuration, and it also contains additional terms and conditions regarding use of StarStar numbers. *Id.*

StarStar Select Service Order

After execution of the Toolkit Agreement but before the web portal was operational, Mblox and Sumotext entered into several written contracts for lease of StarStar numbers. The StarStar Select Service Order, executed on May 1, 2015, was the first of those. *See* StarStar Select Service Order, Exh. B to Miller Decl., ECF 30. That contract states that it was entered into

3

1   pursuant to the TOS, that it may be terminated upon thirty days notice by either Mblox or
2   Sumotext, and that it will terminate automatically upon transfer of the StarStar numbers covered
3   by the contract into Sumotext's toolkit account.  As the Court understands it, those StarStar
4   numbers ultimately were moved into the web portal such that the contract terminated
5   automatically.

ASP Service Orders

7   Mblox and Sumotext executed seven other written contracts, each titled ASP Service
8   Order, between May 22, 2015 and September 28, 2015.  *See* ASP Service Orders, Exhs. E-L to
9   Miller Decl., ECF 30.  All seven of those contracts contain unilateral termination provisions
10  granting termination rights only to Sumotext.  *See id.*  All but the last of the contracts state that the
11  StarStar numbers covered therein will be moved to the toolkit account once operational.  *See id.*  It
12  appears that in fact all of Sumotext's StarStar numbers have been moved into its toolkit account.
13  Email, Exh. 1 to Ticktin Decl., ECF 31-5.

14  In December 2015, Defendant VHT acquired Zoove from Mblox.  In February 2016,
15  Zoove notified Sumotext that it would be terminating all of Sumotext's StarStar leases effective
16  April 1, 2016.  The termination notice stated that an updated Reseller Agreement would be made
17  available by March 15, 2016, and that new regionally based pricing, as opposed to national
18  pricing, would be offered starting on April 1, 2016.

19  Sumotext claims that VHT and Zoove do not have the contractual right to terminate
20  Sumotext's StarStar leases.  According to Sumotext, the above agreements grant Sumotext the
21  sole right to terminate its StarStar leases, with the exception that Zoove may terminate a StarStar
22  lease in very limited circumstances not applicable here.  Sumotext also claims that Zoove's
23  proposed new pricing would increase Sumotext's lease rate from approximately $500 per month,
24  per number, to $500,000 per month, per number.  Sumotext asserts that as a practical matter the
25  proposed new pricing is so prohibitive as to effect terminations of all Sumotext's StarStar leases
26  and preclude Sumotext from participating in the StarStar market.

27  Sumotext filed this action on March 21, 2016, asserting claims for:  (1) breach of contract,
28  (2) breach of the implied covenant of good faith and fair dealing, (3) tortious interference with

4

1  contractual relationship, (4) unfair business practices under California Business & Professions
2  Code § 17200, (5) fraud, and (6) promissory estoppel.  Immediately thereafter, Sumotext sought a
3  TRO prohibiting VHT and Zoove from terminating its existing StarStar leases, which at that time
4  numbered fifty-two.  The Court issued the requested TRO based upon its determination that
5  Sumotext had shown serious questions going to the merits of its contract claim and that the
6  balance of hardships tipped sharply in its favor.  *See* TRO, ECF 27.  Since then, Sumotext has lost
7  some of its customers and now it has only forty-two StarStar leases remaining.[2]  Sumotext seeks a
8  preliminary injunction to prevent termination of those leases, or effective termination by means of
9  prohibitive lease rates, pending resolution of this lawsuit.

## II. LEGAL STANDARD

A preliminary injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. "[I]f a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

## III. DISCUSSION

Sumotext's motion for preliminary injunction is based upon its claim for breach of contract.  Accordingly, the Court evaluates Sumotext's showing only with respect to that claim.

---

[2] Sumotext's supplemental briefing indicates that it retains forty-three StarStar numbers, *see* Suppl. Miller Decl. ¶ 19 and Exh. C, but at the hearing Sumotext's counsel indicated that Sumotext currently has only forty-two StarStar numbers.

### A.      Likelihood of Success or Serious Questions Going to the Merits

In order to obtain a preliminary injunction, Sumotext must show a likelihood of success on the merits of its contract claim or, in the alternative, serious questions going to the merits of its contract claim. *See Winter*, 555 U.S. at 20; *Friends of the Wild Swan*, 767 F.3d at 942. The crux of Sumotext's contract claim is that Defendants' termination of Sumotext's StarStar leases is a breach of contract because Defendants do not have the contractual right to terminate those leases.

At the hearing, Sumotext's counsel characterized Sumotext's forty-two remaining StarStar numbers as residing in two different "buckets." Counsel represented that twenty-four of the numbers were obtained through the seven written ASP Service Orders and that the other eighteen numbers were obtained through the web portal pursuant to the Toolkit Agreement. The Court evaluates Sumotext's showing on likelihood of success or, alternatively, serious questions going to the merits, separately with respect to each "bucket" of StarStar numbers.

#### 1.      StarStar Numbers Obtained Through ASP Service Orders

Sumotext argues that Zoove does not have the right to terminate the twenty-four StarStar leases that Sumotext obtained through the seven written ASP Service Orders, because those contracts grant unilateral termination rights only to Sumotext. *See* ASP Service Orders, Exhs. E-L to Miller Decl., ECF 30. The language of the seven ASP Service Orders clearly does grant unilateral termination rights to Sumotext. However, Zoove argues that all of the ASP Service Orders were entered into "pursuant to the Terms of Service," and that the TOS grants the parties mutual termination rights. *Id.* Sumotext contends that the mutual termination provision of the TOS, which was executed by Mblox and Sumotext, was not assigned to Zoove and thus cannot be asserted by Zoove.

##### a.      Assignment of the TOS to Zoove

The TOS was "partially" assigned to and assumed by Zoove "solely to the extent that [Zoove] can perform the applicable services described in the respective service orders entered into in connection with each agreement." Assignment and Assumption Agreement, ECF 31-2. Sumotext argues that the partial assignment of the TOS to Zoove encompassed "only StarStar specific provisions," which Sumotext contends did not include the mutual termination provision.

6

1  Sumotext relies on the supplemental declaration of its President, Timothy Miller, who states that
2  Mblox's in-house counsel, Richard Purdy, confirmed Sumotext's reading of the Assignment and
3  Assumption Agreement.  *See* Suppl. Miller Decl. ¶¶ 10-11., ECF 29-1.  Sumotext also relies on
4  black letter law that in order to be assigned, a right must be surrendered.  *See* Pl.'s Suppl. Br. at 6,
5  ECF 29.  Sumotext argues that Mblox clearly did not surrender its rights in the TOS because
6  Mblox continues to rely upon the TOS to govern its relationship with Sumotext as to services
7  other than StarStar services.
8        In response, VHT and Zoove submit the declaration of Richard Purdy, the Mblox attorney
9  who supposedly confirmed Sumotext's reading of the Assignment and Assumption Agreement.
10  Purdy unequivocally refutes the construction of the Assignment and Assumption Agreement
11  advanced by Sumotext.  Purdy Decl., ECF 33-1.  Purdy explains that the TOS between Mblox and
12  Sumotext applied to both messaging services and StarStar services; Mblox retained the messaging
13  services while selling the StarStar services to VHT; and Mblox intended to retain all rights and
14  obligations under the TOS as related to messaging services but to assign all rights and obligations
15  under the TOS as related to StarStar services.  *Id.* ¶ 3.
16        Under the plain language of the Assignment and Assumption Agreement, the most logical
17  construction is that the entire TOS was assigned to Zoove to the extent related to the StarStar
18  business.  *See Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*,
19  68 A.3d 665, 683 (Del. 2013) (under Delaware law, the court "interpret[s] clear and unambiguous
20  contract terms according to their plain meaning.").[3]  To the extent that the language were deemed
21  ambiguous, Purdy's declaration would be admissible extrinsic evidence that could be used to
22  interpret the contract.  *See Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) ("When a
23  contract's plain meaning, in the context of the overall structure of the contract, is susceptible to
24  more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the
25  ambiguity.").  It would make little sense for Mblox to assign its entire StarStar business but to
26  retain significant contractual rights and obligations relating to the StarStar business.  Accordingly,

---

[3] The Assignment and Assumption Agreement contains a choice-of-law provision specifying Delaware law.  Assignment and Assumption Agreement ¶ 3(c), ECF 31-2.

7

1 Sumotext has not shown a likelihood of success as to its argument that the TOS's mutual termination provision was not assigned to Zoove, or even serious questions going to that point.

The Court observes that for practical purposes it may not matter whether the TOS was assigned to Zoove or retained by Mblox. At the hearing, Zoove's counsel indicated that Mblox would exercise any termination rights it retains under the TOS if requested to do so by Zoove. The more important question is whether the mutual termination provision of the TOS controls over the conflicting unilateral termination provision of the ASP Service Orders.

### b. Application of the TOS to the ASP Service Orders

As discussed above, the termination provisions of the TOS directly conflict with the ASP Service Orders. The TOS provides mutual termination authority while the ASP Service Orders allow only Sumotext the right to terminate. Anticipating the potential of conflicting contractual terms, the TOS expressly addresses how such conflicts will be resolved. The TOS provides that "Supplemental Terms" will prevail over the TOS "in the event of a conflict with the Terms of Service, but only to the extent such conflicting term *relates to the Services* governed by those Supplemental Terms." TOS ¶ 17 (emphasis added), ECF 22-3. The TOS goes on to state that "[i]n all other cases, the Terms of Service will prevail in the event of a conflict with another part of the Agreement, unless such other part of the Agreement intends and expressly states that the specific term supersedes." *Id.* In light of this language, the conflict between the TOS's mutual termination provision and the ASP Service Orders' unilateral termination provision will be resolved in Sumotext's favor *only* if (1) it shows that the ASP Service Orders are "Supplemental Terms" and (2) the unilateral termination provision "relates to the Services" governed by the ASP Service Orders.

The TOS defines "Supplemental Terms," as "the Documentation, Compliance Rules, SLA and any other terms governing your use of the Services." TOS ¶ 18, ECF 22-3. Arguably the ASP Service Orders fall within this definition because they govern Sumotext's use of StarStar services, although the use of phrases like "Documentation," and "Compliance Rules" suggests that something more technical may be contemplated than a StarStar lease. Even assuming that the ASP Service Orders are "Supplemental Terms" as Sumotext argues, however, the unilateral

8

termination provision does not appear to relate to "Services" as that term is defined in the TOS. The TOS defines "Services" to mean "your use of and access to the Mblox platform, software, Documentation and any services made available to you or as set forth on a Service Order." TOS ¶ 18. Sumotext does not explain, and the Court does not perceive, how a provision permitting *termination* of a StarStar lease relates to *use of* and *access to* the Mblox platform etc. *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").[4] While the Court need not definitively construe these contracts at this time, the Court cannot enjoin termination of the StarStar numbers leased through the ASP Service Orders unless Sumotext shows it is likely to prevail on its argument that the ASP Service Orders' unilateral termination provision controls. Alternatively, Sumotext could show that there are serious questions going to the merits of that argument. Sumotext has failed to do either.[5]

### c. Application of the Toolkit Product Specification

Sumotext further argues that there is a unilateral termination provision in the Toolkit Product Specification. The Court finds this argument equally unpersuasive. As the Court understands that argument, Sumotext contends that the Toolkit Product Specification grants termination rights only to Sumotext except in certain limited circumstances not relevant here; the Toolkit Product Specification is a "Supplemental Term" of the TOS; and the Toolkit Product Specification's unilateral termination provision controls over the conflicting mutual termination provision of the TOS.

As an initial matter, it is not at all clear that the Toolkit Product Specification contains a unilateral termination provision. The Toolkit Product Specification does provide that when a customer terminates a StarStar lease, termination becomes effective the last day of the month following the month in which written termination notice is delivered to Mblox. Toolkit Product

---

[4] The TOS contains a choice-of-law provision specifying California law. TOS ¶ 15, ECF 22-3.

[5] Having reached this conclusion, the Court need not address Defendants' additional argument that once the StarStar numbers leased through the ASP Service Orders ultimately were placed in Sumotext's toolkit account, they became subject to the mutual termination provision of the Toolkit Agreement.

1   Specification, ECF 16-8. The Toolkit Product Specification also provides that in the event that
2   Mblox is required to stop using a StarStar number by a court order, arbitration award, or the
3   carrier, Mblox will terminate the Toolkit Agreement with respect to that number and refund fees
4   paid by the customer. *Id.* However, nothing in the Toolkit Product Specification suggests that the
5   recited circumstances, which appear in a section titled "Additional Termination Provisions,"
6   constitute the *only* circumstances under which Mblox may terminate a StarStar lease. Sumotext's
7   proposed contract interpretation appears particularly implausible given that the Toolkit Product
8   Specification is *incorporated into* the Toolkit Agreement, which contains an express mutual
9   termination provision.

10   Finally, even if the Toolkit Product Specification were construed to contain a unilateral
11  termination provision, that provision would conflict directly with the TOS's mutual termination
12  provision and the TOS's mutual termination provision would control for the same reasons
13  discussed above with respect to the ASP Service Orders.

### 2. StarStar Numbers Obtained Through Web Portal

15  Sumotext argues that Zoove does not have the right to terminate the eighteen StarStar
16  numbers that Sumotext obtained through the web portal pursuant to the Toolkit Agreement despite
17  the fact that the written Toolkit Agreement provides that StarStar leases may be terminated by
18  either party upon thirty days notice. *See* Toolkit Agreement, ECF 22-4. Sumotext claims that it
19  and Mblox agreed to an oral modification of the Toolkit Agreement which replaced the mutual
20  termination provision with a unilateral termination provision granting Sumotext the sole right to
21  terminate its StarStar leases.

22  Sumotext's application for TRO focused on this asserted oral modification to the Toolkit
23  Agreement. Although it determined that Sumotext had not shown a likelihood of success on that
24  theory, the Court concluded that Sumotext had presented enough evidence of the asserted oral
25  modification to raise serious questions going to the merits. *See* Order Granting Application for
26  Temporary Restraining Order; and Setting Hearing on Motion for Preliminary Injunction at 4-7,
27  ECF 27. That evidence consisted primarily of the declaration of Sumotext's President, Miller,
28  stating that he had negotiated the claimed oral modification with Michael Caffey, an Mblox

Executive and Zoove's original Chief Technology Officer; Bruce Bales, Mblox's Senior Vice President for Global Sales and Strategy; and Kirsten Sachs, Mblox's Director of Legal & Sales Operations and in-house Counsel. *See id.* at 4-5. The Court also relied upon the fact that the seven ASP Service Orders executed shortly after the alleged oral modification were consistent with the asserted modification. *See id.* at 5. Although Sumotext's evidence was controverted by evidence that no oral modification existed, the Court concluded that Sumotext had made a sufficient showing to obtain a TRO so that the record could be more fully developed.

        Sumotext relies on the same evidence in support of its motion for preliminary injunction, arguing that the Court once again should find that Sumotext has raised serious questions going to the merits of its contract claim. However, Defendants have submitted new evidence in their supplemental briefing that significantly undermines Miller's assertions regarding oral modification. When it issued the TRO, the Court acknowledged that Michael Caffey, one of the three individuals with whom Miller allegedly negotiated the oral modification, had submitted a declaration disavowing any knowledge of the claimed modification. *See* Order Granting Application for Temporary Restraining Order; and Setting Hearing on Motion for Preliminary Injunction at 6, ECF 27. Now Bruce Bales, another of the individuals allegedly involved in negotiating the oral modification, has submitted a declaration stating that he never agreed to orally modify any contracts with Sumotext and that as a general matter Mblox does not orally modify its agreements because doing so would create too much uncertainty and risk. Bales Decl. at ¶¶ 3-6, ECF 32. When it issued the TRO, the Court noted that two of Miller's emails appeared to acknowledge that Sumotext's StarStar leases are subject to mutual termination clauses. *See* Order Granting Application for Temporary Restraining Order; and Setting Hearing on Motion for Preliminary Injunction at 6, ECF 27. Now Defendants submit an additional email that Miller sent to a customer acknowledging that "things first went wrong" when Sumotext moved "from long term leases to monthly leases through the Toolkit – the lease termination clause changed to become mutual." Email, Exh. 1 to Ticktin Decl.

        While the Court does not judge the credibility of evidence when determining whether to issue injunctive relief, the Court must determine whether the moving party's showing is sufficient

11

to demonstrate a likelihood of success or serious questions going to the merits. That two of the three individuals with whom Miller allegedly negotiated the oral modification have denied agreeing to such a modification, and that multiple emails written by Miller himself concede that a mutual termination clause applies to the StarStar leases, undeniably weakens Sumotext's showing. Now that the record has been more fully developed, and viewing that record as a whole, the Court concludes that Sumotext has neither demonstrated a likelihood of success nor shown serious questions going to the merits of its contract claim based upon the alleged oral modification.

### B. Remaining Factors

The parties have devoted substantial briefing to the remaining *Winter* factors, in particular the likelihood of irreparable harm absent injunctive relief and the balance of the equities. The parties paint very different pictures. According to Sumotext, "Defendants' flagrant and opportunistic breach is the centerpiece of VHT's attempt to take from Sumotext the very partnership program benefits Mblox used to induce Sumotext to invest in the original launch of the Zoove StarStar number partnership program." Pl.'s Suppl. Br. at 1, ECF 29. Sumotext claims that allowing Defendants to terminate its StarStar leases will cripple its business. *See, e.g.,* Miller Decl. ¶¶ 57-61, ECF 15-4. Defendants, on the other hand, claim that termination of Sumotext's StarStar leases is simply part of a new business model that phases out the "middleman" between Zoove and StarStar customers. Defs.' Suppl. Br. at 5-7. The Court need not address the parties' briefing and evidence on these points, however, because absent a showing of likelihood of success on its contract claim, or serious questions going to the merits of that claim, Sumotext is not entitled to a preliminary injunction.

## IV. ORDER

Plaintiff's motion for a preliminary injunction is DENIED and the TRO is hereby DISSOLVED.

Dated: April 26, 2016

/s/ Beth Labson Freeman
BETH LABSON FREEMAN
United States District Judge

12