1  David W. Kesselman (SBN 203838)
   *dkesselman@kbslaw.com*
2  Trevor V. Stockinger (SBN 226359)
   *tstockinger@kbslaw.com*
3  KESSELMAN BRANTLY STOCKINGER LLP
   1230 Rosecrans Avenue, Suite 690
4  Manhattan Beach, CA 90266
   Telephone:    (310) 307-4555
5  Facsimile:    (310) 307-4570

6  Julie D. Greathouse (Pro Hac Vice)
   *julie@ppgmrlaw.com*
7  Jeffrey M. Swann (Pro Hac Vice)
   *jeff@ppgmrlaw.com*
8  PPGMR LAW, PLLC
   101 Morgan Keegan Drive, Suite A
9  Little Rock, AR 72202
   Telephone:    (501) 503-9000
10 Facsimile:    (501) 603-0556

11 *Attorneys for Plaintiff* SUMOTEXT CORP.

12            **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14                  **SAN JOSE DIVISION**

15 SUMOTEXT CORP.,                           **CASE NO. 5:16-cv-01370-BLF-NMCx**

16            *Plaintiff,*                   *Hon. Beth Labson Freeman*

17       v.                                  **PLAINTIFF SUMOTEXT CORP.'S**
                                             **OPPOSITION TO DEFENDANTS**
18 ZOOVE, INC., VIRTUAL HOLD                 **STARSTEVE'S, VHT'S, VHT**
   TECHNOLOGY LLC, STARSTEVE LLC,            **STARSTAR'S, AND ZOOVE'S MOTION**
19 MBLOX, INC., VHT STARSTAR, LLC,           **TO DISMISS**

20            *Defendants.*                  Date:     February 8, 2018
                                             Time:     9:00 a.m.
21                                           Place:    Courtroom 3

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... i

I.      INTRODUCTION ........................................................................................................... 1

II.     STATEMENT OF THE ISSUES .................................................................................... 2

III.    STATEMENT OF RELEVANT FACTS ....................................................................... 2

        A.  The Mobile Dial Code Market ................................................................................ 2

        B.  Before StarSteve and VHT Acquired Zoove, Competition Thrived ....................... 3

        C.  StarSteve's and VHT's Anticompetitive Scheme ................................................... 3

        D.  Mblox Joins the Conspiracy .................................................................................... 5

        E.  Harm to Competition and Sumotext Post-Acquisition ........................................... 5

        F.  Absent The Conspiracy, Zoove's Conduct Was Economically Irrational ............. 7

IV.     LEGAL STANDARD ..................................................................................................... 8

        A.  Motion to Dismiss Legal Standard .......................................................................... 8

        B.  Antitrust Conspiracy Legal Standards ..................................................................... 8

V.      ARGUMENT .................................................................................................................. 9

        A.  Sumotext Has Properly Differentiated Between Defendants ................................... 9

        B.  Sumotext Has Properly Alleged A Conspiracy to Restrain Trade (Count IV) ....... 12

            1.  LEGAL STANDARD FOR SECTION 1 CLAIM ...................................... 12

            2.  DEFENDANTS CANNOT RECAST THE ALLEGATIONS ..................... 12

            3.  SUMOTEXT HAS PROPERLY ALLEGED GROUP BOYCOTT AND
                HORIZONTAL MARKET DIVISION ........................................................ 14

            4.  THE COPPERWELD DOCTRINE DOES NOT APPLY ........................... 16

        D.  Sumotext Has Properly Alleged Monopolization / Conspiracy to Monopolize
            (Count V) ................................................................................................................. 18

            1.  LEGAL STANDARD FOR SECTION 2 CLAIM ...................................... 18

            2.  THIS COURT HAS ALREADY HELD THAT SUMOTEXT PROPERLY
                PLED A RELEVANT MARKET .................................................................. 19

            3.  IN CHALLENGING SUMOTEXT'S MONOPOLIZATION CLAIM,
                DEFENDANTS' FAIL TO ADDRESS THE UNDERLYING CONDUCT
                ALLEGED .................................................................................................... 20

**TABLE OF CONTENTS** *(con't)*

Page

    4.  AS THIS COURT PREVIOUSLY HELD, SUMOTEXT HAS PROPERLY ALLEGED A CLAIM UNDER ESSENTIAL FACILITIES AND REFUSAL TO DEAL THEORIES. .............................................................................. 23

VI.     CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

<u>CASES</u>

Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,
836 F.3d 1171 (9th Cir. 2016)..............................................................................24

Alaska Airlines , Inc. v. United Airlines, Inc.,
948 F.2d 536 (9th Cir. 1991)................................................................................23

Am. Inst. Of Intradermal Cosmetics, Inc. v. Soc'y of Permanent Cosmetic Prof'l,
2013 U.S. Dist. LEXIS 58138 (C.D. Cal. April 16, 2013) ..........................................14

American Needle Inc. v. National Football League,
560 U.S. 183 (2010)............................................................................................17

Apple Inc. v. Psystar Corp.,
586 F. Supp. 2d 1190 (N.D. Cal. 2008)..................................................................20

Ariz. v. Maricopa County Medical Soc.,
457 U.S. 332 (1982)............................................................................................17

Ashcroft v. Iqbal,
556 U.S. 662 (2009)..............................................................................................8

Aspen Skiing v. Aspen Highlands Skiing Corp.,
472 U.S. 585 (1985)........................................................................... 18, 22, 24, 25

Bell Atlantic v. Twombly,
550 U.S. 544 (2007).................................................................................. 8, 9, 12

Beltz Travel Service v. Int'l Air Trans. Ass'n,
620 F.2d 1360 (9th Cir. 1980)................................................................................9

Blizzard Entm't Inc. v. Ceiling Fan Software LLC,
941 F. Supp. 2d 1227 (C.D. Cal. 2013)..................................................................20

California Computer Products, Inc. v. Int'l Business Machines Corp.,
613 F.2d 727 (9th Cir. 1979)................................................................................22

Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.,
710 F.2d 1366 (9th Cir. 1976)..............................................................................23

Christou v. Beatport, LLC,
849 F. Supp. 2d 1055 (D. Colo. 2012)...................................................................11

Continent Ore Co. v. Union Carbide & Carbon Corp.
370 U.S. 690 (1962)............................................................................................13

Copperweld v. Independence Tube Corp.,
467 U.S. 752 (1984)......................................................................................16, 17

Corenswet, Inc. v. Amana Refrigeration, Inc.,
594 F.2d 129 (5th Cir. 1979)................................................................................12

# TABLE OF AUTHORITIES

Page(s)

<u>CASES</u> *(con't)*

Creative Mobile Techs, LLC v. Flywheel Software, Inc.,
  16-CV-02560, 2016 WL 5815311 (N.D. Cal. Oct. 5, 2016).......................... 20

Darush v. Revision LP,
  2013 U.S. Dist. LEXIS 186906 (C.D. Cal. July 16, 2013) ......................... 12

Doughery v. Bank of America, N.A.,
  175 F. Supp. 3d 1230 (E.D. Cal. April 5, 2016) ...................................... 8

Esco v. United States,
  340 F.2d 1000 (9th Cir. 1965)................................................................ 9

Falstaff Brewing Co. v. Stroh Brewing Co.,
  628 F. Supp. 822 (N.D. Cal. 1986) ...................................................... 23

Glen Holly Entm't, Inc. v. Tektronix, Inc.,
  352 F.3d 367 (9th Cir. 2003).................................................................. 15

Hannah's Boutique v. Surdei,
  2013 U.S. Dist. LEXIS 122219 (N.D. Ill. Aug. 28, 2013) ...................... 11

House of Materials, Inc. v. Simplicity Pattern Co.,
  298 F.2d 867 (2d Cir. 1962).................................................................. 12

In re Cathode Ray Tube (CRT) Antitrust Litig.,
  738 F. Supp. 2d 1011 (N.D. Cal. 2010) ................................................ 12

In re Flat Glass Antitrust Litig.,
  385 F.3d 350 (3d Cir. 2004)................................................................... 8

In re Fresh & Process Potatoes Antitrust Litig.,
  834 F. Supp. 2d 1141 (D. Idaho 2011) ................................................. 12

In re High-Tech Emple. Antitrust Litig.,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ................................................ 12

In re IBM Peripheral EDP Devices Antitrust Litig.,
  481 F. Supp. 965 (N.D. Cal. 1979) ...................................................... 23

In re Text Messaging Antitrust Litig.,
  630 F.3d 622 (7th Cir. 2010).................................................................. 9

Int'l Audiotext Network v. AT&T Co.,
  62 F.3d 69 (2d Cir. 1995)..................................................................... 23

Intergraph Corp. v. Intel Corp.,
  195 F.3d 1346 (Fed. Cir. 1999)............................................................. 12

Kendall v. Visa USA, Inc.,
  518 F.3d 1042 (9th Cir. 2008)...................................................... 9, 11, 12

# TABLE OF AUTHORITIES

Page(s)

<u>CASES</u> *(con't)*

Klor's v. Broadway Hale,
    359 U.S. 207 (1959) ................................................................................................ 14

Knutson v. Daily Review, Inc.,
    548 F.2d 795 (9th Cir. 1976) ................................................................................. 23

Merced Irrigation Dist. v. Barclays Bank PLC,
    165 F. Supp. 3d 122 (S.D.N.Y. 2016) ................................................................... 18

MetroNet Servs. Corp. v. Qwest Corp.,
    383 F.3d 1124 (9th Cir. 2004) ................................................................................ 23

Monsanto Co. v. Spray Rite Service Corp.,
    465 U.S. 762 (1984) ................................................................................................ 8

Newcal Indus., Inc. v. IKON Office Solution,
    513 F.3d 1038 (9th Cir. 2008) ............................................................................... 19

Novation Ventures, LLC v. J.G. Wentworth Co., LLC,
    156 F. Supp. 3d 1094 (C.D. Cal. 2015) ................................................................. 23

Nynex Corp. v. Discon,
    525 U.S. 128 (1998) ........................................................................................ 14, 15

Oahu Gas Serv. v. Pacific Res., Inc.,
    838 F.2d 360 (9th Cir. 1988) ................................................................................. 22

Ocasio v. United States,
    136 S. Ct. 1423 (2016) ............................................................................................ 9

Otter Tail Power Co. v. United States,
    410 U.S. 366 (1972) ............................................................................................... 24

Oxbow Carbon & Minerals LLC v. Union Pac. R.R.,
    81 F. Supp. 3d 1 (D.D.C. 2015) ............................................................................ 11

Paladin Assoc. Inc. v. Montana Power Co.,
    328 F.3d 1145 (9th Cir. 2003) ............................................................................... 18

Palmer v. BRG of Georgia, Inc.,
    498 U.S.46 (1990) .................................................................................................. 16

Radiant Burners v. People's Gas,
    364 U.S. 656 (1961) ............................................................................................... 14

Rebel Oil Co. v. Atlantic Richfield Co.,
    51 F.3d 1421 (9th Cir. 1995) ................................................................................. 19

Safeway Inc. v. Abbott Labs,
    2010 U.S. Dist. LEXIS 2145 (N.D. Cal. Jan. 12, 2010) ........................... 22, 24, 25

# TABLE OF AUTHORITIES

Page(s)

<u>CASES</u> *(con't)*

Sambreel Holdings LLC v. Facebook, Inc.,
  906 F. Supp. 2d 1070 (S.D. Cal. 2012) ................................................................... 25

Solyndra Residual Trust v. Suntech Power Holdings Co.,
  62 F. Supp. 3d 1027 (N.D. Cal. 2014) ................................................... 8, 15, 20, 22

Starr v. Baca,
  652 F.3d 1202 (9th Cir. 2011) ................................................................................. 8

Sunbelt Television, Inc. v. Jones Intercable, Inc.,
  795 F. Supp. 333 (C.D. Cal. 1992) ........................................................................ 23

Texaco v. Dagher,
  547 U.S. 1 (2006) .................................................................................................... 17

Thurman Indus. v. Pay 'N Pak Stores,
  875 F.2d 1369 (9th Cir. 1989).................................................................................. 22

Toys "R" Us v. FTC,
  221 F3d 928 (7th Cir. 2000) ..................................................................................... 9

TV Communications Network, Inc. v. Turner Network Television, Inc.,
  964 F.2d 1022 (10th Cir. 1992)................................................................................ 25

United States v. Grinnell Corp.,
  384 U.S. 563 (1966) ................................................................................................ 20

United States v. Hilton Hotels Corp.,
  467 F.2d 1000 (9th Cir. 1972).................................................................................. 11

United States v. Montgomery,
  384 F.3d 1050 (9th Cir. 2004).................................................................................... 9

United States v. Portac,
  869 F.2d 1288 (9th Cir. 1989).................................................................................. 11

United States v. Topco Assocs., Inc.,
  405 U.S. 596 (1972)................................................................................................. 16

Zenith Elecs, LLC v. Sceptre, Inc.,
  2015 U.S. Dist. LEXIS 33661 (C.D. Cal. Feb. 5, 2015)............................... 11, 17, 20

<u>STATUTES</u>

Rule 12(b)(6) ................................................................................................................... 8

Sherman Act Section 1 ................................................................................................... 16

Sherman Act Section 2 .......................................................................................... 8, 18, 25

# TABLE OF AUTHORITIES

Page(s)

OTHER AUTHORITIES

ABA Antitrust Law Development (Seventh) ........................................................... 13, 14, 22

ABA Model Jury Instructions in Civil Antitrust Cases, B2-3 Contract, Combination or Conspiracy: Instruction 1 (2005) .......................................................................................... 8

Ninth Circuit Model Criminal Jury Instructions 8.20 Conspiracy – Elements .................................... 9

1    Plaintiff Sumotext Corp. ("Plaintiff" or "Sumotext") files this consolidated Opposition to the

2    Motions to Dismiss filed by Defendants Zoove Corporation ("Zoove"), Virtual Hold Technology

3    LLC ("VHT"), Defendant StarSteve LLC ("Star Steve"), VHT StarStar, LLC ("VHT StarStar"),

4    and Mblox, Inc. ("Mblox") (collectively "Defendants").[1]  Defendants no longer challenge the

5    breach of contract claims (Counts I and II) or the tortious interference claim (Count III).

6    Accordingly, the only pleadings that remain unsettled are the antitrust claims (Counts IV and V).

7    The Defendants' motions should be denied in their entirety.

8    **I.    INTRODUCTION**

9    Sumotext took to heart the guidance set forth in the Court's detailed order on June 26, 2017

10   ruling ("Order").  Accordingly, the format of the Third Amended Complaint ("TAC") was revised

11   to ensure that the Court would not have to "guess which of the 120 paragraphs proceeding the []

12   claims are intended to support" each claim.  Order at 10.  Additionally, Sumotext identified each

13   corporate defendant's liability for each claim, and delineated the individual actions of each separate

14   corporate defendant's officer, director, or agent.  The TAC now provides an even more extensive

15   set of allegations that "give[s] each defendant fair notice of the conduct that forms the basis of the []

16   claims against it" without "improperly lump[ing] multiple defendants together", even where joint

17   liability is alleged by virtue of a conspiracy or joint venture agreement. Order at 13.

18   The arguments in Defendants' motions are not well taken.  Defendants' contention that

19   Sumotext has not properly alleged "who did what" is simply wrong.  Similarly, there is no legal

20   support for Defendants' suggestion that the Court should decide, as a matter of law on the

21   pleadings, that they only engaged in legitimate "unilateral business decisions."  Defendants also

22   challenge, yet again, whether Sumotext has properly alleged a proper relevant market, harm to that

23   market[2], and whether the national registry for StarStar numbers can constitute an "essential facility"

---

[1]  Sumotext has concurrently filed an opposition to address certain additional arguments raised in Mblox's separately filed motion to dismiss.

[2]  Defendants only make this assertion in passing but never directly challenge Sumotext's allegations of harm to the market.  Any challenge would be futile.  As this Court previously ruled: "[w]hile Defendants certainly may challenge Sumotext's allegations of injury to competition as a factual matter in a future motion, the Court concludes that the allegations are adequate for pleading purposes."  Order at 17.

1  – all issues that this Court previously held had been properly alleged by Sumotext.  That

2  Defendants' want to re-litigate these issues is not only a waste of time for the parties and the Court,

3  but serves to highlight the weakness of Defendants' positions.  The motions to dismiss must be

4  denied.

5  **II.**     **STATEMENT OF THE ISSUES**

6          Has Sumotext properly stated a claim in the Third Amended Complaint for: (i) Conspiracy to

7  Restrain Trade (Count IV); and (ii) Monopolization/Conspiracy to Monopolize (Count V)?

8  **III.**    **STATEMENT OF RELEVANT FACTS[3]**

9          **A.**     **The Mobile Dial Code Market**

10          The national market for mobile dial codes is comprised of three segments: leasing, reselling,

11  and servicing (the "Market" unless otherwise noted).  TAC ¶ 106.  The relevant geographic market is

12  the United States because mobile dial codes are registered and leased on a nationwide basis,

13  supported by all major wireless carriers in the U.S., and are called from and interconnected to phone

14  lines throughout the fifty states.  TAC ¶ 107.  The national market for mobile dial codes is separate

15  from other markets (including 10-digit phone numbers and internet domain names) because, among

16  other things, each has its own separate national registry, its own separate operator/administer, its own

17  separate value to customers, and its own separate demand for inventory and supply.  TAC ¶¶ 108-09.

18  Zoove secured exclusive contracts with AT&T, Verizon Wireless, Sprint, and T-Mobile (the

19  "Common Carriers") to operate and administer this national registry where anyone could instantly

20  provision a mobile dial code "nationwide", across each major wireless carrier's network – via a

21  single registration process.  TAC ¶ 110.  There are significant barriers to entry because no one other

22  than Zoove has access to the exclusive contracts with the Common Carriers to operate and administer

23  StarStar numbers nationally.  TAC ¶ 113. In short, Zoove controls the only source of supply for

24  mobile dial codes in the United States, and its registry remains an "essential facility" for anyone who

25  wants to register a mobile dial code in the United States.  TAC ¶ 112.

26

27

---

28  [3]  This summary statement of facts is limited to the antitrust allegations only.

**B.      Before StarSteve and VHT Acquired Zoove, Competition Thrived**

Until corporate defendants StarSteve and VHT seized control of their upstream supplier Zoove, competition in all three segments of the market thrived as anyone could (i) <u>lease</u> any unregistered mobile dial code, nationwide; (ii) <u>resell</u> or sublease their mobile dial code to third parties; (iii) <u>service</u> the market by developing software applications and integrating with the registry's application programming interfaces ("API's") to provide value-added services.  TAC ¶ 273.

Sumotext competed with each of the defendants in at least one segment of this properly functioning market (leasing, reselling, or servicing mobile dial codes), including Zoove, who functioned as both vertical supplier and downstream horizontal competitor in the reselling and servicing segments of the market (*see*, *e.g*., TAC ¶ 122). The competition among these rival lessees, resellers, and application service provider ("ASPs") benefited the general public because it led to increased choice, innovation and lower prices. TAC ¶¶ 119-123.

Even after Mblox purchased Zoove in 2014, the registry continued to be operated in a manner that comported with principles of equal access, fair play, and fair dealing.  TAC ¶ 114.  Indeed, Mblox expanded competition in all three segments of the market by, among other things, financially incentivizing even more lessees, resellers, and ASPs to enter the Market, and by enhancing the StarStar Toolkit ("the Toolkit") model to also allow prospective lessees to electronically search, secure, and lease any previously unregistered StarStar number without additional written requests, proposals, or paperwork (like other national registries).  TAC ¶¶ 29-31, 34, 122, 170(b)(i).

**C.      StarSteve's and VHT's Anticompetitive Scheme**

The original mastermind of the conspiracy to restrain trade and monopolize the market for mobile dial codes was Steve Doumar ("Doumar").  Doumar formed corporate defendant StarSteve, LLC in April 2015 and began to compete with Sumotext and others in all three segments of the market. TAC ¶¶ 65-6, 129.  However, rather than continue to compete on the merits, Doumar determined that it would be more profitable to acquire control of the registry, boycott his rivals, and "take back" all of the "prime" StarStar numbers from the Market's existing lessees. TAC ¶¶ 67, 132,

141. Specifically, Doumar devised a scheme to:

- <u>Acquire control of the mobile dial code registry</u> and therefore the sole source of supply for the market (TAC ¶ 133(a));

- <u>Alter the registry's leasing policies</u> to restrict rival resellers and service providers from leasing StarStar number on the same economic terms and conditions that were otherwise available (TAC ¶ 133(b));

- <u>Alter the registry's reselling policies</u> to restrict rival resellers and service providers from freely sublicensing StarStar numbers to downstream customers (TAC ¶ 133(c));

- <u>Alter the registry's servicing policies</u> to restrict rival resellers and service providers from accessing ASP Toolkit portal and APIs necessary to provide value-added software and services (TAC ¶ 133(d));

- <u>Usurp rivals' rights, customer relationships, and revenues</u>, including by means of breaching or disrupting the valid contracts rivals had upstream with Zoove and downstream with customers (TAC ¶ 133(e));

- <u>Raise prices and reduce services</u> to a captured group of customer and prospects left with no competing services, service providers, or prices from which to choose (TAC ¶ 133(f)).

To accomplish the anticompetitive scheme, Doumar first set out to secure an exclusive Letter of Intent ("LOI") to acquire Zoove from Mblox – an LOI which Mblox drafted to include express, illegal terms to divide and allocate customers and territories in the market between StarSteve and Mblox, while barring Mblox's competitors from the market.[4] TAC ¶ 69. Armed with the exclusive LOI, Doumar then recruited his former employee, Wes Hayden ("Hayden"), CEO of VHT, to join forces for the purpose of further recruiting VHT's Chairman Greg Garvey ("Garvey") to co-finance

---

[4]   While not denying the express terms of the LOI (Ex. 9), Defendants assert that because the final purchase agreement between the parties was silent as to the *per se* unlawful terms authored by Mblox to divide and allocate customers and territories in the Market, this silence evidences that the parties never entered and/or withdrew from the unlawful agreement. Defendants are free in discovery to provide an evidentiary showing to support that contention; but for purposes of the pleadings, they should be bound by their own writings.

1   their conspiracy to restrain trade and monopolize the market. TAC ¶¶ 135-37. Doumar, Hayden, and

2   Garvey then entered into a written agreement to form a new joint venture entity, VHT StarStar, in

3   which StarSteve and VHT would use as the vehicle to acquire control of the Zoove registry.  TAC ¶

4   138.

5         **D.     Mblox Joins the Conspiracy**

6         By early December 2015, Mblox CEO Tom Cotney possessed not only knowledge, but

7   irrefutable written evidence, that VHT would only acquire Zoove from Mblox if Mblox acquiesced to

8   their anticompetitive scheme. TAC ¶¶ 89, 157-61.  Indeed, as Mblox executive vice president Bruce

9   Bales has now testified, Mblox was concerned that StarSteve and VHT personnel were engaged in

10  "inappropriate" conduct that included, among numerous other things, the improper use of

11  confidential information and misrepresentations to end customers that existing mobile dial code

12  leases "could and/or would be terminated" post-acquisition.  TAC ¶ 159.  As a result, Mblox

13  attempted to insert language into an early version of the definitive purchase agreements that sought to

14  provide very limited and temporary protections for Sumotext and other market participants –

15  language that was rejected by VHT. TAC ¶¶ 93, 95-6.

16        Undeterred by the rejection of those proposed terms – and despite the risks, warnings, and far

17  beyond mere acquiescence – Mblox affirmatively joined VHT's and StarSteve's anticompetitive

18  conspiracy and secured Mblox's share of the monopoly profits, while also memorializing in the LOI

19  terms for an unlawful horizontal customer allocation scheme to the strategic benefit of Mblox.  TAC

20  ¶¶ 162-166; ¶¶ 282-291.

21        **E.     Harm to Competition and Sumotext Post-Acquisition**

22        Upon acquiring control of the Registry from Mblox, and consistent with their plan to profit

23  from suppressing competition in the market, the principals of VHT, StarSteve, and VHT StarStar

24  (Doumar, Hayden and Garvey) directed Zoove to begin:

25        •     Breaching Sumotext's Service Orders and "Taking Back" Sumotext's prime StarStar

26              numbers, as fully set out in Counts I and II; TAC ¶ 305(a)

27

28

- Intentionally inducing a breach or disruption of Sumotext's valid third party contracts with its customers and usurping those customer relationships and revenues, as fully set out in Count III; TAC ¶ 305 (b)

- Eliminating the Registry's "reseller" model that had contractually enabled Sumotext and other rival lessees to freely sublicense their StarStar numbers to further downstream customers; TAC ¶ 305 (c)

- Eliminating the Registry's "Toolkit model" that had contractually enabled Sumotext and other rival service providers to integrate their value-added software to service downstream customers and others in the Market; TAC ¶ 305 (d)

- Terminating other contracts with other former customers and refusing to allow A-Z Lock and Key, M&K Marketing, Dawson Law Firm, and other lessees with prime StarStar numbers to renew their national leases; TAC ¶ 305 (e)

- Eliminating the Registry's "nationwide" leasing options for Sumotext, A-Z Lock and Key, M&K Marketing, and the Dawson Law Firm, while still continuing to provide "nationwide" leases to others in the Market; TAC ¶ 305 (f)

- Dramatically raising prices to Sumotext, A-Z Lock and Key, M&K Marketing, and the Dawson Law Firm, but not for others in the Market; TAC ¶ 305 (g)

- Dramatically changing the terms of service to include exclusionary terms of adhesion, price fixing, and tying the purchase of marketing and advertising as a condition to leasing StarStar numbers for Sumotext, A-Z Lock and Key, M&K Marketing, and the Dawson Law Firm, but not for others in the Market; TAC ¶ 305 (h)

The result of Defendants' successful anticompetitive scheme has been the total elimination of competition in the Market.  Since VHT and StarSteve acquired control of the Registry from Mblox via their joint venture entity VHT StarStar:

- No one can freely <u>lease</u> any previously unregistered number.  Instead, the joint venture members capriciously determine who they will and won't allow to access the mobile dial code registry.  TAC ¶ 273(b)(i).

6

CASE NO. 5:16-CV-01370-BLF-NMCx
PLAINTIFF SUMOTEXT CORP.'S OPPOSITION TO
VHT/ZOOVE/STARSTEVE/VHT STARSTAR/  MOTIONS TO DISMISS

- No one can freely <u>resell</u> their mobile dial codes to downstream customers without a 3-way agreement with the registry that includes abiding a vertically fixed price and agreeing to tied products and services.  TAC ¶ 273(b)(ii).

- No one can <u>service</u> the Market with their value-added software applications.  Only members of the joint venture can provide those services, and they do not offer many key services previously offered by Sumotext and have an incentive to innovate or control their excessive pricing.  TAC ¶ 273(b)(iii).

The impact on competition and the public has been dramatic.  TAC ¶ 305.  Sumotext and others with innovative software programs can no longer compete to service downstream customers and other market participants.  TAC ¶ 305.  Thus, individuals and businesses are now subject to dramatically higher prices and reduced services with new onerous and inflexible contract terms with no alternative services, service providers, or prices from which to choose.  TAC ¶ 275.

**F.      Absent The Conspiracy, Zoove's Conduct Was Economically Irrational**

Prior to VHT's and StarSteve's acquisition of Zoove's corporate stock, Zoove had voluntarily engaged in a mutually beneficial and profitable relationship with Sumotext over a 4-year period.  TAC ¶ 306(a).  Sumotext was Zoove's most important customer and accounted for over 30% of Zoove's total revenues.  TAC ¶ 306(a).  Zoove's termination of Sumotext and sudden change in pricing policy – *i.e.* offering to re-lease mobile numbers to Sumotext at prices 1,000 times higher than had been provided for in the breached contracts – was economically irrational.  TAC ¶ 306(a)(i).  Sumotext was paying Zoove over $75,000 per month (and growing) in recurring revenues at the time of its termination. TAC ¶ 306(a)(ii). By terminating Sumotext, Zoove prevented its largest customer from growing its revenues even further. TAC 306(a)(ii).  Accordingly, Zoove's refusal to deal on rationale economic terms with Sumotext went against Zoove's own economic interests and can only be explained by the joint venture's economic interests that superseded Zoove's – i.e. their willingness to forsake short term profits for the sake of long-term, anti-competitive gain. TAC ¶ 306(a)(iii).  These actions only make sense if motivated by anti-competitive malice.

CASE NO. 5:16-CV-01370-BLF-NMCx
PLAINTIFF SUMOTEXT CORP.'S OPPOSITION TO
VHT/ZOOVE/STARSTEVE/VHT STARSTAR/  MOTIONS TO DISMISS

## IV.    LEGAL STANDARD

### A.    Motion to Dismiss Legal Standard

Rule 12(b)(6) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), and "give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007.  To meet this standard, pleadings must contain "sufficient factual matter" to nudge the claim from "conceivable to plausible." *Twombly*, 550 U.S. at 570.  Specific and detailed facts are not necessary, *id.*, as long as the pleadings "enable the [defendant] to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  When considering a Rule 12(b)(6) motion, a "court is to accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Soluyndra Residual Trust v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1038 (N.D. Cal. 2014).  A court must give plaintiff the "benefit of every reasonable inference" from the allegations of the complaint. *Doughery v. Bank of America, N.A.*, 175 F. Supp. 3d 1230, 1241 (E.D. Cal. April 5, 2016).

### B.    Antitrust Conspiracy Legal Standards

A conspiracy or agreement under the Sherman Act requires "a conscious commitment to a common scheme," *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (quoting *Monsanto Co. v. Spray Rite Service Corp.*, 465 U.S. 762, 764 (1984) (internal quotes omitted).  "To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement; that they met together; or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose.  What the evidence must show to prove that a conspiracy existed is that the alleged members of the conspiracy in some way came to an agreement to accomplish a common purpose.  It is the agreement to act together that constitutes the conspiracy." ABA Model Jury Instructions in Civil Antitrust Cases, B2-3 Contract, Combination or Conspiracy: Instruction 1 (2005.  Moreover, under general legal principals, to prove a conspiracy, "[t]he agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th

Cir. 2004).  Indeed, a "conspiracy may exist even if some members of the conspiracy cannot complete the offense, so long as the object of the conspiracy is that at least one conspirator complete the offense."  Ninth Circuit Model Criminal Jury Instructions 8.20 Conspiracy – Elements (citing *Ocasio v. United States*, 136 S. Ct. 1423, 1429-32 (2016)).

Additionally, it is well established that "[i]f [plaintiff] can establish the existence of a conspiracy in violation of the antitrust laws and that [defendants] were a part of such a conspiracy, [defendants] will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of [defendants'] own actions. Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Service v. Int'l Air Trans. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980).

Finally, the defendant's participation in a conspiracy may be inferred from circumstantial evidence. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("Circumstantial evidence can establish an antitrust conspiracy"); *Toys "R" Us v. FTC*, 221 F3d 928, 934 (7th Cir. 2000) (antitrust agreement "may be proved by either direct or circumstantial evidence"). To meet the plausibility standard, the defendants should be put on notice with sufficient facts so that it has "idea of where to begin" to defend itself." *Kendall v. Visa USA, Inc.*, 518 F.3d 1042 (9th Cir. 2008) (citing *Twombly*, 550 U.S. at 1970 n.10). Specific allegations identifying "a written agreement or even a basis for inferring a tacit agreement" are sufficient to meet this standard. *Id.* (quoting *Twombly*). Indeed, the Ninth Circuit has held that in proving a conspiracy even "[a] knowing wink can mean more than words." *Esco v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965).

## V.   ARGUMENT

### A.   Sumotext Has Properly Differentiated Between Defendants

Defendants contend that Sumotext "continues to improperly group VHT, StarSteve, VHT StarStar, and Zoove together in its allegations."[5]  Motion at 11.  Yet even a cursory review of the

---

[5]   It should be noted that Defendants only challenge "who did what" with respect to Count IV. Nevertheless, Sumotext addresses this as a threshold matter given the Court's prior admonition. Order at 16.

TAC makes clear that this assertion is without merit.  Sumotext took quite seriously this Court's mandate that Sumotext more fully "distinguish between the defendants" and not refer to them as the "VHT StarStar Parties."  Order at 16.  As a consequence, Sumotext took great pains to separate allegations as to VHT, StarSteve, VHT StarStar, Zoove, and Mblox.

Sumotext devoted pages to addressing allegations specific to Mblox (TAC ¶¶ 29-64, ¶¶ 142-166), StarSteve (TAC ¶¶ 65-68, ¶¶ 129-141) and VHT (TAC ¶¶ 70-78, ¶¶ 134-141).  Sumotext identified the "founders of the conspiracy" as Doumar (StarSteve), Hayden (VHT) and Garvey (Chairman of VHT).  TAC ¶¶ 134-137.  Sumotext then identified the conduct that each individual undertook on behalf of each of their respective corporate entities in furtherance of the conspiracy.  TAC ¶¶ 133-41.  Sumotext further devoted pages to Mblox CEO Tom Cotney's knowledge, incentives, and ultimate decision to join, further, profit from, and conceal the same conspiracy.  TAC ¶¶ 142-166.  And Sumotext set out in painstaking detail the manner in which the individual defendants accomplished their unlawful objective, including extensive exhibits and recitations with dates of emails, meetings, and power point presentations in which the individual participants and recipients are identified by name throughout.  (TAC ¶¶167-170.)  If that were not enough, in the actual charging allegations (Count IV and Count V), Sumotext broke out element by element the facts supporting each claim, including identifying by name each individual and their role in the various agreements and conduct alleged herein.  (TAC ¶¶ 261-316.)

Desperate to support their contention, Defendants pluck out a few instances where Sumotext, rather than repeat the names of each individual officer and defendant in every single paragraph throughout the 91 page TAC, may have utilized a shorthand like "monopolists", "members of the joint venture," or in a couple of instances, "Defendants."  Motion at 11.  Yet, merely glancing at the surrounding paragraphs in each instance it is clear that Defendants are grasping at straws.  For example, Defendants take issue with the word "monopolists" in paragraph 104.  But paragraphs 98 through 103 provide the context and identify the individuals and corporate entities at issue, including Doumar, Hayden, Garvey, VHT, StarSteve and VHT StarStar.  Similarly, the use of "Defendants" in paragraph 279 is clearly referenced within the context of the Group Boycott heading, in which Sumotext expressly identifies VHT, StarSteve, VHT StarStar, Zoove, and Mblox as the entities at

issue in paragraphs 274 and 277.   In short, Defendants cannot seriously suggest that the use of a shorthand in a few instances, after repeated references to the individuals and entities involved, does not put them on proper notice.

Moreover, Defendants cannot legitimately claim ignorance where, as here, the individuals identified in the TAC continued to play a "shell game" of transitioning between the corporate defendants in an apparent but futile attempt to avoid liability.  Sumotext provided a chart summarizing the corporate affiliations of each individual (Doumar, Hayden, Garvey, Cotney) and their affiliations with each corporate defendant (StarSteve, VHT, VHT StarStar, Zoove, and Mblox) during the conspiracy period. TAC ¶¶ 301(a-d).  Because it is hornbook law that the named corporate defendants are liable for the conduct of the individual officers and directors acting on their behalf, there can be no doubt but that each Defendant is on proper notice of the antitrust allegations against it.  *See United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1007 (9th Cir. 1972) ("corporation is liable under the Sherman Act for the acts of its agents"); *see also United States v. Portac*, 869 F.2d 1288, 1293 (9th Cir. 1989) (same).

Given the detailed allegations in the TAC, Defendants' motions to dismiss must be denied. *See*, *e.g.*, *Zenith Elecs, LLC v. Sceptre, Inc.*, 2015 U.S. Dist. LEXIS 33661, at *20-24 (C.D. Cal. Feb. 5, 2015) (denying motion to dismiss conspiracy to monopolize claim); *Oxbow Carbon & Minerals LLC v. Union Pac. R.R.*, 81 F. Supp. 3d 1, 4 (D.D.C. 2015) (denying motion to dismiss and finding sufficient allegations of conspiracy to restrain trade and monopolize); *Hannah's Boutique v. Surdei*, 2013 U.S. Dist. LEXIS 122219, at 15-16 (N.D. Ill. Aug. 28, 2013) (denying motion to dismiss based upon plaintiff's detailed allegations and noting that "Defendant cannot defeat [plaintiff's] complaint by making conclusory statements that the conduct at issue 'can be good for competition' . . . Defendants can pursue such defenses or put forth evidence . . . at later stages in the litigation"); *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1072-73 (D. Colo. 2012) (denying motion to dismiss).

While Sumotext has more than met its pleading obligations, it should be noted that Defendants once again overstate the Ninth Circuit's test in *Kendall*.  As various district courts within this Circuit have held, *Kendall* requires sufficient factual allegations to make an agreement plausible.

That means including allegations "*such as* 'a specific time, place or person involved in the alleged conspiracies.'" *Darush v. Revision LP*, 2013 U.S. Dist. LEXIS 186906, at *14-15 (C.D. Cal. July 16, 2013 (emphasis in original). *See also In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1163 & n. 13 (D. Idaho 2011) (*Twombly* "did not impose the elaborate 'who-what-where-when' pleading requirement defendants insisted upon"). Where an antitrust plaintiff has alleged specific details of the conspiracy, a motion to dismiss will be denied. *See In re High-Tech Emple. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1115-18 (N.D. Cal. 2012); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1018-19 (N.D. Cal. 2010).

**B.      Sumotext Has Properly Alleged A Conspiracy to Restrain Trade (Count IV)**

**1.      Legal Standard for Section 1 Claim**

The elements of a Section 1 claim for a conspiracy to restrain trade are: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

**2.      Defendants Cannot Recast the Allegations**

Defendants argue at length that their conduct should be deemed "unilateral" because it was Zoove that refused to deal with Sumotext. Motion at 5. Once again, Defendants are simply recasting and/or ignoring the allegations of the Third Amended Complaint to suit their own self-serving position which is simply improper at the pleading stage.[6]

It is certainly correct that Zoove refused to deal with Sumotext. But Defendants wish to ignore the extensive allegations throughout the operative complaint that Zoove's refusal to deal with

---

[6]   Not surprisingly, the cases cited by Defendants to suggest that "[c]ourts will not impose antitrust liability where a <u>distributor</u> is terminated for a sound business reason" (Motion at 3) are completely inapposite. Besides the fact that Sumotext was first and foremost a customer of Zoove with valid contracts leasing 171 StarStar numbers (TAC ¶ 64), the cases cited were decided on the developed evidentiary record required to address the grant or denial of a preliminary injunction. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999); *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867 (2d Cir. 1962); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129 (5th Cir. 1979).

1  Sumotext was part and parcel of a larger scheme to restrain trade and monopolize the market via

2  control of the registry.  TAC ¶67.  That larger agreement to restrain trade was effectuated by

3  StarSteve, VHT, VHT StarStar, Zoove, and Mblox – acting by and through their corporate officers,

4  Doumar, Hayden, Garvey, and Cotney.  TAC ¶ 267.  Sumotext has alleged that to carry out the

5  conspiracy, StarSteve, VHT, VHT StarStar, Zoove, and Mblox entered into a series of oral and

6  written agreements (and combinations) that ultimately resulted in StarSteve and VHT gaining control

7  of the registry (Zoove) through their joint venture vehicle, VHT StarStar, and with Mblox's

8  affirmative consent, eliminating competition in the market, including existing competitors like

9  Sumotext.  TAC ¶¶ 261-291.

10         In an effort to dance around these core allegations, Defendants ask the Court to put blinders

11  on and evaluate each of the written agreements independently to determine as a matter of law that

12  each agreement cannot support an inference of a larger, anti-competitive agreement among

13  Defendants to restrain trade.  Motion at 7-9 (parsing LOI #1, LOI #2, StarSteve Operating

14  Agreement, Assignment and Assumption Agreement, Stock Purchase Agreement #1, and Stock

15  Purchase Agreement #2). Defendants' request is contrary to longstanding Supreme Court law that the

16  allegations must be read together, not considered in isolation. *Continent Ore Co. v. Union Carbide &*

17  *Carbon Corp.*, 370 U.S. 690, 699 (1962). Further, "[a]cts that are themselves violations of Section 1,

18  such as horizontal territorial allocations, price fixing, or group boycotts, or that are otherwise

19  unlawful suffice; ***however, the overt act required to establish the combination or conspiracy need***

20  ***not be unlawful and may be found in almost any type of activity or practice***."  ABA Law

21  Developments (Seventh) 325-26 (emphasis added).

22         Here, Sumotext has properly alleged a series of agreements (and combinations) among and

23  between StarSteve, VHT, VHT StarStar, Zoove, and Mblox in which the parties had a "conscious

24  commitment" to profit from allowing StarSteve and VHT to gain control of the registry for the

25  purpose of eliminating competition in the market.

26         As fully addressed in Sumotext's opposition to Mblox's motion to dismiss, Mblox CEO

27  Cotney was expressly told by VHT CEO Hayden that VHT would not effectuate the plan and acquire

28  Zoove if Mblox attempted to reconfirm any of Sumotext's rights in a proposed consolidated Service

Order (*see* "show stopper" exhibit 11, TAC ¶ 89).  Indeed, Mblox executive Bales has testified that Mblox officials knew the other corporate defendants were engaging in "inappropriate" conduct. TAC ¶ 159(a-c).  As evidence that Mblox recognized its exposure, Mblox "tried to hide its participation in the illegal conspiracy . . . in essence to 'kick the can down the road' . . . by inserting certain provisions in a revised draft version of the Zoove Stock Purchase Agreement that might have provided temporary protections to Sumotext and others. Ex. 12 at 40, Section 5.10 (Certain Customer and Transition Matters)."  TAC ¶ 95.  But Mblox acquiesced when "Doumar, Hayden, Garvey, VHT, StarSteve and VHT StarStar however, rejected those proposed terms, which were ultimately not included in a final executed version of the Zoove Stock Purchase Agreement. TAC ¶ 96.

### 3. Sumotext has properly alleged group boycott and horizontal market division

Defendants argue that Sumotext has not properly set forth allegations of a group boycott and horizontal market division.  Motion at 5-8.  While Sumotext is not required to "prove" these allegations to support an overarching agreement to restrain trade (ABA Law Development (Seventh) 325-26), Defendants' are wrong in each instance.

Group Boycott.  Defendants argue that Sumotext has "at most" alleged that Zoove "unilaterally refused to deal with Sumotext."  Motion at 5.  This recasting of Sumotext's allegations is not only improper but wrong.  Sumotext has alleged that StarSteve and Zoove – both of which were direct horizontal competitors of Sumotext in the market – combined (along with VHT and VHT StarStar) to eliminate Sumotext and other competitors from the market. TAC ¶¶ 274-281. Where, as here, horizontal competitors are alleged to have entered into an agreement that effectively prevents an antitrust plaintiff from access to a market, the plaintiff has stated a claim for a *per se* group boycott. *See Nynex Corp. v. Discon*, 525 U.S. 128, 134-36 (1998) (explaining when boycott is per se unlawful); *Radiant Burners v. People's Gas*, 364 U.S. 656, 659-60 (1961) (per se group boycott); *Klor's v. Broadway Hale*, 359 U.S. 207, 210-14 (1959) (per se group boycott); *see also Am. Inst. Of Intradermal Cosmetics, Inc. v. Soc'y of Permanent Cosmetic Prof'l*, 2013 U.S. Dist. LEXIS 58138, at *22-24 (C.D. Cal. April 16, 2013) (per se group boycott).

In *Nynex*, the Supreme Court ruled that a per se group boycott is alleged where there is a "'horizontal' agreement among competitors." 525 U.S. at 136. The Court further explained the rationale for the application of the *per se* rule: "The conspiracy was 'not to be tolerated merely because the victim is just one merchant.'" *Id*. at 135 (quoting *Klor's*). The Court thereby inferred injury to the competitive process itself from the nature of the boycott agreement. And it forbade, as a matter of law, a defense based upon a claim that only one small firm, not competition itself, had suffered injury." *Nynex*, 525 U.S. at 134-35.

However, even if the Court could view the boycott as vertical (due to Zoove's position as a supplier and competitor in the market), Defendants would still be wrong that a group boycott claim could not be sustained.  In *Nynex*, the Supreme Court ruled that a vertical agreement that results in a boycott of the antitrust plaintiff remains entirely viable as group boycott claim – it simply requires an analysis under the rule of reason. *Nynex*, 525 U.S. at 135.  Sumotext has alleged more than sufficient facts demonstrating harm to competition to sustain a rule of reason boycott claim.  As properly alleged, Defendants' restraint on trade resulted in not only the elimination of Sumotext but other competitors, along with higher prices and less innovation in the market.  TAC ¶¶ 274-281.  In addition, consumers have less choice and quality has been impacted because previously Sumotext and other competitors were able to incorporate integrated software programs that added additional value. TAC ¶¶ 99(b), 104(a), 133(f), 279, 294. *See Glen Holly Entm't, Inc. v. Tektronix, Inc*., 352 F.3d 367, 376-78 (9th Cir. 2003); *Solyndra Residual Trust*, 62 F. Supp. 3d at 1044.  And output has been restrained because no one can lease previously unregistered mobile numbers, no one can resell or sublease mobile dial codes to third parties, and no one can service the market with integrated software applications.  TAC ¶¶ 273.

<u>Horizontal Market Division</u>.  Defendants argue that Sumotext has not properly alleged a horizontal division of customers, territories, and pricing in the market.  Motion at 8.  This too is wrong.  Sumotext's allegations are taken verbatim from the exhibited September 2015 written LOI between StarSteve and Mblox.  TAC ¶¶ 282-291.  At the time, StarSteve and Mblox were direct horizontal competitors with Sumotext in each segment of the market.  TAC ¶¶ 283-285.  The LOI provides that Mblox would sell the registry but only on the express condition that certain preferential

customers, territories and pricing terms were exclusively carved out for Mblox and that a list of competitors be barred from the market.  TAC ¶ 287. This included major companies that others in the market would not be allowed to service, including as just a few examples, Wells Fargo, American Express, Barnes & Noble, MLB, Bank of America, Johnson and Johnson and others.  TAC ¶ 287.  On its face, this type of customer allocation among horizontal competitors is *per se* unlawful under Section 1 of the Sherman Act.  *See Palmer v. BRG of Georgia, Inc*., 498 U.S.46, 49-50 (1990) (holding that horizontal market/ customer division is unlawful *per se*); *United States v. Topco Assocs., Inc*., 405 U.S. 596, 608 (1972) (same).

Defendants' sole argument in response is that the LOI was non-binding and the language is not in the executed documents for the purchase and sale of Zoove.  Motion at 8 & n.3; *see also* Mblox Motion at 5.  This is entirely unpersuasive at the pleading stage.  It is Defendants' own admission in writing that memorializes a *per se* violation of the law.  Defendants' are welcome to proffer evidence to demonstrate that they did not follow through and/or that they affirmatively withdrew from the terms of the *per se* violation. But for purposes of this motion, Sumotext has properly alleged a horizontal agreement based entirely on Defendants' own words. [7]

### 4.     The *Copperweld* Doctrine Does Not Apply

As in the last round of briefing, Defendants argue at length that Sumotext's Section 1 claim is barred by the Supreme Court's decision in *Copperweld v. Independence Tube Corp*., 467 U.S. 752 (1984).  And as before, Defendants' contention is wrong.  That case stands for the general proposition that a wholly owned subsidiary of another corporate entity cannot conspire with its parent for purposes of violating Section 1 of the Sherman Act.  *Id*. at 777.  That doctrine has no application here because Sumotext has alleged that VHT and StarSteve – *separate entities* – initially formed the conspiracy to monopolize the market, and that VHT StarStar (their subsequently formed joint venture vehicle that evidences that first combination) further conspired with Mblox – *another separate entity*

---

[7]  A co-conspirator cannot withdraw from a conspiracy without a proper evidentiary showing of affirmative conduct. *See*, *e.g*., *United States v. U.S. Gypsum Co*., 438 U.S. 422, 464 (1978); *see also* <u>ABA Antitrust Law Developments (Seventh)</u> at 28-29 (2010).

1    – to acquire Zoove (the second combination) and effectuate their anticompetitive scheme.[8]  *See* TAC

2    ¶¶ 134-166; 303.  The fact that separate entities are alleged to have conspired ends the inquiry.  *See*,

3    *e.g.*, *American Needle Inc. v. National Football League*, 560 U.S. 183, 196-202 (2010).

4           The Third Amended Complaint makes clear that VHT and StarSteve were separate entities

5    and formed VHT StarStar as a joint venture.  In *Texaco v. Dagher*, 547 U.S. 1 (2006), the Supreme

6    Court presumed that a joint venture made up of two or more entities is subject to Section 1 scrutiny.

7    547 U.S. at 7 & n.2.  Lower court decisions are in accord.  *See*, *e.g.*, *Zenith Elecs,* 2015 U.S. Dist.

8    LEXIS 33661, at *25-26 (citing *Dagher* and rejecting argument that Section 1 claim cannot arise

9    from business of joint venture).  Although *Dagher* and *Zenith* were cited by Sumotext in the last

10   round of briefing, Defendants never address these authorities.  That alone should end the inquiry.

11          Instead, Defendants sidestep those cases and try to recast Sumotext's theory as one of

12   "common ownership" in which they ask the Court to determine, as a matter of law, that the

13   Defendants should be viewed as a "single enterprise" incapable of conspiring in this case.  Motion at

14   6.  Like so much else in their motion, Defendant's request is wholly improper at the pleading stage.

15   Indeed, the Supreme Court cases cited by Defendants were decided on <u>summary judgment</u>, and the

16   Court in both instances rejected the arguments being made by Defendants here; in each instance the

17   Supreme Court held that the individual members of the joint enterprises at issue were subject to

18   Section 1 liability.[9]  *See American Needle*, 560 U.S. at 186, 188 (decided on summary judgment and

19   finding individual NFL teams are subject to Section 1 liability); *Ariz. v. Maricopa County Medical*

20   *Soc.*, 457 U.S. 332, 336-337, 356-57 (1982) (decided on summary judgment and holding that

---

[8]   Defendants reference that StarSteve acquired 49% of the registry as if to suggest that supports their *Copperweld* argument. Motion at 6.  In fact, case law within this Circuit has held that less than 50% ownership does <u>not</u> trigger *Copperweld* immunity.  *See e.g.*, *Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*, 677 F. Supp. 1477, 1486 (D. Or. 1987) (rejecting *Copperweld* unless ownership close to 100%).

[9]   The Ninth Circuit has held that the mere "fact that joint venturers pursue the common interests of the whole is generally not enough, by itself, to render them a single entity" because "commonality of interests exists in every cartel."  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1143, 1148-49 (9th Cir. 2003) (reversing lower court summary judgment ruling and rejecting single entity defense raised by joint venture realtor association) (citation omitted).  Moreover, where conspirators are *potential* competitors who have chosen not to compete due to their unlawful behavior, the *Copperweld* doctrine generally will not apply.  *See id.* ("Cases have required instead that the constituent entities be neither actual nor *potential* competitors.") (emphasis in original).

physicians were individually liable, notwithstanding membership in medical societies, and therefore subject to Section 1 liability).

Defendants' reliance on *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122 (S.D.N.Y. 2016) is even more puzzling.  There, the district court ruled that the plaintiff irrigation district, which had only sued a single bank, failed to allege a claim under Section 1 because the concerted action was with "unidentified" parties and the plaintiff conceded that these unified parties did not have a common purpose with the bank to restrain trade.  *See id*. at 138-140.  Here, Sumotext has named each of the corporate defendants as co-conspirators and alleged in painstaking detail their common purpose in stifling competition and eliminating competitors like Sumotext.  (TAC ¶¶ 134-166, 267-273.)  But beyond that, the *Barclays* case actually supports Sumotext's position.  In examining a line of antitrust case authorities, the district court explains that "express contracts" themselves can constitute Section 1 violations if they diminish competition.  165 F. Supp. at 139 (citing cases).  Among the types of express contracts that can facially give rise to Section 1 liability: mergers and dividing markets.  *See id*.  That is precisely what Sumotext has alleged.  Defendants' own case only further bolsters why their motion to dismiss must be denied.

### D.      Sumotext Has Properly Alleged Monopolization / Conspiracy to Monopolize (Count V)

#### 1.      Legal Standard for Section 2 Claim

A Sherman Act Section 2 claim for monopolization requires a showing that the defendant: (1) possesses monopoly power in a properly defined relevant market; and (2) willfully acquired or maintained that power through exclusionary conduct.  *See Aspen Skiing v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 595-96 (1985).  The elements of a Section 2 claim for conspiracy to monopolize are: (1) the existence of a combination or conspiracy to monopolize; (2) acts in furtherance of the conspiracy; (3) specific intent to monopolize; and (4) causal antitrust injury.  *Paladin Assoc. Inc. v. Montana Power Co*., 328 F.3d 1145, 1158 (9th Cir. 2003).

1

**2.    This Court Has Already Held That Sumotext Properly Pled A Relevant**

2

**Market**

3        Defendants' first argument challenging Sumotext's monopolization claim is that it "*still fails*

4  *to adequately plead a relevant market*." Motion at 12 (emphasis in original). But this Court has

5  expressly ruled otherwise. *See* Order at 16. As this Court noted in its thorough analysis of the

6  Second Amended Complaint, "Sumotext defines the relevant market as 'the national market for

7  mobile dial codes, which comprises three components: leasing, reselling, and servicing." Order at 14.

8  This is the ***same*** market definition set forth in Sumotext's TAC: "The relevant product/ service

9  market is the national market for mobile dial codes, which is comprised of three segments: leasing,

10 reselling, and servicing (collectively 'the Market')". TAC ¶ 106. As before, Sumotext alleges that

11 the geographic market is the U.S. TAC ¶ 107. The Court held that Sumotext "adequately defined the

12 relevant market for pleading purposes. Whether that definition ultimately will stand is not a question

13 the Court needs to answer here." Order at 16. Thus, the Court expressly addressed the issue.

14       Defendants make the very same arguments (and cite the very same cases), that this Court has

15 already rejected. Their arguments are still unavailing – as fully addressed in the last round of

16 briefing. First, contrary to Defendants' repeated suggestion, "the definition of the relevant market is a

17 factual inquiry for the jury." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.

18 1995). It is not an issue that can normally be decided on a motion to dismiss. *Newcal Indus., Inc. v.*

19 *IKON Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).

20       Second, Defendants argue that Sumotext is alleging a market that is limited to the aftermarket

21 of a "single brand." Motion at 13. This is still wrong. Sumotext has properly alleged that Zoove has

22 market power because it operates as the single national registry for mobile dial codes. TAC ¶¶ 106-

23 113. As previously briefed, Zoove's market power flows from exclusivity "upstream" with the major

24 telecommunication carriers – as an operator of a national registry for mobile dial codes; it is not

25 based upon "downstream" contractual terms with customers. *See* TAC ¶ 106-113 (Zoove operates as

26 a national carrier akin to NANPA, CSCA and ICANN registries). Accordingly, as before, the cases

27

28

1  cited by Defendants are simply inapposite.[10]

2  Third, Defendants' assertion that Sumotext "needed to" "identify a broader market in which

3  Zoove competes" is, once again, not well taken.  As before, the TAC alleges throughout that the

4  national mobile dial code registry is an "essential facility" and a separate market in which Zoove

5  competes.  *See, e.g.*, TAC ¶ 108 ("[t]he national Market for mobile dial codes is separate from other

6  markets with registries…").  TAC ¶¶ 108, 109, 112.  And, again as previously briefed, Sumotext has

7  consistently alleged that, by virtue of Defendants' seizure of exclusive control over the registry,

8  coupled with its subsequent anticompetitive conduct, they were able to foreclose on their competitors

9  and raise prices and reduce services.  TAC ¶¶ 167-170.  It is axiomatic that a market participant can

10  only raise prices or reduce competition if it has power in a properly defined market.  *See*, *e.g.*, *United*

11  *States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (citation omitted); *Zenith Elecs, LLC v. Sceptre,*

12  *Inc.*, 2015 U.S. Dist. LEXIS 33661, at 14 (C.D. Cal. Feb. 5, 2015).  Here, the registry is the "sole

13  source of supply for mobile dial codes in the U.S."  TAC ¶ 112.  Thus, there are no substitutes.

14  This Court correctly held that Defendants' arguments must be rejected.  Order at 16.  *See also*

15  *Solyndra Residual Trust*, 62 F. Supp. 3d at 1038.

### 3.   In Challenging Sumotext's Monopolization Claim, Defendants' Fail to Address the Underlying Conduct Alleged

18  Defendants baldly assert that Sumotext has not properly alleged monopolization of the

19  market.  Motion at 14.  But the basis for Defendants' attack is limited to contentions that the initial

20  combination between VHT and StarSteve, and the later combination between Zoove, VHT and

21  StarSteve, are not sufficient to constitute monopolization.  Motion at 14-15.  But, that is not all

22  Sumotext alleges. Defendants conspicuously ignore the pages upon pages of factual allegations

---

[10]   *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200-03 (N.D. Cal. 2008) (single brand aftermarket implausible where the market power flowed from downstream contractual terms with consumers); *Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227, 1228-29 (C.D. Cal. 2013) (foreclosure in downstream development and sale of software bots as part of video game aftermarket). *Creative Mobile Techs, LLC v. Flywheel Software, Inc.*, 16-CV-02560, 2016 WL 5815311, *3-4 (N.D. Cal. Oct. 5, 2016) (dismissing with leave to amend because, among other things, the plaintiff failed entirely to allege a relevant market, market power, or even whether the claim was based on federal or California law).

1   showing that the combinations were vehicles used to carry out a sweeping scheme to gain control of

2   an essential facility (the Zoove registry and its essential inventory of numbers and API's) to

3   monopolize all three segments of the market after deploying unlawful, exclusionary, and

4   anticompetitive conduct. TAC ¶¶ 169, 170(b), 264(e), 274(a), 303, and 306 (b)(iii).

5        Indeed, Sumotext alleges that VHT and StarSteve not only agreed to an unlawful scheme, but

6   actually achieved their objectives after acquiring control of their upstream supplier (Zoove), the only

7   source of supply for mobile dial codes in the U.S.  As a result, Defendants did in fact eliminate

8   competition in the Market by, among other things:

9        • "Altering the Registry's "Leasing" policies to restrict their rival resellers and

10          service providers—including SUMOTEXT—from being able to compete to

11          lease StarStar numbers on the same economic terms and conditions that were

12          otherwise made available to other lessees"; TAC ¶ 167 (a)

13       • "Altering the Registry's "Reselling" policies to restrict their rival resellers and

14          service providers—including SUMOTEXT—from being able to compete to

15          "sublicense" StarStar numbers to downstream customers"; TAC ¶ 167 (b)

16       • "Altering the Registry's "Servicing" policies to restrict their rival resellers and

17          service providers—including SUMOTEXT—from being able to compete to

18          provide value added software and services to other Market participants and

19          downstream customers"; TAC ¶ 167 (c)

20       • "Usurping their rivals' rights, customer relationships, and revenues after

21          inducing a breach or disruption of the valid contracts their rivals held upstream

22          with Zoove and downstream with customers"; TAC ¶ 167 (d)

23       • "Raising prices and reducing services to a captured group of customers and

24          Leaving prospects left with no competing services, service providers, or prices

25          from which to choose". TAC ¶ 167 (e)

26       Defendants never address these allegations in any meaningful way.  Instead, Defendants argue

27   only that "Zoove (and its corporate owners, past and present) had legitimate business justifications

28   for changing Zoove's business model."  Motion at 15.

CASE NO. 5:16-CV-01370-BLF-NMCx
PLAINTIFF SUMOTEXT CORP.'S OPPOSITION TO
VHT/ZOOVE/STARSTEVE/VHT STARSTAR/  MOTIONS TO DISMISS

First, the argument is not credible on its face. Sumotext was Zoove's single largest customer at the time by both total revenue, and by total volume of StarStar numbers leased, and one of the leading resellers and ASP service providers in the market. TAC ¶¶ 103, 306(b)(iii).  Indeed, Mblox's own PowerPoint slide states that Sumotext and the other resellers and ASP's accounted for "almost all sales" of the Zoove registry.  TAC ¶ 306(b).  Zoove's irrational termination of Sumotext and other resellers and ASP's resulted in Defendants forsaking significant short term profits and so was economically irrational; it can only be explained by the long-term anti-competitive scheme alleged. TAC ¶¶ 306(a)-(b).  *See, e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-11 (1985); *Safeway Inc. v. Abbott Labs*, 2010 U.S. Dist. LEXIS 2145, at *4 (N.D. Cal. Jan. 12, 2010).

Second, Defendants' alternative explanation is contrary to the express allegations in the operative complaint, and therefore not a proper basis to challenge the allegations.  *Soluyndra Residual Trust*, 62 F. Supp. 3d at 1038.  Indeed, Defendants' own cases make clear that whether the conduct at issue constitutes a legitimate business justification should be addressed on a fully developed factual record.  *Oahu Gas Serv. v. Pacific Res., Inc.*, 838 F.2d 360, 362 (9th Cir. 1988) (appeal from denial of JNOV); *California Computer Products, Inc. v. Int'l Business Machines Corp.*, 613 F.2d 727, 731 (9th Cir. 1979) (appeal from judgment on directed verdict).

Defendants take further liberties with respect to the legal standards under Section 2.  For example, Defendants suggest that Sumotext was required to plead facts showing "specific intent" for *both* monopolization and conspiracy to monopolize.  Motion at 15.  That is not correct.  Although specific intent is required for a conspiracy to monopolize claim, it is <u>not</u> a required element of a claim for monopolization.  *See* <u>ABA Antitrust Law Developments (Seventh)</u> 316.  Similarly, Defendants mislead when they suggest that specific intent is a "high burden, requiring proof of a specific state of mind."  Motion at 15.  In fact, the law in this Circuit is clear that an intent to monopolize can be shown either by proof of a specific state of mind or it can be inferred from Defendants' anticompetitive conduct.  *See Thurman Indus. v. Pay 'N Pak Stores*, 875 F.2d 1369, 1378 (9th Cir. 1989).  Thus, "an intent to monopolize can be inferred 'from conduct that has no legitimate business justification but to destroy or damage competition.'" <u>ABA Antitrust Law Developments (Seventh)</u> 326 (citations omitted).  Here, Sumotext has more than satisfied the specific intent requirement on the

facts alleged.  TAC ¶¶ 67-104; 134-166; 268-271; 295; 300-301; 305.  And indeed, while Defendants mischaracterize the legal requirement they never directly challenge whether Sumotext has satisfied the specific intent requirement.[11]

### 4.      As This Court Previously Held, Sumotext Has Properly Alleged A Claim Under Essential Facilities and Refusal to Deal Theories.

Next, Defendants seek to re-litigate yet another issue that this Court already ruled has been properly pled.  Citing the same cases referenced in the last round of briefing, including *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004), Defendants argue that the registry cannot constitute an "essential facility" as a matter of law.[12]  Motion at 16-18.  This Court already rejected Defendants' argument and ruled "that, for pleading purposes, [Sumotext's] allegations provide a sufficient factual basis for Sumotext's assertion that the Registry is an essential facility."  Order at 15-16. *See also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991) (essential facilities doctrine applicable where defendants have "the power to eliminate competition in the downstream market"); *Image Technical Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1209 (9th Cir. 1997) ("[u]nilateral refusals to deal often concern an 'essential facility'").

---

[11]   Instead, Defendants cite to case authorities that have no application here.  For example, in *Falstaff Brewing Co. v. Stroh Brewing Co*., 628 F. Supp. 822 (N.D. Cal. 1986), the court held plaintiffs failed to allege *any* specific intent by defendants to harm competition, and the conduct could not support an inference of harm as defendant's market share was only 13%. *See id*. at 829-30. *Falstaff's* facts bear no resemblance to this case.  Similarly, *Novation Ventures, LLC v. J.G. Wentworth Co., LLC*, 156 F. Supp. 3d 1094 (C.D. Cal. 2015), is inapposite because the plaintiff did not allege any facts to support specific intent. *See id*. at 1103.  Defendants' reliance on *Cascade Cabinet Co. v. W. Cabinet & Millwork Inc*., 710 F.2d 1366, 1368 (9th Cir. 1976) (summary judgment) and *In re IBM Peripheral EDP Devices Antitrust Litig*., 481 F. Supp. 965, 974 (N.D. Cal. 1979) (trial), are even more attenuated because they were decided on full evidentiary records.  Finally, in *Knutson v. Daily Review, Inc*., 548 F.2d 795 (9th Cir. 1976) (trial), the court of appeal found that the conduct alleged could support a finding of specific intent. *See id*. at 814.

[12]   Zoove claims the allegations in the TAC are insufficient to support that it is an essential facility because the registry could be "reasonably duplicated."  Motion at 17.  This argument is specious. The TAC quotes Zoove, itself, as stating that it is the "single authority" as the "national registry" with exclusive contracts with the national carriers, including AT&T, Verizon Wireless, Sprint, and T-Mobile.  TAC ¶¶ 16, 110, 111.a.  Zoove's cases do not concern national registries with admitted singular authority and are inapposite. *See, e.g*., *Sunbelt Television, Inc. v. Jones Intercable, Inc*., 795 F. Supp. 333, 334 (C.D. Cal. 1992) (involving cable company with "non-exclusive" rights to serve high desert towns); *Int'l Audiotext Network v. AT&T Co*., 62 F.3d 69, 72 (2d Cir. 1995) (involving advertising services for one common carrier).

1   The same allegations (and in some instances more detailed allegations) supporting the Court's

2   prior ruling are set out in the TAC: "National registries provide essential facilities to the general

3   public…" (TAC ¶ 13); "In 2010, Zoove launched the National Mobile Dial Code Registry through

4   exclusive contracts with the Common Carriers." TAC ¶ 15.  "Zoove marketed itself as a 'national

5   registry' and 'single authority for the leasing of cross-carrier Mobile Dial Codes.'" TAC ¶ 16.  A

6   market for "leasing, reselling, and servicing" arose (TAC ¶ 106), with business rivals competing

7   horizontally in each segment of the market.  TAC ¶¶ 106, 114, 116-123.  "Defendants, through their

8   targeted acquisition of the Zoove Registry, now control the sole source of supply and access to all

9   mobile dial codes in the United States." TAC ¶ 310.  "Access to this essential facility [the registry] is

10  indispensable to competition in each segment of the market." TAC ¶ 310.

11          This Court also rejected Defendants' passing suggestions, also raised in the prior round of

12  briefing, that Sumotext has not alleged a proper refusal to deal.  Motion at 16-18. The Court, noting

13  that "[t]he essential facilities doctrine 'is a variation on a refusal to deal claim'," properly rejected

14  Defendants' argument for the purpose of settling the pleadings.  Order at 15 (quoting *Aerotec Int'l,*

15  *Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016)).  Indeed, as Defendants

16  acknowledge (motion at 12), Zoove is only free to deal with whom it chooses to the extent its conduct

17  is not motivated by predatory behavior.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472

18  U.S. 585, 610-11 (1985) (affirming jury verdict on refusal to deal); *Otter Tail Power Co. v. United*

19  *States*, 410 U.S. 366 (1972) (affirming antitrust liability on refusal to deal); *Safeway Inc. v. Abbott*

20  *Labs.*, 2010 U.S. Dist. LEXIS 2145, at *19-23 (N.D. Cal. Jan 12, 2010) ("Taken together, *Aspen*

21  *Skiing* and *Verizon* demonstrate that liability under Section 2 can arise when a defendant voluntarily

22  alters a course of dealing and 'anticompetitive malice' motivates the defendants' conduct.")

23          Here, Sumotext's allegations are more than sufficient to show predatory behavior and intent.

24  Defendants purposefully terminated a previously long and profitable course of dealings with

25  Sumotext, and then suggested that Sumotext could lease back national mobile numbers for a 99,900%

26  mark-up.  Defendants' outrageous actions were clearly against Zoove's short-term, economic self-

27  interest since Sumotext had been the registry's largest customer; the new price point was patently

28  unreasonable, and Defendants knew full well that Sumotext could not accept it.  TAC ¶¶ 306(a)-(b).

1   That conduct is more than enough to state a claim. *See Aspen Skiing Co*, 472 U.S. at 604. And,

2   Defendants argument that its massive price increase is not an actionable refusal to deal is wrong as a

3   matter of law. *See Safeway Inc*., 2010 U.S. Dist. LEXIS 2145, at *20-21 (400% price increase is

4   actionable because "[a]n offer to deal with a competitor only on unreasonable terms and conditions

5   can amount to a refusal to deal); *see also Safeway Inc. v. Abbott Labs*., 761 F. Supp. 2d 874, 892-95

6   (N.D. Cal. 2011) (denying summary judgment based upon evidence of violation of antitrust duty per

7   *Aspen Skiing*).

8       Finally, as a last defense, Defendants contend that they cannot be held liable for

9   monopolization even if, in the alternative, they are treated as a single entity.  Motion at 18.

10  Defendants are wrong.  The refusal to deal doctrine is fully applicable to single entities.  *See*, *e.g*.,

11  *Aspen Skiing*, 472 U.S. at 587, 610 (affirming refusal to deal jury verdict against single entity);

12  *Safeway Inc*., 761 F. Supp. 2d at 895 (denying summary judgment on refusal to deal claim against

13  single entity).  Nor is there merit to Defendants' suggestion that they cannot be held liable for merely

14  maintaining a "natural monopoly . . . over its own product."  Motion at 18.  This is just a rehash of

15  the same relevant market argument addressed above that this Court has already properly rejected.

16  Accordingly, the cases cited by Defendants have no application here.  *TV Communications Network,*

17  *Inc. v. Turner Network Television, Inc*., 964 F.2d 1022 (10th Cir. 1992) (plaintiff failed to define

18  relevant market beyond the TNT channel); *Sambreel Holdings LLC v. Facebook, Inc*., 906 F. Supp.

19  2d 1070 (S.D. Cal. 2012) (plaintiff failed to allege facts supporting relevant market beyond web site).

20      Sumotext has properly alleged a Sherman Act Section 2 claim (Count V).  Defendants'

21  motion to dismiss must be denied as to this claim.

22  **VI.   CONCLUSION**

23      The antitrust claims addressed above are not only properly stated, but also more clearly

24  explain why Zoove would suddenly terminate the contracts, revenues, and relationships it had worked

25  so hard to secure and nurture since its inception. The arguments raised now by Defendants – many of

26  which this Court already rejected – are not properly addressed on a motion to dismiss.  The motions

27  to dismiss must be denied and the stay on antitrust discovery lifted.

28

1

Dated:  November 13, 2017

Respectfully submitted,

2

3

KESSELMAN BRANTLY STOCKINGER LLP
PPGMR LAW, PLLC

4

By: _____ */s/ Julie D. Greathouse*_____

5

Julie D. Greathouse

*Attorneys for Plaintiff*
SUMOTEXT CORP.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 5:16-CV-01370-BLF-NMCx
PLAINTIFF SUMOTEXT CORP.'S OPPOSITION TO
VHT/ZOOVE/STARSTEVE/VHT STARSTAR/  MOTIONS TO DISMISS