**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SUMOTEXT CORP., | Case No. 16-cv-01370-BLF |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| ZOOVE, INC., dba STARSTAR MOBILE; VIRTUAL HOLD TECHNOLOGY, LLC; STARSTEVE, LLC; and VHT STARSTAR LLC, | [Re: ECF 336, 338] |
| Defendants. | |

This antitrust action arises from alleged misconduct relating to the leasing and servicing of "StarStar numbers," also referred to by the parties as "** numbers." A StarStar number is a mobile dial code that lets a user call a short code – e.g., "**CASH" or "**LAW" – from a mobile telephone and be connected to a ten-digit telephone number. Defendant Zoove, Inc., now doing business as StarStar Mobile, has the exclusive right to operate StarStar numbers for all major mobile carriers.[1]

Plaintiff Sumotext Corporation ("Sumotext") built up a successful business leasing StarStar numbers from Zoove and re-leasing them to end users while also selling the users related add-on services. After Sumotext built up its business, Zoove was acquired by Defendant VHT StarStar, a company then owned by Defendant Virtual Hold Technology LLC ("VHT"). Defendant StarSteve, LLC ("StarSteve") subsequently became a shareholder in VHT StarStar. Shortly after the acquisition, Zoove terminated Sumotext's existing StarStar leases and offered

---

[1] This order refers to the entity as both "Zoove" and "StarStar Mobile."

new leases on less advantageous terms. Sumotext contends that the offered terms were so unreasonable as to amount to a refusal to deal, with the result that Sumotext was excluded from two distinct markets, one for leasing StarStar numbers in the United States and the other for servicing StarStar numbers in the United States.

Sumotext filed suit against Sumotext for breach of contract and related state law claims, but ultimately the case has morphed into federal antitrust suit. Two claims remaining in the operative third amended complaint ("TAC"): Claim 4 for restraint of trade in violation of Section 1 of the Sherman Act, and Claim 5 for conspiracy to monopolize and monopolization in violation of Section 2 of the Sherman Act. Defendants seek summary judgment on both claims.

For the reasons discussed below, Defendants' motion is DENIED.

## I.    BACKGROUND

The chronology of events set forth below is undisputed, although there is substantial dispute whether those events give rise to antitrust liability on the part of Defendants.

*Zoove's Creation of the StarStar Registry*

Zoove created and launched the national registry of StarStar numbers, giving it complete control over distribution of StarStar numbers in the United States. Miller Dep. 123:11-124:12, Greathouse Decl. Exh. 61. Sumotext began leasing StarStar numbers from Zoove in 2012 and re-leasing them to users while providing add-on services such as mobile messaging. Miller Dep. 79:6-19, Greathouse Decl. Exh. 61.

Zoove was not successful in monetizing its StarStar registry despite investments of tens of millions of dollars of venture capital. Cotney Dep. 66:19, Bloch Decl. Exh. B. Zoove was on the brink of bankruptcy when Mblox, Inc. ("Mblox") became interested in acquiring it. Cotney Dep. 29:2-5, Bloch Decl. Exh. B. Mblox's CEO, Tom Cotney, thought Zoove might be a good complement to Mblox's text messaging business. Cotney Dep. 66:17-19, Bloch Decl. Exh. B.

*Mblox's Acquisition of Zoove*

Mblox acquired Zoove in 2014, thereby gaining control of the StarStar registry. Caffey Dep. 13:23-14:4, Greathouse Decl. Exh. 56. Mblox's business model "was to primarily sell and service its products and services indirectly through ASPs." Bales Dep. 18:16-19, Greathouse

Decl. Exh 52.  The term "ASPs" refers to "application service providers," entities like Sumotext that re-leased StarStar numbers while providing add-on services to the end user.  Bales Dep. 18:20-20:10, Greathouse Decl. Exh. 52.  Entities that simply re-leased StarStar numbers without adding any value were referred to as "resellers."  Bales Dep. 19:1-14, Greathouse Decl. Exh. 52.

Mblox supported ASPs by providing them access to application programming interfaces ("APIs").  Bales Dep. 25:10-22, Greathouse Decl. Exh.52.  Mblox also created the "StarStar Toolkit" in 2015, which was specifically designed to help ASPs provide add-on services when they re-leased StarStar numbers to downstream customers.  Bales Dep. 16:1-17:15.  Mblox viewed ASPs as "partners" that would "add value and create a StarStar ecosystem."  Bales Dep. 17:25-18:5.

Sumotext thrived during Mblox's ownership of Zoove.  Sumotext leased dozens of StarStar numbers under a master contract that gave it a 25% discount on the list price of all StarStar numbers.  Miller Dep. 177:18-178:2, Bloch Decl. Exh. P.  As a result, Sumotext could re-lease any StarStar number at Zoove's list price but still "have a 25 percent profit margin in that fee."  *Id.* 202:2-11.  And on certain StarStar numbers, Sumotext made a much greater profit.  For example, Sumotext made a profit of $8,700 per month on \*\*BOSS, \*\*CASH, \*\*CRUISE, and \*\*TRAVEL.  Miller Dep. 177:3-6, Bloch Decl. Exh. P.  On \*\*MOVE, Sumotext incurred $3,500 in monthly costs but charged $16,200 per month.  Miller Dep. 178:8-16, Bloch Decl. Exh. P.

Mblox, in contrast, was losing money on Zoove.  Cotney Dep. 172:6-15, Bloch Decl. Exh. B.  Mblox also was having trouble with a major carrier, Verizon.  *Id.*  Mblox's CEO, Cotney, testified, "I wanted to move those risks out of my portfolio."  *Id.*  Mblox approached StarSteve's president, Steve Doumar, to ask whether StarSteve was interested in buying Zoove.  Doumar Dep. 116:2-24, Bloch Decl. Exh. E.

*VHT StarStar's Acquisition of Zoove*

StarSteve was created in early 2015, when it leased some StarStar numbers from Zoove and attempted to become a reseller.  Doumar Dep. 93:1-21, Greathouse Decl. Exh. 51.  StarSteve was unsuccessful – it never had any StarStar customers and never generated any revenue from StarStar numbers.  Doumar Dep. 51:6-21, Greathouse Decl. Exh. 53.  StarSteve gave up trying to

1    re-lease StarStar numbers after approximately four months, and instead it considered acquiring the

2    StarStar registry when approached by Mblox.  Doumar Dep. 51:6-23, 116:2-24, Greathouse Decl.

3    Exh. 53; Garvey Dep. 30:10-12, Greathouse Exh. 20.

4         StarSteve's President, Steve Doumar, approached VHT's Chairman, Greg Garvey, about

5    investing in an acquisition venture.  Garvey Dep. 30:2-21:12, Greathouse Exh. 20.  At that time,

6    VHT was a successful company with a product that enabled companies to monitor hold times and

7    offer callers the option of hanging up and being called back when they got to the top of the hold

8    queue.  Garvey Dep. 16:3-17:4, Bloch Dep. Exh. F.  Garvey determined that StarSteve was not in

9    a financial position to lead the acquisition of Zoove, but Garvey became interested in acquiring the

10   StarStar registry on behalf of VHT.  Garvey Dep. 45:1-46:4, Bloch Dep. Exh. F.  VHT formed

11   VHT StarStar, which acquired 100% of Zoove from Mblox in December 2015 without StarSteve's

12   participation.  Garvey Dep. 54:2-6, 56:6-13, 77:20-78:5.  Bloch Decl. Exh. F.

13        After VHT StarStar acquired Zoove, Garvey allowed StarSteve to acquire a 49% share of

14   VHT StarStar, with VHT retaining the other 51% share.  Garvey Dep. 49:1-6, Bloch Dep. Exh. F;

15   Garvey Dep.154:2-13, Greathouse Decl. Exh. 50.  Since then, StarSteve essentially has been a

16   holding company for its shares of VHT StarStar, and its president, Steve Doumar, became the

17   president of VHT StarStar.  Doumar Dep. 50:1-24, Greathouse Dep. Exh. 51.

18        *Restructuring of StarStar Business*

19        Executives at VHT StarStar, Zoove, and StarSteve began to discuss restructuring the

20   StarStar business which, as noted, had never made money.  Email, Greathouse Decl. Exh. 27.

21   Email exchanges from mid-December 2015 show that Wes Hayden and Steve Garvey of VHT,

22   Steve Doumar of StarSteve, and Mike Caffey of Zoove decided to "take back" the StarStar

23   numbers that had been leased to Sumotext.  Email, Greathouse Decl. Exh. 27.  They also planned

24   to contact each of Sumotext's customers to "onboard them."  Email, Exh. 28 to Greathouse Decl.

25   Steve Doumar met with Sumotext's four largest customers and signed non-disclosure agreements

26   with some of them.  Doumar Dep. 85:22-93:10, Greathouse Decl. Exh. 53.

27        As Sumotext's customers learned about the restructuring of the StarStar business, they

28   began expressing concern that Sumotext would not be able to renew their StarStar licenses.  Some

4

felt that Sumotext's President and CEO, Tim Miller, had lied regarding the longevity of the StarStar licenses, and some threatened to sue Sumotext.  Miller Dep. 227:7-25, 228:1-229:25; 255:14-256:20, Greathouse Decl. Exh. 60.  On February 29, 2016, Tim Keyes, the COO of Zoove, StarSteve, and VHT StarStar, sent an email to Wes Hayden, the CEO of VHT and acting CEO of VHT StarStar and Zoove.  Email, Greathouse Decl. Exh. 25.  The email content read, "Audience D – Strategy to Take Back Numbers," and indicated that an attachment was "the letter to Sumotext." *Id*.

*February 29, 2016 Notice to Sumotext re Termination of Existing Leases*

On February 29, 2016, Tim Keyes informed Tim Miller of Sumotext via email that Zoove had been acquired.  Email, Bloch Decl. Exh. N.  The email stated that it served as a thirty-day termination notice of all of Sumotext's StarStar leases, and that Sumotext would be given an opportunity to enter into new StarStar leases.  *Id*.  The email advised that StarStar numbers no longer would be leased nationally but only regionally, and that a new pricing model would "be made available no later than March 15th, and we hope you will want to participate in this new model." *Id*.  Keyes recognized that Sumotext was a "long time partner" and that Miller's "feedback and knowledge is vital as we finalize a model that will work for everyone." *Id*.  Keyes invited Miller to set up a time to meet and go over the new plan.  *Id*.

*March 7, 2016 Notice to Sumotext of New Terms*

On March 7, 2016, Keyes sent Miller another email, stating that the new pricing model was still being revised, but that the plan was to price by county with prices dependent on county population.  Email, Bloch Decl. Exh. JJ.  Keyes included a chart showing a range of prices from $150 per month, for a county with 0 to 99k residents, to $5,000 per month, for a county with 3m to 3.99m residents.  *Id*.  Keyes also advised that StarStar numbers could be re-leased only to end customers – not to entities who themselves wished to release the numbers.  *Id*.  Any such re-leasing had to be approved by StarStar Mobile.  *Id*.  Under the new plan, resellers would receive a flat 15% commission.  *Id*.

*Email Correspondence March 8, 2016 – March 10, 2016*

Miller responded by email the following day, March 8, 2016, stating that Sumotext

5

previously had nationwide leases of StarStar numbers, and asking that Sumotext's 54 existing StarStar leases be "grand-fathered" in under the prior terms. Email, Greathouse Decl. Exh. 20. Miller opined that "nobody would or could" afford nationwide leases under the new pricing plan, because "[s]ome quick math shows your charges would be $200,750 per month just to lease a phone number in the top 100 counties of the 3,144 counties of the U.S., along with $150,000 in setup fees." *Id*.

Further email communication ensued. *See* Email, Bloch Decl. Exh. KK. In a March 10, 2016 email from Wes Hayden of VHT StarStar to Tim Miller of Sumotext, Hayden stated that the prior Zoove business model had failed; StarStar Mobile had tried to engage with Sumotext regarding its new business model; and Sumotext's only response "is apparently focused on Sumotext continuing a failed business concept that only benefits you." *Id*. Hayden reiterated that Sumotext's existing StarStar leases were terminated effective April 1, 2016, and advised Miller that "[a]s details of a new reseller program are developed, we will make this program available to Sumotext for your consideration and participation." *Id*. Miller responded immediately on behalf of Sumotext, asking for a "standstill agreement" extending the lease termination date from April 1, 2016 to May 1, 2016 to allow negotiation of a resolution that would avoid the necessity for Sumotext to file a lawsuit. Email, Bloch Decl. Exh. KK.

*Email Correspondence on March 11*

Hayden responded on March 11, 2016, indicating that Miller should speak with Keyes immediately to try to negotiate a plan going forward, and advising that "[a] standstill can be part of that discussion if done in the framework of an overall agreement to move forward." Email, Bloch Decl. Exh. KK. Miller wrote back the same day stating that there was no point in negotiating without a 30-day extension of the termination date for Sumotext's StarStar numbers. *Id*. Miller indicated that if Sumotext were not granted the 30-day extension, it would "spend the next week solely dedicated to preparing the legal filings to protect SUMOTEXT and its customers from the pending deadline." *Id*. Hayden declined to grant the 30-day extension, but indicated that he and Keyes would be "available to meet with you via phone or face to face from tomorrow through end of day Tuesday," and would be "happy to provide concentrated time to determine if

we can come to an agreement in short order." *Id.*

Miller's same-day response on behalf of Sumotext consisted of two sentences: "I don't negotiate with terrorists. When all of this comes out, Mr. Garvey is going to be shocked to learn how you have bungled this whole thing." *Id.*

*Termination of Toolkit*

In restructuring of the StarStar business, StarStar Mobile eliminated the Toolkit. Caffey Dep. 23:11-22, Greathouse Decl. Exh. 56. StarStar Mobile still uses the underlying software for certain tasks, but it does not provide a means by which third parties can access the Toolkit. Caffey Dep. 25:10-19, Greathouse Decl. Exh. 56. Mr. Keyes testified that "[w]e don't have ASPs today." Keyes Dep. 160:25-161:2, Greathouse Decl. Exh. 59. Instead, StarStar Mobile and VHT StarStar provide almost all add-on services associated with StarStar numbers that previously were provided by Sumotext and other ASPs. Caffey Dep. 68:15-69:11, 74:17-75:22, Bloch Decl. Exh. A. Occasionally, a StarStar customer will request to use a third party for a mobile web service, and in those instances StarStar Mobile generally agrees to use the third party. Caffey Dep. 76:9-77:11, Bloch Decl. Exh. A.

*This Lawsuit*

Sumotext filed this suit on March 21, 2016. The original complaint asserted breach of contract and related state law claims. Compl., ECF 1. Substantial motion practice resulted in the operative TAC, containing claims for: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) tortious interference with contract, (4) restraint of trade in violation of Section 1 of the Sherman Act, and (5) conspiracy to monopolize and monopolization in violation of Section 2 of the Sherman Act. TAC, ECF 251. The TAC names Zoove, VHT, VHT StarStar, StarSteve, and Mblox. *Id.* The Court dismissed Mblox, and Sumotext dismissed the three state law claims. Order on MTD, ECF 251; Order Approving Joint Stipulation of Dismissal, ECF 335. Defendants Zoove, VHT, and VHT StarStar have filed a motion for summary judgment on the remaining two antitrust claims. MSJ, ECF 336. That motion is joined by StarSteve. Joinder, ECF 338.

## II.   LEGAL STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1088 (9th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*

The court must view the facts and draw all factual inferences in favor of the non-moving party. *Stanislaus*, 803 F.3d at 1088. However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* (internal quotation marks and citation omitted). Moreover, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 587-88. Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588.

## III.   DISCUSSION

Sumotext asserts that Defendants conspired to, and did, exclude it from two distinct markets:  the market for leasing StarStar numbers in the United States, and the market for servicing StarStar numbers in the United States.

Claim 4 is for restraint of trade in violation of Section 1 of the Sherman Act.  That section provides:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  To prevail, Sumotext must prove:  (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or

entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). Sumotext claims that Defendants conspired to and did monopolize the StarStar market through acquisition and control of Zoove, excluded Sumotext and others from the relevant markets for leasing and servicing StarStar numbers, and thereby imposed dramatically higher prices for StarStar numbers and reduced the related services available to the public. *See* TAC, ¶¶ 263-91, ECF 185-4.

Claim 5 is for conspiracy to monopolize and monopolization in violation of Section 2 of the Sherman Act. That section provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize any part of the trade or commerce . . . shall be deemed guilty of a felony." 15 U.S.C. § 2. To prevail on a claim for monopolization, Sumotext must prove: (1) the possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). To prevail on a claim for conspiracy to monopolize, Sumotext must prove: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury. *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). Sumotext claims that Defendants conspired to, and did, acquire monopoly power in the StarStar leasing and servicing markets by acquiring control of the StarStar registry and refusing to deal with Sumotext in violation of the essential facility doctrine. *See* TAC ¶¶ 293-316.

Defendants argue that they are entitled to summary judgment on these claims for four reasons. First, Defendants argue that they are entitled to judgment on both the Section 1 and the Section 2 claims because Sumotext cannot establish that there is a distinct market for StarStar numbers. Second, Defendants contend that they are entitled to judgment on both claims because Sumotext cannot demonstrate injury to competition. Third, Defendants assert that they are entitled to judgment on the Section 2 claim because the StarStar registry is not an essential facility. And fourth, Defendants argue that they are entitled to judgment on the Section 1 claim because they are

the same entity under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984).

Sumotext contends that there are disputed, material facts that preclude summary judgment on any of these bases. In their reply brief, Defendants argue that Sumotext has not established that any material facts are in dispute. Defendants identify five facts that they assert are undisputed and entitle them to summary judgment. Those facts are: (1) Zoove has always been the only provider of StarStar numbers; (2) the Mblox business model, which Sumotext seeks to preserve, existed for less than a year and a half; (3) that business model was unprofitable for Zoove; (4) Zoove's new owners were interested in a continued business relationship with Sumotext at roughly the same prices, but Sumotext rejected their overtures; and (5) StarStar numbers are not a distinct antitrust market but instead one company's service, which competes with a myriad of readily apparent consumer alternatives for customer engagement. For the reasons discussed below, the Court concludes that these facts either are disputed or do not entitle Defendants to summary judgment.

### A. Relevant Market (Claims IV and V)

In order to prevail on a claim under the Sherman Act, a plaintiff must demonstrate that the defendant has market power within a "relevant market." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). The plaintiff must show both that a relevant market exists and that the defendant has power within that market. *Id.* "The 'relevant market' and 'market power' requirements apply identically under the two different sections of the Act," Section 1 and Section 2. *Id.* at 1044 n.3; *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (A plaintiff asserting a § 1 claim "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."); *Somers*, 729 F.3d at 963 (A plaintiff asserting monopolization under § 2 must show "the possession of monopoly power in the relevant market").

As noted above, Sumotext asserts that Defendants have market power in two relevant markets, the markets for leasing and servicing StarStar numbers in the United States. Defendants contend that Sumotext cannot prove that StarStar numbers comprise a distinct market under relevant antitrust law. Sumotext responds by arguing that record evidence supports its market definitions and that in any event it need not define a relevant market because it has produced direct

10

evidence of injury to competition. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (formal market analysis not required where the plaintiff presents "direct evidence of the injurious exercise of market power" such as "evidence of restricted output and supracompetitive prices").

Addressing the latter argument first, this Court notes that under *Ohio v. Am. Express Co.* – a case not cited by either side – it appears that "an accurate definition of the relevant market" is required even where the plaintiff relies on direct evidence, at least in the context of a Section 1 claim. *Ohio*, 138 S. Ct. at 2285 & n.7. When questioned by the Court at the hearing, Sumotext's counsel represented that there is disagreement among scholars whether the requirement for a market definition applies to all Sherman Act claims or is limited to the unique facts of the *Ohio* case. *See* Hrg. Tr. 50:25-51:14, ECF 371. Although Sumotext submits some direct evidence of injury to competition, it also relies on indirect evidence. A jury potentially will be presented with both direct and indirect evidence and thus Sumotext will be required at trial to establish the relevant market.

"[T]he term 'relevant market' encompasses notions of geography as well as product use, quality, and description." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir. 2001) (citation omitted). "The geographic market extends to the area of effective competition . . . where buyers can turn for alternative sources of supply." *Id.* (internal quotation marks and citation omitted). "The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Id.* (citation omitted). In general, "the definition of the relevant market is a factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility." *Rebel Oil*, 51 F.3d at 1435.

Defendants do not challenge the geographic aspect of Sumotext's asserted market definitions. However, Defendants contend that Sumotext's proposed product markets are too narrow, arguing that StarStar numbers are part of a broader market for "mobile engagement" that includes 10-digit telephone numbers, 800 numbers, text messages, SMS codes, and MMS codes.

"The principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291-92 (9th

11

Cir. 1979); *see also United States v. E. I. Du Pont De Nemours & Co.*, 351 U.S. 377, 380 (1956) ("Every manufacturer is the sole producer of the particular commodity it makes but its control in the above sense of the relevant market depends upon the availability of alternative commodities for buyers: *i.e.*, whether there is a cross-elasticity of demand between cellophane and the other wrappings."). "[I]nterchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities." *E. I. Du Pont*, 351 U.S. at 380-81. "Commodities which are 'reasonably interchangeable' for the same or similar uses normally should be included in the same product market for antitrust purposes." *Kaplan*, 611 F2d at 292.

Keeping these standards in mind, the Court must determine whether Defendants have submitted evidence that Sumotext's proposed product markets are too narrow and, if so, whether Sumotext has submitted evidence sufficient to create an issue of fact as to the plausibility of its market definitions.

Defendants submit testimony from a plethora of company executives involved in the StarStar business, all opining that there are alternative communication methods that are the equivalent of StarStar numbers. For example, Tom Cotney of Mblox testified that StarStar numbers could be used "to replace some vanity short codes." Cotney Dep. 70:18-71:24, Bloch Decl. Exh. B. Bruce Bales of Mblox testified that StarStar numbers are not the only type of mobile dial codes, because there also are Star codes, Pound codes, PoundPound codes, and short access codes of just two or three digits. Bales Dep. 104:25-105:16, Bloch Dep. Exh. S. Bales also identified other alternatives to StarStar numbers, including SMS and MMS services. Bales Dep. 116:6-16, Bloch Decl. Exh. S. Sumotext's own executive vice president, John Styers, characterized StarStar codes, text messages, MMS, click to text, and the like as "just another call to action. They're all the same." Styers Dep.32:8-33:10, Bloch Decl. Exh. D. If all of these products actually are alternatives to StarStar codes, Sumotext's market definitions are too narrow. *See E. I. Du Pont*, 351 U.S. at 394 ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or

1   commerce', monopolization of which may be illegal."). Defendants' evidence is sufficient to meet

2   their initial burden on summary judgment, shifting the burden to Sumotext to provide specific

3   evidence supporting its proposed market definitions.

4        Sumotext submits the opinions of its expert economist, Ryan Sullivan, Ph.D. Dr. Sullivan

5   concludes that "[t]here are two relevant markets for analysis in this case: (1) the market for leasing

6   StarStar numbers in the United States, and (2) the market for servicing StarStar numbers in the

7   United States." Sullivan Report ¶ 43, Greathouse Decl. Exh. 4. Dr. Sullivan provides a cogent

8   explanation for his conclusion that StarStar numbers are not reasonably interchangeable with other

9   types of consumer engagement products. *Id.* ¶¶ 85-99. Dr. Sullivan considered the historical price

10  gap between StarStar numbers and other products, noting that the average monthly lease fee for a

11  StarStar number is $1,500 while the average monthly price of short text codes is $500-$1,000 and

12  the average monthly price of a 1-800 number is $0.50-$5.00. *Id.* ¶ 89. Dr. Sullivan explains that

13  this price gap indicates that StarStar numbers have features that the alternatives do not, and that

14  those features are so highly valued by StarStar customers that "substitution, if any, between

15  StarStar numbers and other forms of consumer engagement is limited." *Id.* Dr. Sullivan considers

16  the lack of operation connection between the StarStar registry and registries for other products. *Id.*

17  ¶ 90. He also devotes several paragraphs of his report to the functional differences between

18  StarStar numbers and other forms of consumer engagement, including short codes for texting,

19  apps and websites, phone numbers, and 1-800 numbers, and in particular the unique nature of

20  StarStar dial code experiences as compared to other products. *Id.* ¶¶ 91-97. Dr. Sullivan also

21  indicates that he conducted a significant non-transitory increase in price ("SSNIP") test,

22  commonly used in economic analysis of antitrust to define the relevant market, to determine that

23  the relevant markets in this case are the StarStar leasing and servicing markets. *Id.* ¶¶ 103-09.

24       Dr. Sullivan's opinions constitute evidence sufficient to meet Sumotext's burden at this

25  stage. "[E]xpert opinion is admissible and may defeat summary judgment if it appears that the

26  affiant is competent to give an expert opinion and that the factual basis for the opinion is stated in

27  the affidavit, even though the underlying factual details and reasoning upon which the opinion is

28  based are not." *Rebel Oil*, 51 F.3d at 1435.

Defendants argue that Dr. Sullivan's opinion "is not evidence" and "therefore it cannot create a triable issue of fact in the face of admissible evidence to the contrary." Defs.' Reply at 5, ECF 361. Defendants rely on *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993), and *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002). In *Brooke*, the Supreme Court determined that the opinion of the plaintiff's economic expert was insufficient to support the jury's verdict, noting that "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke*, 509 U.S. at 242. In *Domingo*, the Ninth Circuit affirmed the district court's exclusion of the plaintiff's expert under *Daubert*. *Domingo*, 289 F.3d at 607.

Neither case advances Defendants' position here. Defendants have not challenged Dr. Sullivan's qualifications, moved to exclude Dr. Sullivan's opinion under *Daubert*, or objected to any specific portions of Dr. Sullivan's report. Defendants have articulated general criticisms regarding Dr. Sullivan throughout their briefs, asserting for example that his opinions are "not supported by economic analysis," Defs.' Motion at 9, ECF 336, and chastising him for failing to "discuss[ ] a single price that was actually charged by StarStar Mobile to resellers or end-users," Defs.' Motion at 22, ECF 336. At the hearing, the Court noted that Defendants' general criticisms did not constitute evidentiary objections upon which the Court could rule. *See* Hrg. Tr. 5:18-6:3, ECF 371. When defense counsel indicated that Defendants had intended to challenge Dr. Sullivan's opinions for lack of foundation, the Court advised counsel that it was impossible to tell from the briefing which paragraphs of Dr. Sullivan's "hefty" report Defendants sought to exclude. *See* Hrg. Tr. 9:7-17. The Court declined defense counsel's offer to submit particularized objections after the hearing, indicating "that time has come and gone." Hrg. Tr. 9:18-21. Further, Defendants' general criticisms of Dr. Sullivan's opinions are more appropriately addressed in cross-examination. Dr. Sullivan's opinions therefore are admissible for purposes of the present summary judgment motion and, as discussed above, are sufficient to defeat Defendants' summary judgment motion based on market definition.

Defendants argue that even if it were plausible that StarStar numbers constitute a distinct

market, Sumotext has not shown that StarStar Mobile exercised market power.  Market power

"has been defined as the ability of a single seller to raise price and restrict output." *Eastman*

*Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992).  Defendants contend that none of

the record evidence shows that StarStar Mobile profitably raised prices or restricted output.

However, Dr. Sullivan opines that "Defendants have possessed and exerted market

power by way of the alleged anticompetitive conduct."  Sullivan Report ¶ 47, Exh. 4 to

Greathouse Decl.  Dr. Sullivan specifically states that Defendants have increased prices for

StarStar numbers.  *Id*. ¶¶ 61-65.  He also states that output of StarStar numbers has been restricted.

Sullivan Reply Report ¶¶ 56-58, Exh. 39 to Greathouse Decl.  Defendants argue that Dr.

Sullivan's opinions on these topics are unsupported and unreliable.  However, for the reasons

stated herein, Dr. Sullivan's opinions are admissible for purposes of summary judgment, and they

are sufficient to create disputed facts as to whether Defendants exercised market power.

Defendants argue that Sumotext cannot assert a viable monopolization claim based on

Defendants' conduct with respect to StarStar numbers, because such conduct "implicates only

StarStar Mobile's ability to control the distribution of its own product."  Defs.' Motion at 8-9,

ECF 336.  That argument is addressed in section III.C. below, in the context of Defendants'

essential facility argument.

In summary, having considered the parties' arguments, the relevant legal authorities, and

the record evidence, the Court concludes that Sumotext has demonstrated the existence of disputed

facts precluding summary judgment based on an inadequate market definition.  This case falls

within the ordinary rule that "the definition of the relevant market is a factual inquiry for the jury."

*Rebel Oil*, 51 F.3d at 1435.  It will be up to the jury to determine whether StarStar numbers are so

unique as to comprise a distinct market as argued by Sumotext, or whether StarStar numbers are

part of a broader market of mobile engagement as argued by Defendants.

### B.  Injury to Competition (Claims IV and V)

Defendants next argue that they are entitled to summary judgment on the basis that

Sumotext cannot establish injury to competition.  Injury to competition is required under both

Section 1 and Section 2.  *See Kendall*, 518 F.3d at 1047 (injury to competition is element of

Section 1 claim); *Somers*, 729 F.3d at 963 (causal antitrust injury is element of Section 2 claim for monopolization); *Paladin*, 328 F.3d at 1148 (causal antitrust injury is element of Section 2 claim for conspiracy to monopolize). "The antitrust laws . . . were enacted for the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (internal quotation marks and citation omitted). "Injury that flows from aspects of a defendant's conduct that are beneficial or neutral to competition is not 'antitrust injury.'" *Paladin*, 328 F.3d at 1145. "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Id*. Defendants argue that there is no evidence in the record showing that consumers have suffered due to Defendants' conduct.

Before turning to Defendants' evidence on that point, the Court notes that under their motion brief's subheading "The defendants did not injure competition," Defendants also argue that there could not have been a group boycott or conspiracy to deny Sumotext access to StarStar numbers, because StarStar Mobile was the only entity operating the StarStar registry, and it had the right to terminate an unprofitable distribution agreement. *See* Defs.' Motion at 12-13, ECF 336. Defendants also advance the related argument that there could not have been a conspiracy because Defendants are part of the same entity under *Copperweld*. *See* Defs.' Motion at 13-14, ECF 336. In the Court's view, the latter two arguments bear more directly on other elements of Sumotext's claims, and more properly are addressed in sections III.C and III.D below, discussing the essential facility doctrine and *Copperweld*. However, Defendants' remaining arguments and evidence are sufficient to meet their initial burden with respect to the element of injury to competition, as discussed below.

Defendants present evidence that many of Sumotext's former customers now have direct leasing relationships with StarStar Mobile. *See* Doumar Dep. 79:8-12, Bloch Decl. Exh. E. Defendants also show that there are at least six StarStar resellers in the market who are allowed to re-lease StarStar numbers. *See* Summary of VHT**/SSM Reseller Agreements, Bloch Decl. Exh. FF. StarStar Mobile has entered into referral-based StarStar marketing agreements with at least seventeen entities. *See* Summary of VHT**/SSM Referral Agreements, Bloch Decl. Exh. GG. Defendants assert that StarStar Mobile offers all the services Sumotext offered when it was an

ASP.  *See* Caffey Dep. 68:15-69:11, 74:17-75:22, Bloch Decl. Exh. A.  Finally, Defendants point to the absence of a single declaration or deposition showing the existence of customers who are dissatisfied by StarStar Mobile's current business model and services.  Based on this evidence, a reasonable jury could conclude that Defendants' conduct did not injury competition.  Thus, the burden shifts to Sumotext to show the existence of disputed facts.

Sumotext relies primarily on Dr. Sullivan's opinion to show that after VHT StarStar acquired Zoove, pricing for StarStar numbers increased and output decreased.  Dr. Sullivan analyzed StarStar Mobile's pricing and concludes that Defendants controlled and increased prices. *See* Sullivan Report ¶¶ 59-67 and C-1, Greathouse Decl. Exh. 4.  Dr. Sullivan states that after the acquisition of Zoove, the output of StarStar number leasing decreased. *Id*. ¶ 142 and B-1.  Dr. Sullivan also opines that innovation in the marketplace decreased after the acquisition of Zoove, because ASPs were eliminated. *Id*. ¶ 80.  This evidence is sufficient to meet Sumotext's burden on summary judgment.  As discussed above, Defendants contend that Dr. Sullivan's opinions are not adequately supported and in fact are plain wrong.  However, Defendants have not made *Daubert* motion or a proper evidentiary objection with respect to Dr. Sullivan.  Dr. Sullivan is a qualified economist and he states the factual bases for his opinions.  Moreover, these general objections are more properly addressed through cross-examination.  Under these circumstances, the Court cannot simply discount Dr. Sullivan's opinions as urged by Defendants.

Dr. Sullivan's opinions regarding increased prices, restricted output, and decrease in innovation are sufficient to create a factual dispute whether Defendants' conduct caused injury to competition.

### C.     Essential Facility (Claim V)

Defendants argue that Sumotext cannot establish that the StarStar registry is an "essential facility," as necessary to make out antitrust claims based on StarStar Mobile's business decisions with respect to its own product.  Sumotext contends that the StarStar registry is an essential facility and that Defendants have denied it access.

"[A]s a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own

independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (internal quotation marks and citation omitted). However, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Trinko*, 540 U.S. at 408. The "essential facilities doctrine imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 542 (9th Cir. 1991). To establish a claim under the essential facilities doctrine, the plaintiff must show that: (1) the defendant is a monopolist in control of an essential facility, (2) the plaintiff, as the monopolist's competitor, is unable reasonably or practically to duplicate the facility, (3) the defendant refuses to provide the plaintiff with access to the facility, and (4) it is feasible for the defendant to provide such access. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016). Defendants argue that Sumotext cannot establish any prong of this test.

### 1. Monopolist in Control of Essential Facility

On the first prong, requiring a showing that the defendant is a monopolist in control of an essential facility, Defendants argue StarStar Mobile is not a monopolist because StarStar numbers are not a properly defined market. Defendants cannot prevail on that argument at this stage, because as discussed above there is a factual dispute whether the relevant markets properly are restricted to StarStar numbers.

Defendants also argue that the StarStar registry is not essential to consumers, because StarStar numbers remain available today. The question is whether the facility is essential to competitors, not to the general public. *See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1129 (9th Cir. 2004) ("The doctrine makes a facility that is essential to competition in a given market available to competitors so that they may compete in that market."). Access to StarStar numbers clearly is essential for Sumotext to compete in the StarStar leasing market. Defendants argue that, with respect to the StarStar servicing market, there is no evidence that the APIs and Toolkit were essential facilities. Defendants suggest that Sumotext could compete in the StarStar servicing market by using web access. *See* Defs.' Motion at 19, ECF 336. Defendants do not cite

18

to any evidence showing how a service provider such as Sumotext could obtain access to StarStar lessees to offer or provide servicing products now that Defendants have discontinued the Toolkit and APIs. The evidence that Defendants cite for the proposition that web access is now available for servicing is the deposition testimony of Michael Caffey, who stated that StarStar Mobile now provides virtually all services to StarStar lessees through web access set up with the lessees. Caffey Dep. 74-77, Bloch Decl. Exh. A. That evidence actually supports Sumotext's position that StarStar Mobile eliminated facilities necessary for Sumotext and other ASPs to service StarStar numbers, as it makes clear that third parties no longer have access to information regarding StarStar numbers. Absent such access, ASPs have been eliminated from the StarStar servicing market. *See* Keyes Dep. 160:25-161:2, Greathouse Decl. Exh. 59.

Accordingly, Defendants have failed to demonstrate that Zoove is not a monopolist with control over an essential facility.

### 2. Duplication of Facility

On the second prong, requiring a showing that the plaintiff cannot reasonably or practically duplicate the facility, Defendants argue that "[t]here is nothing in the record to indicate why Sumotext could not develop its own techniques for communicating with customers via phone or text message. . . ." Defs.' Motion at 19, ECF 336. Defendants' argument is dependent on a market definition that includes text messages, mobile phone shortcuts, and apps. As discussed above, there is a factual dispute as to whether the market properly is limited to StarStar numbers. Defendants do not argue, nor does it appear that they could on this record, that Sumotext could duplicate a facility that would give them access to StarStar numbers. Dr. Sullivan opines that because Zoove has exclusive agreements with the major mobile carriers, "it is not practical for any competitor to try to enter the marketplace as a competing registry or duplicate the registry." Sullivan Report ¶ 60, Exh. 4 to Greathouse Decl.

Thus, there is a factual dispute whether Sumotext could reasonably or practically duplicate the StarStar registry.

### 3. Denial of Access to the Essential Facility

Defendants' strongest argument on the essential facility doctrine arises in connection with

the third prong, requiring a showing that the defendant refused to provide the plaintiff access to the essential facility. Defendants argue that the email exchanges between the parties in February and March 2016 make clear that StarStar Mobile wanted to lease to Sumotext and held itself willing and ready to negotiate. Those email exchanges are described in detail above. In particular, Defendants point to the last exchanges, in which StarStar Mobile offered to meet with Sumotext to negotiate resolution over their dispute regarding lease terms. *See* Emails, Bloch Decl. Exh. KK. Wes Hayden of StarStar Mobile suggested that Tim Miller of Sumotext speak with Tim Keyes of StarStar Mobile, and when that suggestion was rebuffed, Hayden advised Miller that he (Hayden) and Keyes would hold themselves available to meet via telephone or face to face. *Id*. It was *Miller* who broke off communication at that point, stating that he would not "negotiate with terrorists." *Id*. Defendants argue that Sumotext cannot prove that *Defendants* refused to provide Sumotext access to the StarStar registry on this record. If Defendants provided access to Sumotext, even if it was not on the terms that Sumotext wanted, Sumotext cannot maintain a claim under the essential facilities doctrine, because "[t]he doctrine does not guarantee competitors access to the essential facility in the most profitable manner." *MetroNet*, 383 F.3d 1124, 1130 (9th Cir. 2004). Where "reasonable access to the essential facility exists – even if not in a way that is conducive to [the plaintiff's] existing business model – [the plaintiff] cannot establish an essential facilities claim." *Id*.

Sumotext argues that the terms offered by StarStar Mobile were so unreasonable as to constitute a denial of access. They point to Tim Miller's email in which he calculated what he would have to pay under the new pricing plan in order to obtain the same national coverage as Sumotext had under the terminated StarStar leases. *See* Emails, Greathouse Decl. Exh. 20. Miller opined that "nobody would or could" afford nationwide leases under the new pricing plan, because "[s]ome quick math shows your charges would be $200,750 per month just to lease a phone number in the top 100 counties of the 3,144 counties of the U.S., along with $150,000 in setup fees." *Id*. Sumotext relies on *Safeway Inc. v. Abbott Labs.*, No. C 07-05470 CW, 2010 WL 147988, at *7 (N.D. Cal. Jan. 12, 2010), holding that a 400% price increase could amount to a refusal to deal implicating *Trinko*. "An offer to deal with a competitor only on unreasonable terms

and conditions can amount to a practical refusal to deal." *MetroNet*, 383 F.3d at 1132.

Sumotext also argues that there is a genuine factual dispute as to the parties' negotiations. According to Sumotext, the March 2016 email exchanges described above "shows that Sumotext repeatedly sought clarity from the Defendants regarding their notice of termination, they refused to answer Miller's questions, and VHT's CEO refused to provide additional time for a good faith negotiation." Opp. at 19-20, ECF 355-4.

The Court concludes that it cannot determine as a matter of law that StarStar Mobile's conduct fell on the "reasonable" side of the line, so as to preclude Sumotext's essential facilities claim. In the Court's view, a jury easily could find that the offered terms were reasonable, and/or that Sumotext pulled the plug on the negotiations prematurely. However, it is possible that a reasonable jury could agree with Sumotext's view of the negotiations, and conclude that StarStar Mobile offered unreasonable terms or refused to deal. Miller has extensive experience as a participant in the StarStar market, and it appears that his calculations as to what he would have to pay to maintain national StarStar leases are correct based on the price chart provided to him by Defendants. Hayden and Keyes did not indicate that Miller's calculations were incorrect when they responded to his email, they simply indicated that StarStar Mobile was pursuing a new business model. *See* Emails, Bloch Decl. Exh. KK.

Defendants present evidence showing that no lessee ever paid anything close to the numbers set forth in Miller's calculations, and that at the end of the day StarStar Mobile's pricing for nationwide contracts did not change much, staying somewhere between $10,000 to $15,000 per number. *See* Levitt Dep. 99:17-100:14, Bloch Decl. Exh. LL. However, Defendants do not present evidence that Miller was informed he could obtain nationwide contracts in the $10,000 to $15,000 range during the parties' March 2016 email communications, and in fact a review of the email exchanges shows that Hayden and Keyes let Miller's calculations stand. It may be that Sumotext could have obtained the nationwide prices that StarStar Mobile has offered to other customers had he met with Keyes or other executives to negotiate. However, it may be that StarStar Mobile would not have offered Sumotext those prices, in light of evidence that StarStar Mobile had deliberately sought to take back Sumotext's numbers and that Defendants in fact had

met with Sumotext's largest customers around the time of the acquisition.

The Court concludes that a jury viewing this record could find that StarStar Mobile refused to deal with Sumotext and thus cut off Sumotext's access to an essential facility, StarStar numbers.

### 4.     Feasibility of Access to the Essential Facility

On the fourth prong of the essential facilities test, whether it was feasible for the defendant to provide access to the essential facility, Defendants argue that it was not feasible for them to do so on the terms Sumotext wanted.  Defendants contend that Sumotext has not cited any authority for the proposition that the essential facilities doctrine can lock a company into an unprofitable business relationship forever.  While Defendants are correct, this argument assumes that the offered terms were reasonable, and that the terms Sumotext wanted were unreasonable.  While a jury certainly could find as much, the reasonableness of the offered terms presents a question of fact for the reasons discussed above.

Accordingly, Defendants' motion for summary judgment on the ground that it did not deny Sumotext access to an essential facility must be denied.

### D.     *Copperweld Doctrine* (Claim IV)

Finally, Defendants argue that they are immune from suit under Section 1, because they were a single entity under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). Plaintiffs argue that the record evidence does not support Defendants' assertion.

Section 1 "does not reach conduct that is wholly unilateral." *Copperweld*, 467 U.S. at 768 (internal quotation marks and citation omitted).  "Unilateral conduct by a single firm, even if it appears to restrain trade unreasonably, is not unlawful under section 1 of the Sherman Act." *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988) (internal quotation marks and citation omitted).

In determining what constitutes unilateral conduct, the Supreme Court held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Copperweld*, 467 U.S. at 771.  In a later decision, *American Needle*, the Supreme Court clarified that the appropriate inquiry "is one of competitive reality," and that "it is not determinative that two parties to an alleged § 1 violation

22

are legally distinct entities." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196 (2010).

Defendants argue that at all times during the alleged conspiracy period, VHT, StarSteve, VHT StarStar (once it was formed), and Zoove (now StarStar Mobile) were working with such a unity of purpose that they should be treated as a single entity. Sumotext argues that the collaborative conduct described by Defendants is not evidence that Defendants acted as a single entity, but rather shows that Defendants – separate entities – conspired to restrain trade.

The Court concludes that Defendants have not established that they should be considered a single entity. "[T]he single-entity inquiry is fact-specific." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148 (9th Cir. 2003). As Sumotext points out, StarSteve and VHT were separate entities when VHT acquired Zoove. In fact, StarSteve originally sought to acquire Zoove, approached VHT for investment, and was cut out of the deal when VHT went forward unilaterally with the creation of VHT StarStar and acquisition of Zoove. *See* Garvey Dep. 45:1-46:4, 54:2-6, 56:6-13, 77:20-78:5, Bloch Dep. Exh. F. After VHT StarStar acquired Zoove, Garvey permitted StarSteve to acquire a 49% share of VHT StarStar, with VHT retaining the other 51% share. Garvey Dep. 49:1-6, Bloch Dep. Exh. F; Garvey Dep.154:2-13, Greathouse Decl. Exh. 50. The Court is unaware of any authority holding that a stock purchase occurring *after* the allegedly anticompetitive acts can trigger application of the *Copperweld* doctrine.

"[T]he fact that joint venturers pursue the common interests of the whole is generally not enough, by itself, to render them a single entity." *Freeman*, 322 F.3d at 1148. Where, as here, a substantial portion of the conduct giving rise to Sumotext's Section 1 claim occurred before VHT created VHT StarStar, and before StarSteve acquired its interest in VHT StarStar, the Court cannot find as a matter of law that Defendants may be viewed as a single entity for purposes of the *Copperweld* doctrine. That determination is consistent with district court cases within the Ninth Circuit declining to apply *Copperweld* to corporations that are less than 100% in common. *Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*, 677 F. Supp. 1477, 1486 (D. Or. 1987).

**E.    Business Justification**

Although they have not sought summary judgment based on business justification, *see* Defs.' Motion at 1, ECF 336 (setting forth "Statement of Issues to be Decided"), Defendants argue

throughout their briefing that Zoove has never made money, Defendants made a legitimate business decision to pivot to a different business model, and such a decision cannot give rise to antitrust liability.  Defendants may well be able to persuade a jury of that version of events. However, Sumotext has submitted sufficient evidence in opposition to the grounds for summary judgment raised in this motion to preclude summary judgment.

## IV.    ORDER

Defendants' motion for summary judgment is DENIED.

Dated: December 20, 2019

BETH LABSON FREEMAN
United States District Judge