UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SUMOTEXT CORP., <br><br> Plaintiff, <br><br> v. <br><br> ZOOVE, INC., dba STARSTAR MOBILE; VIRTUAL HOLD TECHNOLOGY, LLC; STARSTEVE, LLC; and VHT STARSTAR LLC, <br><br> Defendants. | Case No. 16-cv-01370-BLF <br><br> **ORDER DENYING PLAINTIFF'S *DAUBERT* MOTIONS RE DEFENSE EXPERTS DR. DEBRA ARON AND GREG J. REGAN** <br><br> [Re: ECF 339-4, 347-4] |

Jury selection in this antitrust case is scheduled to commence on February 21, 2020. In preparation for trial, Plaintiff Sumotext Corporation has filed *Daubert* motions with respect to certain opinions offered by Dr. Debra Aron and Greg J. Regan, experts retained by Defendants Zoove, Inc., Virtual Hold Technology, LLC, and VHT StarStar LLC ("Defendants").[1] Following completion of the briefing, the Court vacated the December 12, 2019 hearing and took the motions under submission without oral argument.

The motions are DENIED for the reasons discussed below.

**I.  LEGAL STANDARD**

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

---

[1] While StarSteve, LLC also is a defendant in this case, it is not clear whether Dr. Aron and Mr. Regan have been retained on his behalf as well.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The Supreme Court discussed four factors that may be used to determine reliability: (1) whether the theory or technique used by the expert "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether there is "general acceptance" of the theory or technique in the "relevant scientific community." *Id*. at 593-94; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (reciting factors).

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court clarified that the "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to all expert testimony. The Supreme Court also made clear that the reliability inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id*. at 153.

The Ninth Circuit has emphasized that "[u]nder *Daubert*, the district judge is a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (internal quotation marks and citation omitted). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id*. at 565. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at 564.

**II. DISCUSSION**

Dr. Debra Aron is an antitrust expert retained by Defendants to respond to the opinions of Sumotext's antitrust expert, Dr. Ryan Sullivan. Dr. Aron received a Ph.D. in economics from the University of Chicago in 1985, with honors. Aron Report ¶ 3, Exh. 1 to Kesselman Decl. She is a vice president at Charles Rivers Associates, an international economics and finance consulting firm that provides economic expertise for litigation, regulatory proceedings, policy debates, and business strategy. *Id*. ¶ 2.

Greg J. Regan is a damages expert retained by Defendants to respond to the opinions of Sumotext's damages expert, Dr. Alan G. Goedde. Mr. Regan is a certified public accountant, licensed in California and New York. Regan Report ¶ 8, Exh. 2 to Stockinger Decl. He has worked as an auditor at Ernst & Young LLP, as the controller of a publicly traded company, and as a consultant. *Id*. ¶ 9. Mr. Regan has worked on many complex litigation matters, analyzing lost business value, lost profits, and other forms of economic damage involving entities in the tech industry, retail, health care, and real estate. *Id*.

Sumotext does not challenge these experts as unqualified to give their respective opinions, and the Court finds that Dr. Aron and Mr. Regan are qualified in their respective fields. Sumotext challenges certain of these rebuttal experts' opinions as lacking in foundation and/or based on unsound methodology. The Court notes that Sumotext's challenges are not framed in terms of the four factors discussed in *Daubert*. However, it does not appear that the *Daubert* factors would be a particularly good fit in this case, given the nature of the opinions offered by Dr. Aron and Mr. Regan. The Court therefore conducts the flexible inquiry mandated under *Daubert* and its progeny by determining whether Sumotext's asserted bases for exclusion are sufficient to show that challenged opinions fail to meet the threshold established by Rule 702.

### A.     Motion to Exclude Certain Opinions of Dr. Debra Aron

Sumotext objects to two aspects of Dr. Aron's opinions. First, Sumotext argues that Dr. Aron opines on the scope of the relevant markets in this case but has not performed the necessary foundational market analysis to offer such opinions. Second, Sumotext argues that Dr. Aron's opinions regarding application of the "single monopoly profit" theory must be excluded, on the basis that Dr. Aron has not undertaken a market analysis and or defined a relevant market. In response, Defendants argue that Dr. Aron appropriately criticizes the market definitions offered by Sumotext's expert, Dr. Sullivan, and that Dr. Aron – a rebuttal expert – need not offer her own market definitions in order to offer such criticism. Defendants also argue that Dr. Aron properly applies the single monopoly profit critique to Dr. Sullivan's market definition, and that she need not offer her own market definition to do so.

### 1. Dr. Aron's Criticisms of Dr. Sullivan's Market Definitions

Sumotext's antitrust expert, Dr. Sullivan, opines that there are two relevant markets in this case: the market for leasing StarStar numbers in the United States, and the market for servicing StarStar numbers in the United States. *See* Pl.'s Motion at p.3 n.1, ECF 347-4; Aron Report ¶¶ 12, 43, Exh. 1 to Kesselman Decl. Dr. Aron criticizes Dr. Sullivan's market definitions, stating that "[h]e not only failed to demonstrate the existence of a distinct market for StarStar numbers; he also failed to provide any fact-based economic analysis that could demonstrate the existence of such a market." Aron Report ¶ 1, Exh. 1 to Kesselman Decl. Sumotext contends that Dr. Aron not only criticizes Dr. Sullivan's market definitions but also offers her own affirmative market definitions without laying a foundation for doing so. In response, Defendants argue that Dr. Aron's criticisms of Dr. Sullivan's market definitions constitute proper rebuttal opinions. The Court agrees with Defendants for the reasons discussed below.

In her report, Dr. Aron cites a number of sources, including deposition testimony and industry publications, indicating that StarStar number technology is one of several direct marketing channels that marketers can use to reach potential consumers. Aron Report ¶¶ 13-15, 27-35, Exh. 1 to Kesselman Decl. She observes that the record evidence shows that direct marketing channels available to advertisers include toll-free phone numbers, vanity 10-digit phone numbers, mobile short codes, text messages, Quick Response ("QR") codes, and search engine optimization ("SEO"). *Id*. Dr. Aron opines that "[a]s an economic matter, the goals and perceived strengths and weaknesses of each marketing tool (including the return on investment perceived by the marketer) would determine the extent to which marketers may treat each as a suitable economic substitute for other means to reach their targeted audience." *Id*. ¶ 31.

Dr. Aron opines that Dr. Sullivan has not given adequate consideration to each identified direct marketing channels as a suitable economic substitute for StarStar numbers, and has not utilized any valid methodology in excluding all such channels from the relevant markets. Aron Report ¶ 12.G, Exh. 1 to Kesselman Decl. Specifically, Dr. Aron states that Dr. Sullivan "has provided no economic evidence that StarStar numbers constitute an antitrust market or that other forms of Call to Action marketing such as 1-800 numbers, texts, and emails are not adequate

4

substitutes in the eyes of customers." *Id*. Dr. Aron suggests that Dr. Sullivan based his market definitions on the deposition testimony of Tim Miller, Sumotext's President and CEO, rather than conducting a valid or accepted economic analysis of the market. *Id*. ¶ 12.A.

A defendant may present expert rebuttal of the plaintiff's expert "by putting forth its own expert who either claims that (1) the plaintiff's expert's methodology was conducted improperly in some way; or (2) the ultimate conclusion the plaintiff's expert makes is flawed because a superior methodology provides a different result." *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, No. CV 15-02370 JVS, 2016 WL 7042085, at *5 (C.D. Cal. Aug. 17, 2016). Dr. Aron's opinions fall into the first category, as she identifies numerous potential substitutes for StarStar numbers based on record evidence, and concludes that Dr. Sullivan has not used any legitimate methodology to exclude those potential substitutes from his market definitions.

Sumotext argues that Dr. Aron goes beyond criticizing Dr. Sullivan's methodology and offers affirmative opinions regarding the scope of the relevant markets and what products constitute substitutes for StarStar numbers. Sumotext contends that Dr. Aron cannot opine on the latter topics without conducting an independent market analysis, citing numerous cases discussing the required foundation for expert testimony. *See, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002). At her deposition, Dr. Aron testified expressly that she was not asked to perform an independent market analysis or to define the relevant markets in this case, and that she did not engage in either task. *See* Aron Dep. 36:9-38:20, Exh. 3 to Kesselman Decl. After reviewing Dr. Aron's report, the Court concludes that she does not offer her own market definitions or opine as to which products constitute adequate substitutes for StarStar numbers; instead, Dr. Aron challenges Dr. Sullivan's methodology in excluding all potential substitutes from *his* market definitions. Dr. Aron is qualified to challenge Dr. Sullivan's methodology in this manner, and such challenge constitutes proper rebuttal opinion. Sumotext has offered no authority for the proposition that Dr. Aron must offer her own market definitions in order to criticize Dr. Sullivan's market definitions.

Sumotext identifies several statements in Dr. Aron's report that could be construed as affirmative statements regarding the scope of the relevant markets or the suitability of certain products as substitutes for StarStar numbers. For example, Sumotext points to Dr. Aron's statement that "[t]he evidence I discuss below indicates that the relevant market is much larger than StarStar numbers and StarStar services and includes a much broader set of consumer engagement products." Aron Report ¶ 145, Exh. 1 to Kesselman Decl. Read in context, however, the identified statements do not appear to be independent determinations regarding the scope of the relevant markets, but merely part of Dr. Aron's commentary on asserted deficiencies in Dr. Sullivan's opinions. For example, immediately after the language quoted above, Dr. Aron points to evidence that a decrease in the price of StarStar numbers did not result in increased demand, and opines that "[i]f StarStar numbers constituted a market, a decrease in price would result in an increase in sales of the product." *Id.* ¶¶ 145-47. Highlighting Dr. Sullivan's failure to address this and other record evidence is proper rebuttal. "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 996 (N.D. Cal. 2018) (internal quotation marks and citation omitted). Dr. Aron's opinions do just that. To the extent Dr. Aron offers affirmative market definitions at trial, Sumotext may raise an appropriate objection based on Dr. Aron's testimony that she did not conduct an independent market analysis or to define the relevant markets.

In its reply brief, Sumotext argues that Defendants' opposition inappropriately attacks Dr. Sullivan's report as unreliable and factually unsupported. Sumotext correctly points out that Defendants have not filed a *Daubert* motion with respect to Dr. Sullivan, and that an opposition brief is not a proper vehicle to do so. The Court has disregarded Defendants' attacks on Dr. Sullivan arguments except as relevant to the reliability and admissibility of Dr. Aron's opinions. As stated above, the Court finds Dr. Aron's criticisms of Dr. Sullivan's report to be appropriate expert rebuttal. To the extent Sumotext believes Dr. Aron has mischaracterized Dr. Sullivan's report, that argument goes to the weight of Dr. Aron's opinions and not their admissibility. *Perez v. State Farm Mut. Auto. Ins. Co.*, No. C 06-01962 JW, 2011 WL 8601203, at *8 (N.D. Cal. Dec.

1 7, 2011) ("Whether Bashline's analysis and conclusions misrepresent or mischaracterize the Cripe and Rubinfeld Reports goes to the weight of his testimony rather than its admissibility.").

Accordingly, the Court DENIES Sumotext's motion to exclude Dr. Aron's opinions regarding Dr. Sullivan's market definitions.

### 2. Dr. Aron's Single Monopoly Profit Critique

Dr. Aron concludes that if Dr. Sullivan's market definitions are accepted, then Dr. Sullivan's opinion that Defendants excluded Sumotext as a reseller is internally inconsistent under the "single monopoly profit" principle of economics. *See* Aron Report ¶ 12.E., Exh. 1 to Kesselman Decl. Dr. Aron explains that principle in her report as follows:

> Economics teaches that even if VHT\*\*/SSM were a monopolist as Dr. Sullivan opines, a monopolist has no short-run or long-run incentive to exclude efficient resellers, dealers, and retailers from the market. This is because an upstream monopolist can extract all of the monopoly profits available without controlling the retailing function, and would only seek to control the retailing function if it were a more efficient retailer than existing retailers. An upstream monopolist has no incentive to attempt to "leverage" or extend its upstream monopoly into downstream sales because there are no additional profits to be had; on the contrary, if the downstream dealers or resellers were more efficient at selling, the upstream monopolist would earn more profits by encouraging resellers and dealers. The upstream monopoly would have an incentive to operate the retailing function itself only if it were more efficient at doing so (because it could share in the efficiency gains), and operating the downstream function itself would not harm, and may rather benefit, consumers. This economic principle is known as the "single monopoly profit" critique.

*Id.* ¶ 104 (footnotes excluded), Exh. 1 to Kesselman Decl.

Sumotext argues that Dr. Aron may not offer testimony based on a theory that requires analysis of conduct in two defined markets when she has not defined a relevant market or undertaken a market analysis. That argument is not well-taken. Dr. Aron offers the "single monopoly profit" critique to show that if Dr. Sullivan's market definitions are accepted, his report is internally inconsistent. Dr. Aron need not establish that Dr. Sullivan's market definitions are correct – in fact she has sought to establish just the opposite – in order to argue that *if* they are correct then Dr. Sullivan's report is flawed under a particular economic principle.

Sumotext also argues that to the extent Dr. Aron opines that upstream monopolists cannot be liable for antitrust violations arising from refusal to deal with downstream resellers, Dr. Aron's opinion is contrary to Supreme Court precedent. *See Eastman Kodak Co. v. Image Tech. Servs.,*

7

*Inc.*, 504 U.S. 451 (1992). Sumotext's argument is inapposite, as Dr. Aron does not opine that the "single monopoly profit" principle renders upstream monopolists immune from antitrust liability. Dr. Aron merely opines that if Dr. Sullivan's market definitions are accepted, then his report is internally inconsistent.

Finally, Sumotext cites economic literature for the proposition that the "single monopoly profit" theory has been discredited, and it argues that Dr. Aron's opinions based on the theory therefore should be excluded. In response, Defendants cite other economic literature and case law recognizing the validity of the "single monopoly profit" theory. Sumotext has not provided the Court with an adequate basis to determine that the "single monopoly profit" theory has been uniformly rejected in the field of economics such that Dr. Aron's application of the theory is inherently unreliable. Where, as here, two qualified economists espouse conflicting views about the effect of a particular economic principle on the case, a "battle of the experts" arises. The proper course is to allow each side to attack the other's with contrary expert opinion, other contrary evidence, and cross-examination. *See Primiano*, 598 F.3d at 564-65. Dr. Sullivan in fact takes on Dr. Aron's application of the "single monopoly profit" principle in his reply report, asserting that Dr. Aron's approach is erroneous. Sullivan Reply Report ¶¶ 32-37, Exh. 2 to Kesselman Decl. It will be up to the jury to decide which expert to believe.

The Court DENIES Sumotext's motion to exclude Dr. Aron's opinions regarding the "single monopoly profit" principle.

### B. Motion to Exclude Certain Opinions of Greg J. Regan

Sumotext challenges two aspects of the opinions offered by Defendants' rebuttal damages expert, Greg J. Regan. First, Sumotext seeks to exclude Mr. Regan's opinion that Sumotext's lost profits, if any, total approximately $1.1 million rather than the $9.2 million calculated by Sumotext's damages expert, Dr. Alan G. Goedde. Second, Sumotext seeks to exclude Mr. Regan's opinions regarding Sumotext's lease cancellations. Sumotext asserts that these opinions are based on unreliable and inconsistent methodology. In response, Defendants argue that Mr. Regan's opinions are based on sound methodology and are admissible.

### 1. Mr. Regan's Damages Calculation

Sumotext's damages expert, Dr. Goedde, opines that the present value of Sumotext's lost profits resulting from Defendants' alleged anticompetitive conduct totals $9,223,500. Goedde Report ¶ 44, Exh. 1 to Stockinger Decl. Mr. Regan criticizes Dr. Goedde's methodology on a number of grounds, including Dr. Goedde's asserted failure to adequately account for the impact of lease cancellation by Sumotext's customers, overstatement of projected growth rate, dismissal of the Verizon VoLTE issue, and failure to account for all of Sumotext's variable costs. Regan Report ¶¶ 46-56, 73-77, 89-92, 93-96, Exh. 2 to Stockinger Decl. Mr. Regan provides an alternative calculation of $1,105,200 for the present value of Sumotext's lost profits, if any, resulting from Defendants' alleged anticompetitive conduct. Regan Report ¶¶ 115, 128-33 & Sched. 3. Sumotext moves to exclude Mr. Regan's alternative damages model and damages calculation.

As noted above, a defendant may present expert rebuttal of the plaintiff's expert by putting forth its own expert who either (1) challenges the methodology of the plaintiff's expert, or (2) claims that the ultimate conclusion reached by the plaintiff's expert is flawed because a superior methodology provides a different result. *See TCL Commc'ns Tech. Holdings Ltd.*, 2016 WL 7042085, at *5. Mr. Regan's opinions satisfy both categories, as he challenges Dr. Goedde's methodology and offers a different damages calculation based on what he claims is superior methodology.

Sumotext argues that Mr. Regan's alternative damages model is unreliable because it is dependent on a 75% lease cancellation rate that Sumotext contends is unsupported by the record and based solely on Mr. Regan's *ipse dixit*.[2] "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157 (internal quotation mark and citation omitted). However, as discussed below, the Court finds that Mr. Regan adequately explains how he arrived at the 75% lease cancellation rate and used the rate in his damages calculation.

---

[2] An *ipse dixit* is "an assertion made but not proved." See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/ipse%20dixit (last visited December 30, 2019).

9

1    Mr. Regan observes that Sumotext's StarStar leases typically were for a fixed initial term
2    such as three months, with the leases thereafter renewing on a month-to-month basis. Regan
3    Report ¶ 48, Exh. 2 to Stockinger Decl. Sumotext experienced significant lease cancellations over
4    the period it operated its StarStar business. *Id*. ¶¶ 49-52. Mr. Regan calculated that the average
5    duration of Sumotext's leases at the time of cancellation was 6.4 months. *Id*. ¶ 62. Based on
6    leases in service as of September 15, 2015, which was 6.4 months prior to the termination of all of
7    Sumotext's StarStar numbers, Mr. Regan calculated that Sumotext had a lease cancellation rate of
8    82%. *Id*. ¶ 65. Mr. Regan did not include leases commencing after September 15, 2015 when
9    calculating Sumotext's cancellation rate, because in his opinion those leases had not been in
10   service long enough for complete cancellation data to emerge. *Id*. ¶ 67. Mr. Regan also
11   determined the average duration of StarStar Mobile's leases and StarStar Mobile's cancellation
12   rate based on leases commencing after January 2016. *Id*. ¶ 64. Mr. Regan found that the average
13   duration of StarStar Mobile's leases at the time of cancellation was 8 months and that StarStar
14   Mobile's lease cancellation rate was 67%. *Id*.

15   Mr. Regan used these lease cancellation rates in his lost profits calculation as follows.
16   First, he calculated Sumotext's gross revenue based on its active StarStar leases as of December
17   31, 2015. Regan Report ¶ 128, Exh. 2 to Stockinger Decl. Mr. Regan then calculated Sumotext's
18   future gross revenue based on growth rates identified and explained in his report. *Id*. ¶¶ 128-29.
19   However, those calculations did not take into account the impact of lease cancellation. *Id*. ¶ 130.
20   As noted above, Mr. Regan determined that Sumotext's lease cancellation rate was 82%.
21   However, he applied a lower cancellation rate of 75% for purposes of his analysis. *Id*. Mr. Regan
22   stated in his report that "[t]his reduced cancellation rate considers the cancellation experience of
23   StarStar Mobile (*i.e.*, approximately 67%)." *Id*. Applying the 75% cancellation rate and
24   deducting operating costs, Mr. Regan concludes that the present value of Sumotext's lost profits, if
25   any, total $1,105,200. Regan Report Schedule 3.

26   Sumotext contends that Mr. Regan's explanation of why he applied a 75% cancellation
27   rate is inadequate, and it asserts that Mr. Regan conceded in his deposition that the 75% rate is
28   based solely on his *ipse dixit* judgment. Sumotext mischaracterizes Mr. Regan's testimony. Mr.

1 Regan testified that although he could have used the 82% cancellation rate he had determined for
2 Sumotext, he made a judgment that cancellation rates might decline somewhat over time and thus
3 that a lower rate of 75% was more appropriate. Regan Dep. 131:17-25, Exh. 4 to Stockinger Decl.
4 Mr. Regan's judgment was based in part on StarStar Mobile's 67% cancellation rate. *Id.* Mr.
5 Regan also considered the abatement of the Verizon VoLTE issue and he anticipated that
6 Sumotext might get better at avoiding cancellations as it gained experience in the business. Regan
7 Dep. 132:3-9, Exh. A to Bloch Decl. Based on all of those factors, Mr. Regan decided to apply a
8 more conservative cancellation rate of 75% rather than the rate of 82%. Regan Dep. 132:9-17.
9 Mr. Regan's downward adjustment of Sumotext's actual 82% cancellation rate to an estimated
10 75% cancellation rate, based on his professional judgment that the factors identified above might
11 cause a decline in cancellation rates over time, is an appropriate exercise of his expertise that
12 meets the threshold of Rule 702. *See* Fed. Judicial Ctr. Reference Guide on Estimation of
13 Economic Damages 432-33 (3d Ed. 2011), 2011 WL 7724259, *4 ("Relatively few economists
14 serving as damages experts succumb to Daubert challenges, because most damages analyses
15 operate in the familiar territory of measuring economic values using a combination of professional
16 judgment and standard tools.").

The Court DENIES Sumotext's motion to exclude Mr. Regan's damages model and lost profits calculation on the ground that the 75% lease cancellation rate is based solely on *ipse dixit*.

### 2. Mr. Regan's Opinions Re Sumotext's Lease Cancellations

In addition to challenging the 75% estimated lease cancellation rate used by Mr. Regan, Sumotext also challenges the actual 82% lease cancellation that was Mr. Regan's starting point.

First Sumotext contends that the 82% cancellation rate is inflated by inclusion of leases cancelled on March 31, 2016 – the effective date of Defendants' termination of Sumotext – as a result of Defendants' anticompetitive conduct. Sumotext argues that it is improper to calculate lost profits based on data affected by Defendants' alleged anticompetitive conduct, because "[a] plaintiff's antitrust damages are to be calculated by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791

11

F.2d 1356, 1367 (9th Cir. 1986) (internal quotation marks and citation omitted).

Mr. Regan expressly recognized in his deposition testimony that his goal was to determine what Sumotext's baseline performance was prior to the alleged bad acts, and to use that baseline to estimate Sumotext's hypothetical performance had the bad acts not occurred. Regan Dep. 32:17-6, Exh. A to Bloch Decl. Mr. Regan acknowledged that in determining the 82% lease cancellation rate, he considered leases that were cancelled on March 31, 2016. *Id.* 150:16-25. He explained that he did so to increase his data pool. *Id.* More specifically, the leases terminated on March 31, 2016 generally were cancelled more quickly than other leases, and thus including those leases brought down the average months to termination figure, which enabled a deeper pool of leases to be analyzed. *Id.* Mr. Regan confirms the 82% cancellation rate by looking at other data, such as how many of Sumotext's StarStar numbers leased in 2012 were still leased in 2015. Regan Report ¶¶ 49-50, Exh. 2 to Stockinger Decl. That data shows a cancellation rate of 80%. *Id.* Mr. Regan also analyzes data on usage of StarStar numbers and concludes that there is a strong correlation between low or declining call volume and cancellation. *Id.* ¶¶ 56-61. Mr. Regan indicates that most of leases cancelled on March 31, 2016 had low call volume and therefore likely would have been cancelled in any event. *Id.* ¶¶ 67-70. Mr. Regan looks to the call usage activity as a cross-check for his lease cancellation rate and concludes that Defendants' alleged bad acts did not affect the analysis. Regan Dep. 165:17-167:1, Exh. A to Bloch Decl.

Based on the foregoing, the Court is satisfied that Mr. Regan has articulated a reasonable methodology grounded in the record evidence which is sufficient to satisfy the threshold of Rule 702. Sumotext's assertions that the methodology of its expert is superior, or that Mr. Regan's 82% lease cancellation rate is inaccurate, may be addressed at trial through presentation of Dr. Goedde's testimony and cross-examination of Mr. Regan.

Sumotext argues that Mr. Regan acted inconsistently by excluding all Sumotext leases in effect for less than 6.4 months when calculating the lease cancellation rate, but applying the cancellation rate to new leases on a trailing 6.0 month basis. Sumotext argues that had Mr. Regan used a 6.0 month term for the average lease duration, the cancellation rate would have been 41% - half of the 82% rate he reached. Mr. Regan explains the basis for his determination that the

12

average duration of Sumotext's leases at the time of cancellation was 6.4 months. Regan Report ¶ 62, Exh. 2 to Stockinger Decl. Using the 6.4 figure, Mr. Regan calculates a lease cancellation rate of 82%. It is not apparent that use of the 6.4 month average lease duration figure in calculating the lease cancellation rate is inconsistent with Mr. Regan's subsequent application of the reduced lease cancellation rate of 75% "on a trailing two quarter basis" as disclosed in the portions of Mr. Regan's testimony cited by Sumotext. Regan Dep. 127:14-20, Exh. 4 to Stockinger Decl. Even if there were an inconsistency in the manner in which Mr. Regan applies the lease cancellation rate, that inconsistency would not dictate reduction of the average lease duration from 6.4 months to 6.0 months or render unreliable Mr. Regan's calculation of the lease cancellation rate. Sumotext is free to challenge Mr. Regan's calculations regarding average lease duration, lease cancellation rate, or any other of his results at trial through presentation of competing expert opinion or cross-examination. However, Sumotext has failed to establish that the asserted inconsistency described above renders Mr. Regan's opinions unreliable and thus excludable under Rule 702 and *Daubert*.

The Court notes that the parties engage in substantial debate as to whether and which portions of Mr. Regan's report may be irrelevant now that Sumotext has dismissed its state law claims. The Court is confident that any testimony offered at trial will be relevant to the remaining antitrust claims. If that is not the case, Sumotext may raise an appropriate objection.

Accordingly, the Court DENIES Sumotext's motion to exclude Mr. Regan's opinions regarding Sumotext's lease cancellations.

### III. ORDER

Sumotext's *Daubert* motions regarding defense experts Dr. Aron and Mr. Regan are DENIED.

Dated: January 2, 2020

_____
BETH LABSON FREEMAN
United States District Judge

13