# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SUMOTEXT CORP., | Case No. 16-cv-01370-BLF |
| Plaintiff, | |
| v. | **ORDER RE MOTIONS IN LIMINE** |
| ZOOVE, INC., et al., | [Re: ECF 384, 385, 386, 387, 388, 390, 391, 392] |
| Defendants. | |

Plaintiff Sumotext Corporation ("Sumotext") brings this suit against Defendants Zoove, Inc. ("Zoove"), Virtual Hold Technology LLC ("VHT"), VHT StarStar, and StarSteve, LLC ("StarSteve"), alleging that Defendants have violated the federal antitrust laws in connection with the leasing and servicing of "StarStar numbers." After substantial motion practice, two claims remain in the operative third amended complaint ("TAC"): Count IV for restraint of trade in violation of Section 1 of the Sherman Act, and Count V for conspiracy to monopolize and monopolization in violation of Section 2 of the Sherman Act. Trial in this case is scheduled to begin on February 24, 2020.

On January 16, 2020, in advance of the Final Pretrial Conference, Defendants jointly filed five motions in limine, ECF 384, 385, 386, 387, 388, and Plaintiff filed three motions in limine, ECF 390, 391, 392. Each side responded to the other's motions on January 23, 2020. ECF 396, 397, 398, 399, 400, 401, 402, 403. The Court held the Final Pretrial Conference in this case on January 30, 2020, during which the Court heard oral argument on the motions in limine and issued its rulings on the record. This order memorializes those rulings. For the reasons stated on the record, and as summarized below, the Court orders as follows:

## I. LEGAL STANDARD

Motions in limine are a "procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). Like other pretrial motions, motions in limine are "useful tools to resolve issues which would otherwise clutter up the trial." *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017). Accordingly, "a ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court." *Id.*; *see Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984) (explaining that a court may rule in limine "pursuant to the district court's inherent authority to manage the course of trials").

In many instances, however, rulings "should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016). After all, in order to exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential grounds." *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1167 (D. Nev. 2014). Thus, denial of a motion in limine to exclude certain evidence does not mean that all evidence contemplated by the motion will be admitted, only that the court is unable to make a comprehensive ruling in advance of trial. *Id.* Even if a district court does rule in limine, moreover, the court may "change its ruling at trial because testimony may bring facts to the district court's attention that it did not anticipate at the time of its initial ruling." *City of Pomona*, 866 F.3d at 1070; *see also Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) ("[I]n limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial.").

## II. PLAINTIFF'S MOTIONS IN LIMINE

Plaintiff brings three motions in limine. The Court addresses each in turn below.

### A. Plaintiff's Motion in Limine No. 1

Plaintiff's first motion in limine seeks to "preclude Defendants from arguing that their anticompetitive conduct is justified because they sought to make more profits and prevent Zoove from failing." ECF 390 ("Pl. MIL No. 1") at 2. To provide some context, Defendants argued at the summary judgment stage that "Zoove has never made money, Defendants made a legitimate

business decision to pivot to a different business model, and such a decision cannot give rise to antitrust liability." ECF 382 at 23-24; *see, e.g.*, ECF 336 at 17, 22-23. The Court acknowledged that a legitimate business justification can avert antitrust liability in some cases but concluded that Defendants were not entitled to summary judgment on those grounds. ECF 382 at 24. Plaintiff now contends that Defendants should not be able to present their business justification defense to the jury because the business justification is not "legitimate." Defendants, of course, disagree. They maintain that "Zoove was perfectly entitled to terminate its deal with Sumotext to increase Zoove's profits and make it a more viable company." ECF 397 ("Opp. to Pl. MIL No. 1").

As a general matter, Plaintiff is correct that "the promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct." *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973). Thus, "the desire to make Zoove profitable," Opp. to Pl. MIL No. 1 at 2, is not, by itself, enough to justify "anticompetitive uses of [a company's] dominant economic power," *Otter Tail Power Co.*, 410 U.S. at 380-81. It is not, in the parlance of the Rule of Reason, a "procompetitive benefit." That is because the Sherman Act "assumes that an enterprise will protect itself against" unprofitability "by operating with superior service, lower costs, and improved efficiency" rather than "predatory practices." *Id.*

Plaintiff, however, mischaracterizes Defendants' defense. The legitimate business justification issue properly arises with regard to Plaintiff's claim of actual monopolization under Section 2 against VHT StarStar.[1] *See* ECF 398 at 15. Plaintiff "alleges that after obtaining monopoly power in both relevant markets, VHT StarStar maintained its monopoly power through . . . a practical refusal to deal . . . or a denial of access to an essential facility." ECF 409 at 53 (Plaintiff's proposed jury instruction for claim of actual monopolization). In other words, Plaintiff's theory of liability is based on VHT StarStar's alleged unilateral refusal to deal.[2]

---

[1] Plaintiff stated at the Final Pretrial Conference that it has dismissed certain defendants from certain of its claims. These changes are reflected in Plaintiff's proposed verdict form and proposed jury instructions. *See* ECF 407 (Plaintiff's verdict form). Relevant here, Plaintiff brings its claim for actual monopolization under Section 2 of the Sherman Act against VHT StarStar (and its wholly-owned subsidiary, Zoove) only. *Id.* at 6.

[2] Plaintiff originally alleged a "group boycott" in violation of Section 1 of the Sherman Act. *See* TAC ¶¶ 274-75. However, Plaintiff is apparently no longer pursuing a group boycott theory, which is a theory of per se illegality, *see* TAC ¶ 274, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128,

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("The essential facilities doctrine . . . is a variation on a refusal to deal claim."). "As a general rule, a monopolist has no duty to deal with its competitors." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993). On the contrary, the Supreme Court has repeatedly emphasized the "high value" it "place[s] on the right to refuse to deal with other firms." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.") (internal quotation marks and alterations omitted). And although that right is not "unqualified," the Supreme Court has "been very cautious in recognizing . . . exceptions." *Trinko*, 540 U.S. at 408.

Plaintiff apparently appeals to the "narrow exception," *Aerotec Int'l*, 836 F.3d at 1184, recognized by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). *See also Trinko*, 540 U.S. at 408 ("The leading case for § 2 liability based on refusal to cooperate with a rival . . . is *Aspen Skiing*."). In *Aspen Skiing*, as here, the Court considered "the defendant's decision to cease participation" in a course of dealing with the plaintiff. *Trinko*, 540 U.S. at 408. Specifically, "the defendant—who owned three of the four ski resorts in the market—discontinued a joint lift-ticket package with a smaller rival, the only other competitor in the market, and then flatly refused to sell the rival any lift tickets so it could create its own bundles." *Aerotec Int'l*, 836 F.3d at 1184 (citing *Aspen Skiing*, 472 U.S. at 592-94). The jury was properly instructed that the defendant's actions did not violate Section 2 "if valid business reasons exist for that refusal." *Aspen Skiing*, 472 U.S. at 604-05. The Court upheld the jury's verdict in favor of the plaintiff, which implied that "the jury concluded there were no valid business reasons for the refusal." *Id.* at 605. The Court explained: "The jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing

135 (1998). Instead, Plaintiff is only pursuing its Section 1 claim under the Rule of Reason. ECF 409 at 19 (Plaintiff's proposed jury instruction for Section 1).

competition in the Aspen market over the long run by harming its smaller competitor." *Id.* at 608.

The Supreme Court has since made clear, however, that "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. The key fact in *Aspen Skiing* was that "[t]he unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* (emphasis in original). That is, because the course of dealing the defendant terminated was profitable, it "was apparently motivated entirely by a decision to avoid providing any benefit to" the defendant's competitor rather than any "normal business purpose." *Aspen Skiing*, 472 U.S. at 608, 611. Terminating (or declining to engage in) an *unprofitable* course of dealing, however, is another matter. "Economic necessity" and "business acumen"—and not the acquisition or maintenance of monopoly power—is the rationale for ending a course of dealing that is unprofitable. *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 369 (9th Cir. 1988). That a course of dealing is unprofitable is therefore a valid business reason. *See id.* (finding no Section 2 liability for Pacific Resources' refusal to produce propane to sell to Oahu Gas where "the investment required of Pacific Resources to produce propane would have resulted in a negative return"); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004) (distinguishing *Aspen Skiing* because defendant "Qwest attempted to change this prior course of dealing after it realized that the resale of Centrex by MetroNet and others was having a 'significantly negative' impact on its own profitability"); *High Tech. Careers*, 996 F.2d at 992 ("If Mercury News can prove its assertion" "that it was actually losing money from the insert," "it should prevail."); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1225 (10th Cir. 2009) ("[T]he evidence here suggests that Mercy refused to deal with Dr. Bevan to avoid an unprofitable relationship, and that the hospital pursued the course it did to protect and maximize its chances of profitability in the short-term. . . . *Aspen Skiing* does not require more economic justification than this to avoid Section 2 liability."); *see also Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 740 (9th Cir. 1985) ("Drinkwine argues that the Statesman was merely trying to make more money. Even that motive is consistent with competition and the reasoning in *Aspen Skiing*.").

Put another way, "there is 'no duty to deal under the terms and conditions preferred by a competitor's rivals,' there is only a duty not to refrain from dealing where the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *Aerotec Int'l*, 836 F.3d at 1184 (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457 (2009)).

In sum, once Plaintiff has presented evidence that Defendants' refused to deal with it in order to gain or maintain monopoly power, Defendants' will be entitled to present evidence that it did so because dealing with Plaintiff was unprofitable. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) (explaining that once plaintiffs "have presented evidence that Kodak took exclusionary action to maintain its parts monopoly," "liability turns . . . on whether 'valid business reasons' can explain Kodak's actions"). Plaintiff can certainly contest whether the deal was or would be unprofitable. *See, e.g.*, *High Tech. Careers*, 996 F.2d at 992 (whether Mercury News "was actually losing money from the insert" "will be the issue at trial"). But as just explained, ending an unprofitable course of dealing is a "valid business reason" that would inoculate Defendants' refusal to deal—even if the refusal necessarily excluded competition. *Oahu Gas*, 838 F.2d at 369 ("[T]he desire to maintain market power—even a monopolist's market power—cannot create antitrust liability if there was a legitimate business justification.").

That said, Defendants cannot proffer evidence or argument that it was merely "more profitable" to exclude Plaintiff. Furthermore, as just explained, the valid business reasons defense has only been recognized as to unilateral refusals to deal; it is inapplicable to Plaintiff's conspiracy claims. Accordingly, Plaintiff's motion is DENIED in part and GRANTED in part.

## B. Plaintiff's Motion in Limine No. 2

Second, Plaintiff asks the Court to limit the use of the trade name "StarStar Mobile" to refer only to Defendant VHT StarStar and not to Defendant Zoove. ECF 391 ("Pl. MIL No. 2") at 2. Because "StarStar Mobile" "is the registered fictitious name for VHT StarStar," Plaintiff believes it would be confusing for the jury if Defendants also use "StarStar Mobile" to refer to Zoove. *Id.*

It is undisputed that VHT StarStar and Zoove—a wholly-owned subsidiary of VHT Star-

Star—are distinct legal entities. At the Final Pretrial Conference, however, Defendants asserted that "StarStar Mobile" is not a registered dba name for either entity. In Defendants' telling, the name "StarStar Mobile" "actually does refer to both" entities: "[T]hey operate a single business venture that is referred to internally and holds itself out to the public as 'StarStar Mobile.'" ECF 396 ("Opp. to Pl. MIL No. 2") at 2. "VHT StarStar is the entity that pays employees and makes contracts with customers, while Zoove is the entity that holds contracts with mobile phone operators and owns the relevant technology." *Id.* But if, say, a company wants to lease a StarStar number, it would visit the website https://starstarmobile.com. *Id.* Employees likewise "use starstarmobile.com email accounts and boast StarStar Mobile signature lines." *Id.* at 2-3. Hence, say Defendants, "it is logical to refer to the entities by their technical legal names when describing only one or the other and then to refer to them collectively by their common name." *Id.* at 3.

In light of the foregoing, Plaintiff's motion is DENIED as to the request to use "StarStar Mobile" to refer to VHT StarStar. Nevertheless, it is eminently clear that precision will be necessary to avoid confusing the jury. The parties shall use the legal names for VHT StarStar and Zoove to refer to those entities; the parties shall not use "StarStar Mobile" to refer to either VHT StarStar or Zoove alone. Hence, the Court agrees with Plaintiff that Defendants cannot tell the jury "that StarStar Mobile . . . terminated its business relationship with Sumotext (presumably referring to Zoove), but yet is also the same company that had no course of dealing with Sumotext (presumably referring to VHT StarStar)." Pl. MIL No. 2 at 2. At the same time, the Court will not preclude the Defendants from explaining to the jury that "StarStar Mobile" was a fictitious name used by both VHT StarStar and Zoove. Plaintiff is free to clarify or contest the respective roles of VHT StarStar and Zoove on cross-examination (or re-direct examination, as the case may be).

In addition, in order to aid the jury, the parties shall prepare a chart identifying the name that will be used to refer to each of the relevant entities. That chart must make clear that "StarStar Mobile" is not an independent entity. The deadline for that submission is **February 12, 2020.**

### C. Plaintiff's Motion in Limine No. 3

In its third motion in limine, Plaintiff seeks to bar Defendants from (1) arguing that the dismissal of the contract and tortious interference claims "impacts the legal viability of Plaintiffs'

antitrust claims" or (2) introducing evidence "that Mblox was originally named as a defendant." ECF 392 ("Pl. MIL No. 3") at 2-3. As the Court confirmed at the Final Pretrial Conference, the parties agree that the fact of the dismissals—of the contract claim, of the tortious interference claim, and of Mblox—is not relevant to Defendants' liability *vel non* for the antitrust claims. *See also* ECF No. 384 ("Def. MIL No. 1") at 1 ("To be sure, Sumotext still can claim that Zoove's termination of its contracts with Sumotext violated antitrust law."). Defendants may have violated the antitrust laws regardless of whether Plaintiff's have claims for breach of contract or tortious interference. Likewise, the current Defendants' liability in unaffected by the Court's dismissal of Mblox. Accordingly, the Court GRANTS Plaintiff's motion, recognizing its limited scope.

Defendants' opposition also raises issues that exceed the scope of Plaintiff's motion but are squarely presented by Defendants' first and second motions in limine. The Court addresses those issues below.

## III. DEFENDANTS' MOTIONS IN LIMINE

The Court now turns to Defendants' five motions in limine.

### A. Defendants' Motion in Limine No. 1

First, as alluded to earlier, Defendants also make a motion regarding references at trial to the parties' stipulated dismissals of the claims for breach of contract (Count I) and breach of the covenant of good faith and fair dealing (Count II) in the TAC. Defendants make two requests, one concerning what Plaintiff may present and another concerning what Defendants may present. The former is GRANTED but the latter is DENIED.

As to what Plaintiff may present, Defendants ask the Court to bar Plaintiff from "making any argument or offering any evidence advancing the theory that Zoove's termination of Sumotext's contracts violated either contract law or the implied covenant of good faith and fair dealing." Def. MIL No. 1 at 2. The Court agrees that such argument would be improper in light of the stipulated dismissals with prejudice. Plaintiff also represents that it "does not seek to relitigate its claim against Defendants for breach of contract, breach of implied covenants, or tortious interference." ECF 398 ("Opp. to Def. MIL No. 1") at 4. As Defendants acknowledge, however, "Sumotext still can claim that Zoove's termination of its contracts with Sumotext

violated antitrust law." Def. MIL No. 1 at 1. That is, Plaintiff will be permitted to offer evidence of conduct under the contract, including Zoove's termination of its contracts with Sumotext.

As to what Defendants may present, Defendants seek permission "to inform the jury that it was entitled under contract law to terminate its agreements with Sumotext." Def. MIL No. 1 at 1. No; that would be improper for two reasons. First of all, "voluntary dismissal of a claim prior to any adjudication and without any stipulated findings of fact does not actually litigate any issue." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1159 (9th Cir. 2002). Consequently, there has been no finding that Zoove did not commit a breach of contract or a breach of the covenant of good faith and fair dealing. Second, as already discussed with regard to Plaintiff's Motion in Limine No. 3, Defendants' liability (or lack thereof) for the contract claims is not relevant to Defendants' liability for the antitrust claims.

However, should Plaintiff introduce evidence that Zoove terminated its contracts with Sumotext in the course of its antitrust case, Defendants may tell the jury that they are not being sued for breach of contract or breach of the covenant of good faith and fair dealing. To be clear, Defendants may not refer to the dismissal of those claims, *see supra* Part II.C., but they may state that there are no such claims currently in the case. Moreover, Defendant is entitled to bring evidence that the termination (or any other conduct under the contract) was permitted by the contracts at issue.

And again, Plaintiff may respond with evidence and argument that such conduct—whether allowed by the contract or not, violated the antitrust laws.

## B.     Defendants' Motion in Limine No. 2

Defendants' Motion in Limine No. 2 concerns the parties' stipulated dismissals of the claim for tortious interference with contract (Count III) in the TAC. ECF 385 ("Def. MIL No. 2"). As in their Motion in Limine No. 1, Defendants address the evidence Plaintiff may introduce and the evidence Defendants may introduce.

First, as with the contract claims, Plaintiff may not present evidence or argument advancing the tortious interference claim that has been dismissed with prejudice. However, the Court will not bar Plaintiff from making "[a]ny reference to pre-acquisition communications with

Sumotext's customers." Def. MIL No. 2 at 2. Defendants believe such references are irrelevant to Plaintiff's antitrust claim, but the Court is persuaded by Plaintiff's briefing and arguments at the Final Pretrial Conference that the communications may bear on Plaintiff's allegation of conspiracy to monopolize. The Court therefore DENIES Defendant's motion to exclude all evidence regarding Defendants' pre-acquisition communications with Sumotext's customers. Defendants may, of course, object on relevance grounds to specific questions at trial.

Second, Defendants seek to argue that its "pre-termination communications with Sumotext's customers were permissible and proper" and it "did not tortiously interfere with Sumotext's customer contracts." Def. MIL No. 2 at 1-2. Again, the voluntary dismissal of the tortious interference claim is not sufficient to support such findings—which are also irrelevant to Plaintiff's antitrust claims. The Court therefore DENIES Defendants' motion as to this request. As with the contract claims, the Court will permit Defendants to tell the jury that they are not currently being sued for tortious interference with contract.

### C.    Defendants' Motion in Limine No. 3

In their third motion in limine, Defendants challenge the testimony of Plaintiff's damages expert, Dr. Alan Goedde, ECF 386 ("Def. MIL No. 3") at 5. Dr. Goedde provides two damages figures: (1) $3,048,300 for "Defendants' breach of contract" and (2) $9,223,500 for "the alleged antitrust violations." ECF 386-2 ("") ¶¶ 5-6. Defendants contend that neither of these opinions is admissible and that, consequently, Dr. Goedde should not be permitted to testify at trial.

Turning first to Dr. Goedde's testimony that Plaintiff suffered $3,048,300 in damages from Defendants' alleged breach of contract, Defendants argue this testimony is irrelevant. Plaintiff does not oppose exclusion; it states that it "does not intend to offer Dr. Goedde's breach-of-contract damages calculation at trial." ECF 401 ("Opp. to Def. MIL No. 3") at 4. The Court therefore GRANTS Defendants' motion as to Dr. Goedde's opinion regarding breach of contract damages.

Defendants also move to exclude Dr. Goedde's opinion that Plaintiff suffered $9,223,500 in damages from Defendants' alleged antitrust violations. Defendants make two arguments: (i) that Dr. Goedde has failed to apportion damages amongst Plaintiff's different claims and legal

theories, and (ii) that Dr. Goedde did not consider data on StarStar number usage. Def. MIL No. 3 at 1. As set out below, the Court DENIES Defendants' motion on both scores.

### i. Failure to Apportion Damages

There are several dimensions to Defendants' apportionment argument.

First, Defendants claim that Dr. Goedde's "antitrust calculation includes built-in damages for breach of contract, too" and "offers the jury no way to back out Sumotext's breach-of-contract and tortious-interference damages." Def. MIL No. 3 at 3-4. But there is no need to "back out" these damages. Dr. Goedde has made clear that the entire $9,223,500 in damages is attributable to the alleged antitrust violations. It is not true that Dr. Goedde's antitrust calculation includes damages "for claims that are no longer in this case," Opp. to Def. MIL No. 3 at 4; it simply includes "conduct that is separately actionable for claims of tortious interference with contract and breach of contract," Goedde Report ¶ 5. If the contract claims remained in the case, adding together the $3,048,300 in contract damages and $9,223,500 in antitrust damages might create a double-counting problem—but that is not the present situation.

Second, Defendants object that Dr. Goedde provided a single damages estimate for Plaintiff's antitrust damages, without apportioning the damages amongst Plaintiff's different legal theories under Sections 1 and 2 of the Sherman Act or between the allegedly distinct leasing and servicing markets. Def. MIL No. 3 at 1. Defendants are correct that "where an antitrust plaintiff challenges multiple business practices of a defendant yet fails to disaggregate its proof of damages," the jury is left "without a reasonable basis for determining the amount by which the plaintiff's damage model figure should be reduced in the event that one or more of the challenged business practices are not found to be exclusionary." *Litton Sys., Inc. v. Honeywell, Inc.*, No. CV 90-4823 MRP(EX), 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996). Consequently, "[e]xcept in circumstances where disaggregation is shown to be impossible or impractical, an antitrust plaintiff challenging a variety of conduct is required to segregate damages attributable to particular business practices." *Id.* In *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, for example, the Ninth Circuit ordered a new trial on damages stemming from Kodak's monopolization in the service market because the plaintiff's expert did not distinguish between sales lost "due to Kodak's

11

control over the parts market" and sales "lost due to Kodak's service monopoly."  125 F.3d 1195, 1223 (9th Cir. 1997); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35-37 (2013) (refusing to accept a model for damages that assumed four market distortions when only one remained at issue in the case).

Nevertheless, the Court does not believe Dr. Goedde's aggregated damages figure must be excluded, for three reasons.  To begin with, the disaggregation rule pertains to *conduct*, not *legal theories*.  The point is that damages may be awarded only for conduct that is unlawful.  Where certain conduct is unlawful under multiple theories of liability, a plaintiff need not—and indeed, could not—disaggregate damages across each theory.

Second, the Court is mindful that, once the fact of an antitrust violation is established, the jury has broad latitude in assessing the amount of damages caused by that violation.  *See, e.g.*, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969) (damages are a "matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes").  Defendants worry that "the jury could conclude that Zoove properly terminated Sumotext (and thus did not restrain trade under Count IV) but that the methods by which the defendants acquired were improper (and thus that there was a conspiracy to monopolize under Count V)."  Def. MIL No. 3 at 2.  But the latter violation may be sufficient to establish the entire damages amount.  *Oltz v. St. Peter's Community Hospital*, 19 F.3d 1312 (9th Cir. 1994), is instructive on this issue.  In that case, plaintiff Oltz proved only that an initial exclusive contract between the alleged conspirators violated the antitrust laws, but not that a later, renegotiated contract was also unlawful.  *Id.* at 1314.  The Ninth Circuit held that Oltz was not required to separate out damages resulting from the renegotiated contract: "Because the initial conspiracy destroyed his practice, Oltz is entitled to seek recovery for all damages resulting from the destruction of his business in Helena."  *Id.*; *see also Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1307 (8th Cir. 1988) ("[I]f an antitrust plaintiff alleges that the defendant engaged in unlawful acts A, B, C, and D, and acts C and D are later rejected as a basis of liability, it does not automatically follow that the damage award must be reduced. Rather,

12

if acts A and B support the entire damage award, it must be sustained.").

The Court is more concerned about Dr. Goedde's failure to apportion damages between the allegedly distinct markets for leasing and serving StarStar numbers in the United States. For instance, the jury could conclude that there is a distinct market for servicing StarStar numbers but not for leasing StarStar numbers. Moreover, "conduct found anticompetitive in one market may not be anticompetitive in another market." *Image Tech. Servs*, 125 F.3d at 1224. Should the jury find in Plaintiff's favor as to only one market, Defendants have a plausible argument that Sumotext's lost profits from re-leasing alone should be disaggregated from its losses from having been excluded from the servicing market. *See* Def. MIL No. 3 at 1-2.

It is premature to litigate such possibilities at this stage, however. The evidence at trial will determine whether Dr. Goedde's damages estimate is incongruous with the jury's liability findings. Furthermore, as alluded to above, it may be that disaggregation is "impossible or impractical." *Litton Sys.*, 1996 WL 634213, at *2. Plaintiff is entitled to show that damages cannot be disaggregated across the various markets or courses of conduct in the instant case, at which point "the burden shifts to the defendant to demonstrate the contrary." *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1243 (7th Cir. 1982), *aff'd*, 465 U.S. 752 (1984).

In sum, Defendants' concerns are well-taken, but insufficient to justify excluding Dr. Goedde's damages opinion. If the jury renders a split verdict and awards the full $9,223,500 in damages, Dr. Goedde's damages opinion may very well prove inadequate to support the damages award. But that is properly addressed in a post-trial motion. *See, e.g.*, *Litton Sys.*, 1996 WL 634213, at *4 (ordering a new trial on damages). The motion in limine is, therefore, DENIED.

### ii. Failure to Consider Data on StarStar Number Usage

Defendants also object to Dr. Goedde's antitrust damages calculation on the ground that he "did not look at usage data"—i.e., data on the degree to which the downstream customers were receiving calls on each of the StarStar numbers they were leasing. Def. MIL No. 3 at 4. As background, Dr. Goedde's damages calculation projected the lease revenues Plaintiff would have earned through 2033. *See* ECF 346-6 ¶ 39. That calculation includes an estimate of net growth in lease revenues, which in turn accounts for customer attrition—i.e., customers who would not have

13

renewed their leases with Plaintiff. Opp. to Def. MIL No. 3 at 6; *see* ECF 346-6 ¶ 39. Defendants complain that Dr. Goedde did not base his estimate of customer attrition on usage data. Def. MIL No. 3 at 4 (citing ECF 386-4 ("Goedde Tr.") at 8-9). This is problematic, Defendants say, because Dr. Goedde purportedly acknowledged that customer attrition is affected by usage rates when he testified that "if a downstream customer wasn't getting much use of the number, they would cancel it." Def. MIL No. 3 at 4.[3]

Plaintiff concedes that Dr. Goedde did not consider usage data. In fact, Dr. Goedde did not calculate a customer attrition rate at all; instead, he estimated "net lease growth" rates for each quarter. Those rates represent *net* growth, which means they "already account for cancellations owing to a customer's belief that their **numbers were not getting enough usage." Opp. to Def. MIL No. 3 at 6. Consequently, Dr. Goedde did not need to separately estimate customer attrition.

The Court notes that Plaintiff's representation that Dr. Goedde's net growth rates include "real-world cancellations," *id.*, is not strictly true. According to the footnotes in his report, Dr. Goedde used "actual Q1 2016 growth, with quarterly step-downs through the end of 2017" for 2016 and 2017, but then switched to the 4.0% annual "long term growth rate projected by the Federal Reserve" for 2018 to 2033. ECF 346-6 at 26, 28. In any event, the source of Dr. Goedde's net growth rates goes to the weight of his testimony, not its admissibility. Again, Defendants' are free challenge the accuracy of Dr. Goedde's estimates on cross-examination and using their rebuttal expert witness. The Court DENIES the motion to exclude Dr. Goedde's damages opinion for failure to consider usage rates.

### D. Defendants' Motion in Limine No. 4

Fourth, Defendants move to exclude portions of Plaintiff's expert, Dr. Ryan Sullivan pursuant to *Daubert v. Merrell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). ECF 387 ("Def. MIL No. 4"). Dr. Sullivan is an economist who has been retained by Plaintiff to testify on the scope of the relevant markets in this case. ECF 402 ("Opp. to Def. MIL No. 4").

---

[3] Defendants cite "Goedde Tr. 123:9-19" for this quote but have failed to attach that portion of the deposition to their motion. In any event, the Court does not rely upon the quoted testimony to rule on the motion.

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

In *Daubert*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The Supreme Court discussed four factors that may be inform the reliability determination: (1) whether the theory or technique used by the expert "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether there is "general acceptance" of the theory or technique in the "relevant scientific community." *Id.* at 593-94; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (reciting factors). Then, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court clarified that the "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to all expert testimony. The Supreme Court also emphasized that the reliability inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153.

Pursuant to Rule 702 and *Daubert*, the district court must also "ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact." *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002) (citing *Daubert*, 509 U.S. at 592-93).

Importantly, however, the district judge's role under *Daubert* is as "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (internal quotation marks and citation omitted). "When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony." *Id.* at 565. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564.

Here, Defendants raise three objections to Dr. Sullivan's proffered testimony. As explained below, the Court agrees with Plaintiff that none of these justifies excluding or limiting Dr. Sullivan's testimony and DENIES Defendants' motion.

### iii.    Dr. Sullivan's Opinions Regarding the Functionality of StarStar Numbers

First, Defendants argue that Dr. Sullivan should not be able to opine on "why **numbers are different from other consumer engagement products" because (1) he "is not an expert on consumer engagement" and (2) his opinions are not "beyond the common knowledge of the average layman." Def. Mot. No. 4 at 1. The opinions at issue identify the attributes that purportedly distinguish StarStar numbers from competing consumer engagement products such as short codes for texting, apps and websites, and 1-800 phone numbers. *See* ECF 387-2 ("Sullivan Report") ¶¶ 91-98. For instance, Sullivan states that (i) StarStar numbers are "short, unique, and easy to remember," (ii) they "can be used with any mobile phone, require no additional software to use, are easy for the brand to set up, are easy to use and free for the consumer, offer variable length namespaces, and provide text, voice, and multimedia responses," and (iii) are consequently "functionally distinct" from various alternatives. Def. Mot. No. 4 at 1 (citing Sullivan Report ¶¶ 91, 93-95).

As to Defendants' argument regarding the scope of Dr. Sullivan's expertise, Plaintiff responds that Dr. Sullivan did not need specific expertise on StarStar numbers or the consumer engagement industry to provide the opinions at issue. Opp. to Def. Mot. No. 4 at 3. Rather, as an economist with a Ph.D from UC San Diego, he "applied his industrial organization economic training" to the relevant products. *Id.*; *see* Sullivan Report ¶¶ 6-7. The Court agrees. The threshold for expert qualifications under Federal Rule of Evidence 702 is "low: a minimal foundation of knowledge, skill, and experience suffices." *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.*, No. C 10-00544 JW, 2011 WL 5417090, at *3 (N.D. Cal. Oct. 27, 2011) (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004)). In light of this "broad conception of expert qualifications," the Court holds that Dr. Sullivan has the requisite expertise in "the general field" of economics to review data specific to the consumer engagement industry and render an opinion on product differentiation in that industry. *Hangarter*,

373 F.3d at 1015, 1015 n. 12; *see, e.g.*, *In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2016 WL 7734558, at *5 (N.D. Cal. Sept. 14, 2016) ("Although he has not worked specifically with automobiles," expert's testimony about the technical problems with Ford's infotainment system fell within his "broad engineering and human factors expertise."); *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73689, at *11 (N.D. Cal. Jan. 5, 2008) (finding it was "within his economic expertise" for expert to testify as to "the effect alternative technologies would have had on Rambus's ability to wield market power" in various specific technology markets). In the Court's view, Dr. Sullivan's "lack of particularized expertise goes to the weight accorded [his] testimony, not to the admissibility of [his] opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993).

The Court likewise rejects Defendants' contention that Dr. Sullivan's opinion will not "assist the trier of fact," Fed. R. Evid. 702, because the jury can examine the same documents and testimony cited by Dr. Sullivan and form their own views on the functionality of StarStar numbers. Def. Mot. No. 4 at 1. Generally, "[e]xpert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact." *Finley*, 301 F.3d at 1008. Critically, however, the Ninth Circuit has admonished courts "not to overstate the scope of the average juror's common understanding and knowledge" in determining whether expert testimony would be helpful to the jury. *Id.* at 1013. Although it is certainly possible that a juror could compare the relevant products in this case and identify various similarities and differences, Dr. Sullivan opines on the key dimensions across which the products compete. Furthermore, courts have consistently allowed expert testimony on the differences across products in antitrust cases and other contexts. Hence, the Court finds that his opinions are not so obvious as to be unhelpful to the jury.

### iv. Dr. Sullivan's Opinions Regarding Market Definition

Second, Defendants argue that Dr. Sullivan's opinion that "there are distinct antitrust markets for **number re-leasing and servicing" is invalid because he did not determine the "cross-elasticity of demand between **numbers and the various alternative communication methods that are the equivalent of StarStar numbers." Def. MIL No. 4 at 2.

17

It is true that cross-elasticity of demand—i.e., "whether consumers view the products as substitutes for each other," *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995)—is a guiding principle of product market definition. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("The outer boundaries of a product market are determined by . . . the cross-elasticity of demand between the product itself and substitutes for it.") (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)). A common method for establishing (or disproving) the substitutability of two or more products is the "SSNIP" test, which "asks whether a [hypothetical] monopolist in the proposed market could profitably impose a small but significant and nontransitory price increase" (or "SSNIP") on a product in the proposed market. *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008). As the Ninth Circuit explained:

> If a significant number of customers would respond to a SSNIP by purchasing substitute products, the SSNIP would not be profitable for the hypothetical monopolist. If a monopolist could not profitably impose a SSNIP, the market definition should be expanded to include those substitute products that constrain the monopolist's pricing.

*Id.*

Defendants contend that Dr. Sullivan's market definition opinion is unreliable because he failed to perform the SSNIP test or otherwise calculate the cross-elasticity of demand between StarStar numbers and various potential substitutes. Def. MIL No. 4 at 4-5. Instead, Defendants say, Dr. Sullivan looked only to the large price differential across the products. *Id.* At the outset, the Court agrees with Defendants that comparing existing prices is not a "SSNIP test" and that "the scope of the relevant market is not governed by the presence of a price differential between competing products." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975). What Defendants fail to recognize, however, is that the SSNIP test is a *legal* test; it is not a form of scientific analysis. And Dr. Sullivan's report makes clear that he did apply the SSNIP test, albeit without reference to any empirical analysis. *See* Sullivan Report ¶¶ 103-109.

The heart of Defendants' objection, then, appears to be that Dr. Sullivan failed to substantiate his conclusions under the SSNIP test using empirical analysis. To be sure, it may be

desirable to collect data and construct a formal econometric model of the SSNIP test. As Plaintiff correctly emphasizes, however, there is no requirement in this Circuit that an expert use any particular form of analysis in developing an opinion on market definition. Courts in this district and others have often admitted expert testimony on market definition where the expert did not conduct an econometric study. *See, e.g.*, *Apple iPod iTunes Antitrust Litig.*, No. 05-CV-0037 YGR, 2014 WL 4809288, at *7 (N.D. Cal. Sept. 26, 2014) (denying *Daubert* motion where economics expert looked to "internal Apple documents, employee testimony, and discovery responses, third-party information such as contemporaneous financial analysis and press coverage"); *Hynix Semiconductor Inc.*, 2008 WL 73689, at *10 (admitting expert report on market definition though expert did not use the SSNIP test to determine if the technologies are close economic substitutes). That Dr. Sullivan's opinions have a foundation in qualitative data such as employee testimony, third-party industry analyses, and media coverage is enough to establish their admissibility. *See* Sullivan Report ¶¶ 89-100, 108.

Accordingly, the Court DENIES Defendants' motion to exclude Dr. Sullivan's opinions regarding market definition for having failed to conduct an econometric analysis. Defendants' arguments that Dr. Sullivan's opinions are conclusory and unpersuasive are proper subjects for cross-examination.

### v.    Dr. Sullivan's Opinions Regarding Market Power

Defendants' third objection is to Dr. Sullivan's statement in his report that "Defendants have possessed and exerted market power by way of the alleged anticompetitive conduct." Def. MIL No. 4 at 4 (quoting Sullivan Report ¶ 47). Because "market definition and market power are essentially questions of fact" for the jury, *id.* at 5, Defendants believe this statement runs afoul of the rule that "an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law," *id.* (quoting *Hangarter*, 373 F.3d at 1016). In response, Plaintiff assures the Court that Dr. Sullivan will provide "economic opinions only" and not impermissible legal conclusions.

To be precise, Federal Rule of Evidence 704(a) provides that "an opinion is not objectionable just because it embraces an ultimate issue." *Legal conclusions*, however, are

forbidden. This prohibition recognizes that "when an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (internal quotation marks and citation omitted). "Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter*, 373 F.3d at 1016. At the same time, the Ninth Circuit has recognized that "it is sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard." *Diaz*, 876 F.3d at 1198. In *Diaz*, for instance, the Ninth Circuit affirmed the district court's decision to permit the Government's medical expert to testify that the defendant's prescribing practices were "outside the usual course of medical practice" and lacking "legitimate medical purpose"—phrases that also appear in the elements of the relevant criminal statute. *Id.* at 1199. In sum, although an expert witness may express facts or opinions using "legal terminology," he may not explain the law to the jury or tell the jury how to apply the law to the facts of the case. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008).

Based on the foregoing principles, the Court holds that Dr. Sullivan may provide his expert economic opinion as to whether Defendants possessed market power, to the extent that opinion is supported by economic analysis. In so doing, he may use the term "market power." Although that term is used in antitrust jurisprudence, it does not have so "separate, distinct and specialized" a meaning in the law as opposed to economics that its use rises to the level of a legal conclusion. *Diaz*, 876 F.3d at 1198 (agreeing that "legitimate medical purpose" does not have a "separate, distinct and specialized meaning" in law than it has in medicine). Dr. Sullivan may not, however, give the bare conclusion that "Defendants have possessed and exerted market power by way of the alleged anticompetitive conduct." *See Hynix Semiconductor Inc.*, 2008 WL 73689, at *13 (barring an expert from testifying that the defendant's conduct is "anticompetitive" because he "merely attaches the label 'anticompetitive' to defendant's actions without any "economic analysis"). In addition, Dr. Sullivan may not instruct the jury on how "courts have defined the requisite market power for claims brought under Sections 1 and 2 of the Sherman Act," Sullivan Report ¶ 45, or

otherwise "go beyond providing a legal framework," for his analysis, *Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 965 (N.D. Cal. 2018).

In the instant motion, the only purportedly objectionable portion of Dr. Sullivan's report that Defendants cite is a single sentence summarizing his findings; Defendants have not attached the sections of the report containing Dr. Sullivan's substantive opinions. Because this record is insufficient to justify the exclusion of particular testimony at the motion in limine stage, the motion is DENIED.

### E.    Defendants' Motion in Limine No. 5

Last, Defendants are concerned that "Sumotext intends to call all six defense witnesses . . . live as adverse witnesses during Sumotext's case in chief." ECF 388 ("Def. MIL No. 5") at 1. Defendants acknowledge the "general right of a plaintiff to call adverse witnesses," but ask the Court to prohibit Sumotext from "calling *all of* the defense's witnesses adversely" for two reasons: (1) it would inconvenience the five witnesses who live in Florida to travel to San Jose twice, and (2) it would produce "a disjointed trial narrative that would unfairly disadvantage the defendants." *Id.* at 1-2.

The Court is sympathetic to Defendants' concerns. However, Defendants have cited no authority for the proposition that calling all—rather than merely some—of the defense's witnesses is unfairly prejudicial, and the Court sees no principled basis upon which to determine which witnesses may or may not be called. Hence, the Court will not arbitrarily limit the number of defense witnesses Plaintiff may call during its case-in-chief. Instead, the Court will grant Defendants' alternative request to have the option of eliciting evidence for their case-in-chief from their designated witnesses at the time that Plaintiff calls those witnesses; Defendants will not be limited to cross-examining on topics covered during Plaintiff's direct examination. Defendants are also free to advise the jury that it is doing so for the convenience of the witness. Plaintiff has not opposed this commonly-used trial practice. ECF 403 at 2. Defendants are not, of course, required to put on their full case during Plaintiff's case-in-chief; they may call their witnesses a second time if they so choose.

Defendants' motion is DENIED as to the request to limit the witnesses Plaintiff may call

but GRANTED as to the request to fully examine the defense witnesses when they are called by Plaintiff.

## IV.     ORDER

For the foregoing reasons, the Court rules on Plaintiff's motions in limine as follows:

- Motion in Limine No. 1, ECF 390: DENIED in part without prejudice and GRANTED in part.
- Motion in Limine No. 2, ECF 391: DENIED without prejudice.
- Motion in Limine No. 3, ECF 392: GRANTED.

The Court rules on Defendants' motions in limine as follows:

- Motion in Limine No. 1, ECF 384: GRANTED in part and DENIED without prejudice in part.
- Motion in Limine No. 2, ECF 385: DENIED without prejudice.
- Motion in Limine No. 3, ECF 386: DENIED without prejudice.
- Motion in Limine No. 4, ECF 387: DENIED without prejudice.
- Motion in Limine No. 5, ECF 388: DENIED as to the request to limit the witnesses Plaintiff may call but GRANTED as to the request to fully examine the defense witnesses when they are called by Plaintiff rather than call the witnesses a second time.

**IT IS SO ORDERED.**

Dated: February 3, 2020

_____
BETH LABSON FREEMAN
United States District Judge