1

2

3

4            **UNITED STATES DISTRICT COURT**

5           **NORTHERN DISTRICT OF CALIFORNIA**

6                  **SAN JOSE DIVISION**

7

8    SUMOTEXT CORP.,                          Case No.  16-cv-01370-BLF

9              Plaintiff,
                                              **ORDER DENYING PLAINTIFF'S**
10       v.                                   **MOTION FOR NEW TRIAL**

11   ZOOVE, INC; VIRTUAL HOLD                 [Re:  ECF 495]
     TECHNOLOGY, LLC; VHT STARSTAR
12   LLC; and STARSTEVE, LLC,

13              Defendants.

14

15

16       Plaintiff Sumotext Corporation ("Sumotext") claims that Defendants Zoove, Inc.

17  ("Zoove"), Virtual Hold Technology, LLC ("VHT"), VHT StarStar LLC ("VHT StarStar"), and

18  StarSteve, LLC ("StarSteve") violated federal antitrust laws by seeking to exclude it from two

19  distinct markets, one for leasing StarStar numbers in the United States and the other for servicing

20  StarStar numbers in the United States.  Following a two-week trial, a jury rendered a verdict for

21  Defendants.  Judgment was entered for Defendants and against Sumotext on March 6, 2020.

22       Sumotext moves for a new trial under Federal Rule of Civil Procedure 59(a), arguing that

23  (1) the jury's verdict is against the clear weight of the evidence and (2) the verdict was procured

24  through defense counsel's misconduct.  Defendants oppose the motion, asserting that the verdict is

25  not against the clear weight of the evidence and was not procured through counsel's misconduct.

26  The Court has considered the briefing and evidence submitted by the parties, the oral argument of

27  counsel, the trial record, and the applicable legal authorities.

28       The motion for a new trial is DENIED for the reasons discussed below.

United States District Court
Northern District of California

# I.     BACKGROUND

The parties and the Court are familiar with the history of this case, which need not be set forth in detail here.  The Court recounts only those facts relevant to Sumotext's motion for a new trial.

Sumotext tried two claims to the jury:  (1) a claim "[t]hat VHT and StarSteve conspired to unreasonably restrain trade in a defined relevant market in violation of Section 1 of the Sherman Act"; and (2) a claim "[t]hat StarSteve, VHT, VHT StarStar, and Zoove conspired to monopolize a defined relevant market in violation of Section 2 of the Sherman Act."  Jury Instr. 21, ECF 468. The jury was advised that Sumotext asserted the existence of two relevant markets, a market for leasing StarStar numbers and a market for servicing StarStar numbers.  *See* Jury Instr. 35, ECF 468.  The jury also was advised that Defendants disputed Sumotext's market definitions.  *See id.* The Court instructed the jury that Sumotext had the burden to prove the existence of a relevant market, and that if Sumotext failed to meet that burden, the jury was required to find for Defendants.  *See* Jury Instr. 28 & 35, ECF 468.

Sumotext was afforded a full opportunity to persuade the jury of its proposed relevant market definitions over the course of the two-week trial.  Trial witnesses included Tim Miller, Sumotext's President; Michael Caffey, a long-time executive of Zoove; Bruce Bales of Mblox, a company that owned Zoove for a brief period; Tim Keyes, the COO of VHT StarStar; Ronald Levitt, the Director of Finance and Accounting for VHT StarStar; Wes Hayden, the CEO of VHT and VHT StarStar; Greg Garvey, VHT's Chairman; Dr. Ryan Sullivan, Sumotext's economics expert; Dr. Debra Aron, Defendants' rebuttal economics expert; Dr. Alan Goedde, Plaintiffs' damages expert; and Greg Regan, Defendants' rebuttal damages expert.  The jury also viewed videotaped depositions of Steven Doumar of StarSteve; Tom Cotney of Mblox; and Spero Georgedakis, a StarStar customer.

Sumotext relied primarily on the testimony of its expert economist, Dr. Sullivan, to prove its asserted relevant market definitions.  Dr. Sullivan opined that there is a distinct market for leasing StarStar numbers in the United States and a separate, distinct market for servicing StarStar numbers in the United States.  *See* Trial Transcript ("Tr.") 694:18-25.  Defendants countered Dr.

Sullivan's testimony with that of their rebuttal expert economist, Dr. Aron, who opined that Dr. Sullivan had not used accepted methodology in limiting the relevant markets to StarStar numbers, and had not plausibly excluded numerous other products from the relevant markets.  *See* Tr. 1483:6-1572:2.

The jury was provided with a verdict form divided into two sections, the first addressing Sumotext's leasing market claims and the second addressing Sumotext's servicing market claims. *See* Verdict Form, ECF 470.  The first question in Section I read as follows:

> **1.**    **Did Sumotext prove by a preponderance of the evidence a relevant market for *leasing* \*\* numbers in the United States?**
>
> Yes___ ("Yes" is a finding for Sumotext)
>
> No ___ ("No" is a finding for Defendants)
>
> If you answered "Yes" to Question 1, proceed to Question 2.
> If you answered "No" to Question 1, you have found no liability for Sumotext's Leasing claims.  Do not answer any other questions in Section I.  Please proceed to Section II (Question 8).

Verdict Form at 2, ECF 470.

The first question in Section II, addressing the servicing market claims, read as follows:

> **8.**    **Did Sumotext prove by a preponderance of the evidence a relevant market for *servicing* \*\* numbers in the United States?**
>
> Yes___ ("Yes" is a finding for Sumotext)
>
> No ___ ("No" is a finding for Defendants)
>
> If you answered "Yes" to Question 8, proceed to Question 9.
> If you answered "No" to Question 8, you have found no liability for Sumotext's Servicing Market claims.  Do not answer any other questions in Section II.  Please proceed to Section III (page 9).

Verdict Form at 6, ECF 470.

During deliberations, the jury sent a note to the Court, asking for clarification regarding question number 1.  *See* Note No. 1, ECF 469-1.  The note read, "Is question no. 1 asking:  'Did Sumotext prove by a preponderance of the evidence a relevant market for leasing \*\* numbers in the United States' and ONLY  \*\* numbers?"  *Id.*  After conferring with counsel, and with

United States District Court
Northern District of California

counsel's agreement, the Court sent the following response to the jury:  "yes."  *Id.*

Approximately four hours later, the jury returned its verdict.  *See* Civil Minutes, ECF 469. The jury marked "No" on question 1, thus finding no liability for Sumotext's leasing market claims, and also marked "No" on question 8, thus finding no liability for Sumotext's servicing market claims.  *See* Verdict Form at 2, 6, ECF 470.  Having found that Sumotext failed to prove either of its asserted relevant markets, the jury properly did not answer any other questions on the verdict form.  *See* Verdict Form, ECF 470.

Sumotext moves for a new trial on two grounds, first that the verdict is contrary to the clear weight of the evidence, and second that defense counsel engaged in misconduct throughout the trial.  Defendants contend that Sumotext has not shown a basis for a new trial.

## II.   LEGAL STANDARD

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1).  The Ninth Circuit has construed Rule 59 to permit a new trial "only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quotation marks and citation omitted).

### A.   Clear Weight of the Evidence

"Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence."  *Molski*, 481 F.3d at 729 (quotation marks and citation omitted).  "[D]etermining 'the clear weight of the evidence' is a fact-specific endeavor."  *Id.*  In undertaking that endeavor, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party."  *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  However, "a district court may not grant or deny a new trial merely because it would have arrived at a different verdict" from that reached by the jury.  *United*

1   *States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999).  A new trial should be granted

2   only if the court "on the entire evidence is left with the definite and firm conviction that a mistake

3   has been committed."  *Landes*, 833 F.2d at 1372 (citation omitted).

### B.   Miscarriage of Justice / Attorney Misconduct

4   "A miscarriage of justice can occur where there is prejudicial misconduct from opposing

5   counsel or where legal error was unduly prejudicial to the opposing party."  *J.N. v. Hendrickson*,

6   No. 2-14-cv-02428-DDP (PLAx), 2017 WL 2539390, at *2 (C.D. Cal. June 12, 2017).  "To

7   receive a new trial because of attorney misconduct in the civil context, [the moving party] must

8   meet a high standard:  the moving party must demonstrate adverse counsel's misconduct . . .

9   substantially interfered with the moving party's interest."  *S.E.C. v. Jasper*, 678 F.3d 1116, 1129

10  (9th Cir. 2012) (quotation marks and citation omitted).  "Further, [t]o warrant reversal on grounds

11  of attorney misconduct, the flavor of misconduct must sufficiently permeate an entire proceeding

12  to provide conviction that the jury was influenced by passion and prejudice in reaching its

13  verdict."  *Id.* (quotation marks and citation omitted).  "Where misconduct permeates the

14  proceeding, the jury is necessarily prejudiced."  *Anheuser-Busch, Inc. v. Nat. Beverage*

15  *Distributors*, 69 F.3d 337, 346 (9th Cir. 1995) (quotation marks and citation omitted).

16  "[W]hile constant objections are certainly not required, as they could antagonize the jury,"

17  a party's failure to object is a factor that may be considered when evaluating a motion for new trial

18  based on attorney misconduct.  *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286

19  (9th Cir. 1984) (citation omitted).  Other relevant factors include whether the asserted misconduct

20  was ameliorated by curative instructions and whether the party seeking a new trial had an

21  opportunity to rebut opposing counsel's allegedly improper statements.  *See Maxwell v. Cty. of*

22  *San Diego*, 714 F. App'x 641, 645 (9th Cir. 2017).

### III.   DISCUSSION

23  As noted above, Sumotext moves for a new trial on two grounds.  First, Sumotext argues

24  that the jury's verdict is contrary to the clear weight of the evidence.  Second, Sumotext argues

25  that defense counsel engaged in misconduct that infected the jury's deliberations and was directly

26  related to the jury's adverse verdict.  Defendants assert that both arguments are without merit.

United States District Court
Northern District of California

United States District Court
Northern District of California

**A.     The Verdict is Not Contrary to the Clear Weight of the Evidence**

Sumotext devotes the bulk of its briefing to the first asserted ground for a new trial, that the verdict was contrary to the clear weight of the evidence.  Before turning to the parties' arguments on that ground, the Court finds it necessary to clarify the scope of the issues properly encompassed by Sumotext's motion.

The *only* determinations made by the jury were that Sumotext failed to meet its burden to prove a relevant market for leasing StarStar numbers, and that Sumotext failed to meet its burden to prove a relevant market for servicing StarStar numbers.  *See* Verdict Form at 2, 6, ECF 470.  As a result, Sumotext's challenge to the jury verdict necessarily is limited to a showing that those determinations were in error.  To show that the jury's determinations were in error under the standards set forth above, Sumotext must demonstrate that it actually did meet its burden to prove its asserted relevant markets and that its proof was so strong that the jury's adverse determinations must be set aside as contrary to the clear weight of the evidence.

Sumotext goes well beyond challenging the jury's adverse determinations on relevant market, addressing other elements of its antitrust claims including monopoly power and injury to competition.  Most notably, Sumotext argues that an antitrust plaintiff need not prove a relevant market if the plaintiff presents "direct evidence" of injury to competition.  *See* Mot. at 6 n.1, ECF 495; Reply at 12-14, ECF 505.  Sumotext acknowledges that the Court ruled that Sumotext must prove a relevant market in this case, and that "[t]he scope of that ruling, which was addressed and preserved by the parties, is not before the Court on this motion."  Mot. at 6 n.1, ECF 495. Sumotext nonetheless asserts that "in evaluating Sumotext's motion for new trial, the Court must weigh the direct evidence that was presented at trial."  Reply at 13, ECF 505.  Sumotext devotes two pages of its reply to a section titled "Direct Evidence Shows the Defendants Exercised Market Power," which includes citations to numerous legal authorities addressing direct evidence, market power, and injury to competition, as well as a recap of Sumotext's trial evidence on those issues. *See* Reply at 12-14, ECF 505.

Sumotext does not challenge the jury instructions or the verdict form in this motion, both of which required the jury to determine as a threshold matter whether Sumotext proved its asserted

6

relevant markets.  Because it found that Sumotext did not prove a relevant market for leasing StarStar numbers or a relevant market for servicing StarStar numbers, the jury could not and did not determine any other issues in the case.  Accordingly, Sumotext's argument that it proved injury to competition by direct evidence, and other arguments in Sumotext's briefs that are not directed to Sumotext's proof of a relevant market at trial, are outside the scope of Sumotext's motion.

Having clarified the issues properly before it, the Court takes up Sumotext's assertion that the jury verdict is against the clear weight of the evidence.  Sumotext advances eleven arguments in support of its assertion, which are addressed in turn as follows.

### 1.    Legal Standard

The Court has summarized the applicable legal standard in Section II.A, above.  The Court's summary is drawn from controlling Ninth Circuit authority, including *Molski*, 481 F.3d 724, *Landes*, 833 F.2d 1365, and *4.0 Acres of Land*, 175 F.3d 1133.  The parties do not dispute that those authorities govern, and in fact they cite the same authorities in their briefs.  *See* Mot. at 5 (citing *Molski* and *Landes*), ECF 495; Opp. at 2 (citing *Landes* and *4.0 Acres of Land*), ECF 500. Sumotext nonetheless argues in its reply that Defendants ask the Court to alter the applicable standards under Rule 59.  *See* Reply at 5, ECF 505.  Sumotext construes Defendants' citation to additional authorities from outside the Ninth Circuit as an improper suggestion that this Court need not independently weigh the evidence as required under Ninth Circuit law.  *See id.* at 5-6.

The Court does not read Defendants' brief as suggesting a legal standard different from that articulated in *Molski*, *Landes*, and *4.0 Acres of Land*.  In any event, the Court is well aware of its obligation and authority to conduct an independent evaluation of the evidence in deciding Sumotext's motion for a new trial.  The Court has reviewed those portions of the record highlighted by the parties and, in addition, it has reviewed the entirety of the trial testimony given by both Dr. Sullivan and Dr. Aron.  And, of course, the undersigned judge sat through the entire trial and has a clear recollection of the evidence.  As discussed herein, the Court has formed its own view regarding the credibility of the witnesses and the weight properly accorded to the record evidence.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2.      Mr. Hayden's Asserted Admission to Acquiring Market Power

As its first argument, Sumotext asserts that Defendants expressly admitted to acquiring market power.  Specifically, Sumotext asserts that Wes Hayden made "a series of powerful and case dispositive admissions" when he testified that VHT StarStar acquired the power to control prices in the StarStar market, as well as the power to determine who may lease or service StarStar numbers.  *See* Mot. at 5, ECF 495.

As Defendants point out, Mr. Hayden actually did not admit that Defendants acquired "market power."  What Mr. Hayden said was that VHT StarStar had the ability to control prices and participants in the market for its own products.  *See* Tr. 1340:7-1341:10, ECF 478.  That is hardly surprising, as every company has a "natural monopoly" in its own products.  *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1105 (N.D. Cal. 2013).  Defendants cite *Trinko* for the proposition that, "[A]s a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quotation marks and citation omitted).  Defendants argue that Mr. Hayden's testimony regarding VHT StarStar's control over its own products is not probative of "market power" absent a showing that VHT StarStar's products constitute the relevant market.

Sumotext characterizes Defendants' argument as a refusal to acknowledge that a company's own products or services can be a relevant market.  Sumotext directs the Court's attention to *Eastman Kodak*, in which the Supreme Court expressly rejected the notion that "a single brand of a product or service can never be a relevant market under the Sherman Act."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).  The Supreme Court held that "in some instances one brand of a product can constitute a separate market."  *Id.* at 482.  Once again, Sumotext's reading of Defendants' brief does not square with the Court's.  Defendants do not argue that a single brand of a product or service *never* can be a relevant market.  They argue that in *this* case Sumotext failed to meet its burden to prove that StarStar numbers are the relevant market, and that as a result Mr. Hayden's testimony did not admit to market power.

8

1    Having reviewed Mr. Hayden's testimony against the backdrop of *Trinko* and *Eastman*

2    *Kodak*, the Court concludes that Mr. Hayden did not admit to acquiring "market power."  Mr.

3    Hayden testified that VHT StarStar had the power to control prices and participants in the market

4    for its own products.  A company's power over its own products could equate to market power if

5    those products comprise the market.  *See Eastman Kodak*, 504 U.S. at 481-82.  However, without

6    knowing the scope of the relevant market, Mr. Hayden's testimony is insufficient to establish

7    market power.  Dr. Aron's trial testimony illuminated this point very well.  She explained that

8    whether a company's power over the price of its own product constitutes market power "depends

9    on what the market is."  Tr. 1546:12-16, ECF 479.  Dr. Aron elaborated that, "you have to identify

10   what the market is and what the competitive products are before you can ask the question of, can

11   this company control a market or control a market price?"  Tr. 1546:17-20, ECF 479.  On cross-

12   examination, Dr. Aron again explained that "companies have the control over the price and output

13   of their own product.  That's not determinative of what those products compete with, though."  Tr.

14   1562:21-24, ECF 479.

15   The Court finds Dr. Aron's testimony on this point to be consistent with applicable case

16   law and persuasive as a matter of common sense.  While Mr. Hayden's testimony could be

17   characterized as powerful admissions if the relevant market were limited to StarStar numbers,

18   Sumotext failed to prove that the relevant market is so limited.  Absent proof of the relevant

19   market, Mr. Hayden's testimony cannot be viewed as an admission of market power.  More to the

20   point for purposes of the present motion, Mr. Hayden's testimony does not support Sumotext's

21   asserted relevant market definitions.  In the Court's view, all Mr. Hayden meant by his testimony

22   was that he, as the boss, sets the price for his own products.  Considering his testimony as a whole,

23   Mr. Hayden's testimony cannot reasonably be interpreted as tantamount to admitting monopoly

24   power.

25   **3.      Dr. Sullivan's Testimony Regarding the Asserted Relevant Markets**

26   Sumotext contends that Dr. Sullivan's testimony was sufficient to prove that the relevant

27   markets are those for leasing and servicing StarStar numbers.  *See* Mot. at 6, ECF 495.  Sumotext

28   asserts that Dr. Sullivan performed a market analysis and articulated a market definition, while Dr.

United States District Court
Northern District of California

9

1    Aron neither performed a market analysis nor offered an alternative market definition.  *See id.*

2    Sumotext argues that, "Because Dr. Aron was unable to define a single alternative market where

3    significant substitution in consumption or production occurred, this Court is required to analyze

4    the challenged conduct in the only two relevant markets defined in this case (by Dr. Sullivan): 1) a

5    market for *leasing* StarStar numbers in the U.S., and 2) a market for *servicing* StarStar numbers in

6    the U.S."  Mot. at 6, ECF 495.

7          Sumotext's argument misses the mark.  As reflected in the jury instructions and verdict

8    form, *Sumotext* had the burden to prove its asserted relevant markets by a preponderance of the

9    evidence.  Defendants were not required to offer an alternative market definition.  Defendants

10   properly could, and did, offer a rebuttal expert to testify that Dr. Sullivan's methodology was

11   flawed.  *See TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktiebologet LM Ericsson*, No. CV 15-

12   02370 JVS, 2016 WL 7042085, at *5 (C.D. Cal. Aug. 17, 2016) (rebuttal expert may either

13   challenge the methodology of the plaintiff's expert or offer alternative methodology leading to

14   different result).  After considering both experts' opinions, the jury was free to credit *or* decline to

15   credit Dr. Sullivan's market definitions.  *See Bell Atl. Bus. Sys. Servs., Inc. v. Hitachi Data Sys.*

16   *Corp.*, No. C93-20079 JW, 1995 WL 798932, at *1 (N.D. Cal. Sept. 28, 1995) ("No authority has

17   been presented to support the contention that the jury must accept either party's definition of how

18   the market is to be defined and in fact, case law is clear that the jury is given great leeway in

19   defining the relevant market.").  The jury apparently did not credit Dr. Sullivan's opinions, as it

20   found that Sumotext did not prove its asserted relevant markets.

21         Pursuant to its obligations under Rule 59, the Court has conducted an independent

22   evaluation of Dr. Sullivan's testimony.  That evaluation is informed by the Court's review of the

23   entirety of Dr. Sullivan's trial testimony, as well as the entirety of Dr. Aron's trial testimony.  The

24   key portions of both experts' testimony are summarized below.  Thereafter, the Court sets forth its

25   independent determinations regarding the credibility of the experts and the weight properly

26   assigned to their testimony.

27                    **a.      Market for Leasing StarStar Numbers**

28         Dr. Sullivan opined that there is a distinct relevant market for leasing StarStar numbers.

United States District Court
Northern District of California

10

Tr. 694:18-25.  He explained that "the products that should be within a relevant market are only those products that are economic substitutes."  Tr. 666:23-25.  "These are products that are reasonably interchangeable for the use that they provide, as well as on pricing in terms and availability."  Tr. 666:25-667:2.  In Dr. Sullivan's view, "there are no other economic substitutes that are reasonably interchangeable" with StarStar numbers.  Tr. 694:24-25.

Dr. Sullivan testified that StarStar numbers are an aspect of "mobile engagement," which he also called "consumer engagement."  Tr. 668:3-20, 701:4-7.  He identified several other forms of mobile engagement, including ten-digit telephone numbers, 1-800 numbers, short codes, text messaging, and internet access.  Tr. 669:13-670:14, 701:4-17.  However, he found that no other mobile engagement products belong in the same market as StarStar numbers.  Tr. 694:18-25.  Dr. Sullivan testified that four factors influenced his opinion:  price, the unique nature of the StarStar registry, functional distinctions between the products, and the marketing advantages provided by StarStar numbers.  Tr. 668:6-20.

### i.    Price

With respect to the first of these factors, price, Dr. Sullivan compared the average monthly price of a StarStar number with that of a ten-digit telephone number, a 1-800 number, and a short code.  Tr. 669:13-670:14.  He testified that the monthly price is $1,500 for a StarStar number, $0.50 for a ten-digit telephone number, $5 for a 1-800 number, and $500-$1,000 for a short code. *Id.*  Dr. Sullivan indicated that the wide pricing disparity between StarStar numbers and the other products indicates that they are not in the same market, citing guidelines issued by the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ") for the proposition that "when economists are looking at the effects of pricing to determine a relevant market, typically the threshold is 5 percent to 10 percent."  Tr. 669:20-670:1.  Dr. Sullivan elaborated that "the issue is whether a 5 to 10 percent price change would cause customers to go to a different product.  Here we are so far beyond 5 to 10 percent in terms of the price differential that there is no measurable or meaningful effect that a change in price, say, [of] 1-800 numbers is going to have on StarStar quantity use or vice versa."  Tr. 670:2-8.

On cross-examination, Dr. Sullivan clarified that the FTC and DOJ guidelines discussed

use of a particular methodology – a "SSNIP test"[1] – to define a relevant market, and that he had *not* performed a SSNIP test.  Tr. 702:1-21.  He explained that a SSNIP test evaluates "the effects of changes in pricing of one product on sales of another product."  Tr. 703:14-18.  Instead of a SSNIP test, Dr. Sullivan performed something he called a "natural SSNIP test" by comparing, over time, prices of StarStar numbers and prices for ten-digit telephone numbers, 1-800 numbers, and short codes.  Tr. 702:13-704:23.  His natural SSNIP test did not include MMS or SMS texting, social networks, web and search, or other abbreviated dial codes such as Pound numbers or Star numbers, even though industry witnesses testified that those products compete with StarStar numbers.  Tr. 705:23-707:9.

Dr. Aron opined that the "natural SSNIP test" Dr. Sullivan said he performed "isn't a thing."  Tr. 1532:21-23.  She testified that "to determine what is in the market and what competes for a product, one does what is called a market definition analysis," and that the standard methodology for performing such an analysis is a SSNIP test.  Tr. 1531:11-22.  Dr. Aron explained that "SSNIP test means that you assess whether an increase in price of a product would cause so much defection from that product to other things that it would not be profitable."  Tr. 1532:10-13.  She emphasized that the test must be run with real information, and "those things that customers deviate to, those things become candidates for being in the market, and you run the test again, and it's an iterative process, until you figure out what is the boundary of the market and what is outside of it."  Tr. 1532:14-20.

Dr. Aron indicated that in some circumstances an economist might rely on a "natural experiment."  Tr. 1532:24-25.  She described a hypothetical scenario in which both Coke and Pepsi are sold in multiple states, and in one state a tax is imposed that causes the price of Coke to go up but not the price of Pepsi.  Tr. 1532:24-1533:6.  Dr. Aron explained that in such a scenario, an economist could apply statistical analysis and methodology to determine whether the increase in the price of Coke caused consumers to defect and, if so, to what other product.  Tr. 1533:10-15.  She distinguished a natural experiment, in which the change in price results from an outside cause,

---

[1] SSNIP is an acronym that stands for "small but significant nontransitory increase in price."  Tr. 702:9-12.

from Dr. Sullivan's natural SSNIP test, in which "he just looked at the actual prices and said they're very far apart, so this can't be a market." Tr. 1533:7-19.  In Dr. Aron's opinion, Dr. Sullivan "did not apply any accepted or standard or recognizable methodology."  TR 1534:4-6.

### ii.      Nature of StarStar Registry

With respect to the second factor identified by Dr. Sullivan, the nature of the StarStar registry, he stated that the registry for StarStar numbers is "separate" and "unique as compared to a registry for 1-800 numbers, for toll numbers, and for short codes." Tr. 670:18-21.  He went on to state, "That means that the inventory and the supply of the numbers that can be provided to customers is all handled separately.  There's no overlap." Tr. 670:22-24.  Dr. Sullivan opined that "this is part of what indicates and is consistent with the fact that these different forms of consumer engagement are complements and not substitutes." Tr. 671:3-6.  Dr. Sullivan stated that 1-800 numbers are not substitutes for StarStar numbers, because "companies keep both and they use both, and they're not dropping one thing for another." Tr. 676:15-18.

Dr. Aron testified that a company's purchase of two consumer engagement products does not necessarily mean that those products do not compete.  Tr. 1542:15-18. She used the example of a family that has two cars in its garage, a Ford and a Toyota.  Tr. 19-1543:1.  That the family purchased both cars does not mean that Ford and Toyota do not compete with each other in a relevant market.  *Id.*

### iii.      Functional Distinctions

With respect to the third factor identified by Dr. Sullivan, functional distinctions between consumer engagement products, Dr. Sullivan testified that StarStar codes "have flexibility between two digits and ten digits, that provides a nice opportunity to use succinct terms that can resonate with a consumer." Tr. 671:9-13.  He opined that it is more difficult to make a 1-800 number memorable, and noted that there are toll numbers that begin with 877, 855, 844, and 833, "so now a consumer has to recognize all of those as well." Tr. 671:13-672:6.  Similarly, Dr. Sullivan stated that short codes are less flexible than StarStar numbers, because a short code must be five or six digits.  Tr. 672:9-14.  Dr. Sullivan also testified that "with StarStar numbers, there's an ability to connect with a consumer in multiple ways, voice, multimedia, text, and that is unique

to StarStar numbers as compared to the other alternatives." Tr. 672:15-19.  In his view, these functional distinctions between StarStar numbers and other products explain why StarStar numbers command much higher prices than other products.  Tr. 673:4-8.

On cross-examination Dr. Sullivan conceded that he had not performed any surveys to determine whether and to what extent the functional distinctions he identified are important consumers.  Tr. 720:18-721:1.  Dr. Aron testified that merely observing that a product has unique characteristics is insufficient to show that it is in a distinct market.  Tr. 1543:5-14.  She explained that one must "do a market definition analysis to figure out whether those differences are meaningful enough that customers view the products as so different that they don't view them as reasonably substitutable."  Tr. 1534:17-21.  She also observed that Dr. Sullivan had done no surveys of any kind, and opined that "it's uncommon to not have some kind of customer data or information."  Tr. 1554:19-1555:2.  In fact, Dr. Aron opined that Dr. Sullivan had "zero . . . evidence that is acknowledged and recognized by the economics profession."  Tr. 1555:14-19.

### iv.    Marketing Advantages

Finally, with respect to the fourth factor identified by Dr. Sullivan, he opined that the functional differences between StarStar numbers and other consumer engagement products "provide some very unique marketing advantages" to StarStar numbers.  Tr. 672:22-25.  He stated that StarStar numbers' functional differences "allow engagement directly with the consumer.  It allows it on a voice basis, it allows it to connect with text and with other multimedia."  Tr. 672:23-673:1.

On cross-examination, Dr. Sullivan admitted that a consumer to business voice connection could be obtained with a Pound number, a ten-digit telephone number, and a toll-free number.  Tr. 707:21-708:10.

### b.    Market for Servicing StarStar Numbers

Dr. Sullivan opined that there is a separate relevant market for servicing StarStar numbers.  Tr. 666:8-12.  He stated that "leasing is different from servicing.  So leasing gets you to the number, but it doesn't provide you the services."  Tr. 673:16-18.  When asked to identify particular services that would be in the relevant market, Dr. Sullivan identified geofencing and

United States District Court
Northern District of California

1   MMS, among others.  Tr. 695:6-15.  Dr. Sullivan provided very little additional information

2   regarding his determination that servicing StarStar numbers is a distinct market.  His direct

3   testimony on that issue spans only a few pages of the transcript, culminating with the following

4   question from Sumotext's counsel:  "And without rehashing the same analysis that you described

5   with respect to leasing, are you confident in your opinion that the servicing of StarStar numbers

6   constitutes a separate relevant market?"  Tr. 675:44-7.  Dr. Sullivan responded in the affirmative,

7   stating, "I am.  I, in my view, performed very thorough work, and there is substantial underlying

8   economic data demonstrating that StarStar servicing is a distinct product market."  Tr. 675:8-10.

9          Dr. Aron testified that Dr. Sullivan did not perform the sort of analysis that an economist

10   would perform to determine if StarStar servicing is a distinct market.  Tr. 1544:4-12.  She stated

11   that "he didn't identify the prices of those products, and he didn't even mention or purport to do a

12   market definition analysis like an SSNIP test."  Tr. 1544:8-10.  Dr. Aron emphasized that Dr.

13   Sullivan "didn't mention that in his reports, and he didn't mention that at trial."  Tr. 1544:10-12.

14   She also stated that Dr. Sullivan did not perform any surveys or other research to determine

15   market demand for the identified StarStar services.  Tr. 1544:13-16.

16                          c.        **The Court's Evaluation**

17          With respect to the asserted leasing market, Dr. Sullivan's "natural SSNIP test" does not

18   appear to be grounded in any accepted methodology for conducting a market analysis.  Even

19   assuming that a natural SSNIP test properly could have been used in this case, Dr. Sullivan did not

20   explain why he limited such test to ten-digit telephone numbers, 1-800 numbers, and short codes.

21   Dr. Sullivan's failure to include other forms of mobile engagement appears to have been arbitrary.

22   Moreover, while Dr. Sullivan testified that he relied in part on StarStar numbers' unique features

23   to conclude that StarStar numbers are a separate market, he did not perform any market surveys to

24   determine that consumers value those unique features.  These weaknesses in Dr. Sullivan's

25   testimony were ably highlighted in cross-examination.

26          The Court also credits Dr. Aron's testimony critiquing Dr. Sullivan's methodology.  Dr.

27   Aron identified many products that appear to perform a similar function, and meet a similar need,

28   to StarStar numbers.  Tr. 1534:18-20.  Among those products were 1-800 numbers, vanity text

codes, vanity ten-digit telephone numbers, Facebook advertising, search engine optimization, Star numbers, and Pound numbers.  Tr. 1534:3-1536:3.  Dr. Aron made clear that she was not offering an affirmative opinion that all of those products are in the same relevant market as StarStar numbers.  Tr. 1538:14-20.  However, she expressed her view that "it's not plausible that none of these calls to action compete with StarStar numbers," and that Dr. Sullivan simply had not undertaken the necessary rigorous analysis to exclude all other products from the relevant market.  Tr. 1538:21-1543:21.  The Court finds Dr. Aron's opinion persuasive, and in particular the Court credits Dr. Aron's testimony that Dr. Sullivan did not use any recognized methodology to define the relevant markets.  Tr. 1544:4-16.

With respect to the asserted servicing market, the Court reviewed Dr. Sullivan's testimony carefully and was unable to locate any description of his methodology to determine that there is a separate, distinct relevant market for leasing StarStar numbers.  The Court finds Dr. Sullivan's testimony on the asserted servicing market to be unpersuasive.  The Court also credits Dr. Aron's testimony that Dr. Sullivan did not perform the type of analysis required to determine that StarStar servicing is a distinct market.

Sumotext relied primarily on Dr. Sullivan to prove the asserted relevant markets in this case.  Because the Court declines to credit Dr. Sullivan's market definitions, the Court concludes that Sumotext failed to satisfy its burden to prove the relevant markets by a preponderance of the evidence.

### 4.    Defendants' Acquisition of Zoove Registry

Sumotext asserts that "Defendants knew full well, from the very outset when VHT and StarSteve came together to acquire the Zoove Registry, they were doing so to take complete control of the defined relevant markets to minimize competition."  Mot. at 6, ECF 495.  Sumotext quotes documents and testimony showing that Defendants intended to, and did, obtain complete control of the StarStar registry.  Mot. at 6-8, ECF 495.  Sumotext uses bold, italics and underlining to highlight certain words in the quoted evidence, such as "control" and "market."  *Id.*

This argument assumes the very fact that Sumotext must prove to prevail on its motion, namely, that "the defined relevant markets" are limited to StarStar numbers.  None of the cited

evidence regarding Defendants' acquisition of the Zoove registry shows that the relevant markets are limited to StarStar numbers.

### 5.   Evidence of Price Increases

Sumotext next argues that its asserted market definitions are supported by evidence of price increases after Defendants acquired Zoove.  Sumotext focuses on price increases with respect to four StarStar numbers:  the price for **CRASH was raised from $1,000 per month for the entire United States to $5,000 per month for South Florida only; the price for **KIA was went from $3,000 per month for the entire United States to $2,000 per month for a single territory in Naussau County; the price for **CASH was raised from $3,000 per month to $12,000 per month, and then again to $20,000 per month; and the price for **MOVE was raised 10% the first year and an additional 10% for every year thereafter.  Tr. 1344:19-1350:16.   Defendants do not dispute the four price increases, but they direct the Court to Wes Hayden's testimony that overall prices of StarStar numbers stayed the same or went down.  Tr. 1273:20-1274:24, 1353:12-17.

Sumotext does not explain how evidence of price increase supports its asserted market definitions.  Price increases can be evidence of monopoly power.  *See* Jury Instr. 36, ECF 468 ("[M]onopoly power is the power to control prices and exclude competition in a relevant market.").  However, the jury was instructed to determine whether Defendants had monopoly power only if Sumotext proved a relevant market:  "*If* you find that Sumotext has proven a relevant market, *then* you should determine whether Defendants have monopoly in that market." *Id.* (emphasis added).  The jury never got to price increase, because it determined that Sumotext did not prove a relevant market.

The jury was instructed that price could play a part in defining a relevant market under SSNIP principles:  "To determine whether products or services are reasonably interchangeable substitutes for each other, you may consider whether a small but significant permanent increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable."  Jury Instr. 35, ECF 468.  A "small but significant and non-transitory price increase" was defined as approximately a five percent increase in price not due to cost factors.  *Id.*  The jury was instructed that if such an increase would

cause consumers to switch from one product to another, the jury could conclude that the two products were in the same market.  *See id.*  Here, the four price increases identified by Sumotext exceed five percent and it is unclear if any consumers switched to another product.  Moreover, neither expert conducted a SSNIP test and the jury certainly was not instructed to construct its own.  Thus, the evidence of price increases is not determinative of a relevant market.

Sumotext's evidence of price increases does not support Sumotext's contention that the jury's determinations on relevant market were against the clear weight of the evidence.

### 6.  Evidence of Reduced Output

Sumotext argues that its market definitions are supported by evidence of reduced output in both the StarStar leasing market and the StarStar servicing market.  *See* Mot. at 9-12, ECF 495. Defendants dispute that output was reduced and, more to the point, assert that Sumotext has not explained how evidence of reduced output would support its market definitions.  *See* Opp. at 7, ECF 500.

The Court agrees that Sumotext has not explained how Defendants' alleged reduced output supports its market definitions.  Reduced output could be probative of injury to competition.  *See* Jury Instr. 28, ECF 468.  But Sumotext has cited no authority for the proposition that a company's reduction in output bears on the definition of the relevant market.

### 7.  Evidence of Excluded Competitors

Sumotext contends that its market definitions are supported by Defendants' exclusion of competitors.  *See* Mot. at 12-13, ECF 495.  As with evidence of reduced output, Sumotext has not explained how exclusion of competitors supports its market definitions.  Evidence that an accused monopolist excluded competitors from a defined relevant market would be probative of market power.  *See* Jury Instr. 36 ("If the evidence establishes that Defendants have the power to control prices and exclude competition in the relevant antitrust market, then you may conclude that Defendants have monopoly power in the relevant market.").  But Sumotext has cited no authority showing that such evidence is relevant to defining the relevant market in the first instance.

Moreover, Sumotext did not identify any such excluded competitors, and no such competitors testified at trial.  Sumotext asserts that ASPs competed with Zoove, and that Sumotext

United States District Court
Northern District of California

eliminated ASPs by discontinuing the Toolkit in 2016.  However, Bruce Bales of Mblox testified that there were about a dozen ASPs when Mblox owned Zoove in 2015, *see* Tr. 395:10-15, and Mr. Caffey testified that there were ten new resellers in May 2016, *see* Tr. 344:19-345:6. Moreover, Mr. Caffey testified that after the Toolkit was discontinued, businesses were still able to lease and service StarStar numbers.  *See* Tr. 330:4-8.  Finally, while Sumotext relied on a marketing document indicating that Zoove had a "strategy to take back numbers," Mr. Hayden testified that the "strategy" was really "what the marketing team had come up with to analyze the disposition of every number that we were inheriting and what we should be doing with it."  Tr. 1364:13-19.  The marketing team helped divide the StarStar numbers into "four categories, category A, category B, category C, category D."  Tr. 1364:1-7.  Some StarStar numbers "were on hold and had no call volume, so those were treated one way."  Tr. 1364:11-13.  Other StarStar numbers were "operative effectively," and as to those "there was really nothing to do."  Tr. 1364:14-15.  Thus, there was ample evidence in the record refuting Sumotext's position that Defendants excluded competitors in the alleged relevant markets.

The Court finds that Sumotext's asserted evidence of excluded competitors does not undermine the jury's verdict that Sumotext failed to meet its burden to establish a relevant market. In order to show that competitors were excluded from a relevant market, Sumotext first had to prove its market definitions, which it failed to do.  Moreover, the Court agrees with Defendants that Sumotext has not established that any actual competitors were excluded from the alleged relevant markets.

### 8.   Contemporaneous Evidence

Sumotext asserts that two trial exhibits, which it characterizes as "contemporaneous evidence," support its asserted market definitions.  The first document, JX831, is dated September 17, 2009.  *See* Kesselman Decl. Exh. N, ECF 495-1.  It is Zoove's response to a request for proposal from the Cellular Telecommunications Industry Association ("CTIA"), which was considering operating the registry for StarStar numbers and was looking for vendors to provide assistance.  *See id.*; Tr. 288:12-289:2.  Zoove proposed an economic model based on "code utilization and campaign fees," where "[c]ode leasing is uniform and open," and where "[c]ode

United States District Court
Northern District of California

leasing is independent of campaign management."  JX-831.013-014.  The CTIA ultimately decided not to operate the StarStar registry, so Zoove's proposal did not lead to any agreement. Tr. 288:12-289:2.  Sumotext argues that language in the proposal supports its market definitions.

The second document, PX005, is dated June 28, 2010.  *See* Kesselman Decl. Exh. P, ECF 495-1.  It is a press release about the availability of StarStar numbers.  *See id.*  Sumotext argues that language in the press release supports its market definitions.

The Court is perplexed by Sumotext's reliance on these documents.  Both were created years prior to the events giving rise to this lawsuit.  Sumotext's expert, Dr. Sullivan, testified that the relevant markets did not even come into existence until around 2012.  Tr. 698:13-25.  Under these circumstances, the Court finds the evidence to be neither contemporaneous nor relevant to the market definitions in this case.

### 9.      Entry and Exit of Competitors

Sumotext next contends that its market definitions are supported by the history of competitors' entry and exit from those markets.  Jury Instruction 36 states that the history of entry and exit of competitors in the relevant market may be helpful to determining whether Defendants have monopoly power.  *See* Jury Instr. 36.  "Entry of new competitors or expansion of existing competitors may be evidence that Defendants lacked monopoly power."  *Id.*  "On the other hand, departures of competitors from a market, or the failure of competitors to enter the market . . . may support an inference that Defendants have monopoly power."  *Id.*

As discussed above, the jury never reached the issue of monopoly power because it determined that Sumotext failed to meet its burden to prove its asserted relevant markets.  The question before the Court on this motion is whether the jury's determinations on relevant market are contrary to the clear weight of the evidence.  Nothing in the jury instructions suggests, and Sumotext has not shown, that the history of competitors' entry and exit from the relevant markets is probative of the market definition in the first instance.

### 10.      Other Restraining Forces

Sumotext next argues that Defendants failed to show the existence of any restraining forces.  Jury Instruction 35 discussed economic forces that restrain a defendant's freedom to set

United States District Court
Northern District of California

United States District Court
Northern District of California

prices or restrict output in the defined relevant market.  *See* Jury Instr. 35, ECF 468.  The jury was instructed that the most likely and important restraining force will be "actual and potential competition from other firms and their products."  *Id.*  "This includes all firms and products that act or likely could act as restraints on the defendant's power to set prices as it pleases because customers could switch to them if defendant sets its own prices too high."  *Id.*  "All the firms and products that exert such restraining force are within what is called the relevant market."  *Id.*

Sumotext argues that "Defendants provided no evidence of any firm, product, or service capable of restraining their ability to exercise their monopoly powers to harm competition in the defined markets."  Mot. at 17, ECF 495.  According to Sumotext, Defendants merely elicited unsubstantiated testimony from lay witnesses that StarStar numbers compete with all "calls to action," including web/search/internet, web/mobile apps, social networks/platforms, text messages, 10-digit telephone numbers, and other abbreviated dial codes ("ADCs").  *Id.*  Sumotext addresses these each of these products in turn, arguing that they are not interchangeable with StarStar numbers.[2]

In response, Defendants correctly point out that Sumotext is attempting to shift the burden of proof.  Sumotext's argument assumes that Defendants had the burden to prove that particular firms or products exerted restraining forces in the relevant market, and Sumotext attempts to show that Defendants failed to meet such burden.  However, Defendants did not have any burden to demonstrate the existence of restraining forces.  *Sumotext* had the burden to prove that all other products properly are excluded from the relevant markets.

Sumotext devotes substantial briefing to summarizing the trial evidence presented with respect to each of the products listed above.  While not entirely clear from Sumotext's briefs, it

_____

[2] After briefing was completed on the motion for a new trial, but before the hearing on the motion, Sumotext filed a request for judicial notice that was opposed by Defendants.  *See* Plf.'s RNJ, ECF 507; Defs.' Opp. to RJN, ECF 508.  Sumotext asks the Court to take judicial notice of "certain content on Defendant VHT StarStar LLC's web site."  Plf.'s RJN at 1.  According to Sumotext, this content disproves Defendants' contention at trial that abbreviated dial codes ("ADCs") compete with StarStar numbers in a broader relevant market than that asserted by Sumotext.  The request for judicial notice is DENIED.  *See Phillips v. P.F. Chang's China Bistro, Inc.*, No. 5:15-CV-00344-RMW, 2015 WL 4694049, at *2 (N.D. Cal. Aug. 6, 2015) ("The contents of websites generally are not a proper subject of judicial notice.").

United States District Court
Northern District of California

appears that Sumotext may be asking the Court to make an independent determination that each of the products listed above does not compete in the same market with StarStar numbers. The Court is not qualified to make such a determination. While the Court has a duty to weigh the evidence in evaluating Sumotext's motion for a new trial, the Court cannot render expert opinion regarding the proper market definition in this case. The Court can only weigh the expert opinions offered by the parties' experts on the question of relevant market. The Court has weighed those opinions and, as discussed herein, has found that Dr. Sullivan's market definitions are not credible.

Further, Sumotext ignores the direct testimony of a number of trial witnesses who worked in the business and who testified that, in their view, StarStar numbers compete with these other products. Mr. Caffey testified that StarStar numbers compete with Internet, web search, mobile apps, and social networks, *see* Tr. 311:9-11, 312:14-17, 313:1-5; SMS text messages, *see* Tr. 312:23-25; 10-digit phone numbers, *see* Tr. 312:19-22; and other abbreviated dial codes, *see* Tr. 316:8-12. Tim Keyes, VHT StarStar's COO, testified that StarStar numbers compete with Internet, web searches, mobile apps and social networks. *See* Tr. 518:17-22, 651:11-15. Wes Hayden testified that StarStar numbers compete with SMS/Text messages, *see* Tr. 1290:3-4, 1293:4-6; and other abbreviated dial codes, *see* Tr. 1290:22-1292:23. Mblox's Bruce Bales testified that StarStar numbers compete with SMS/Text messages. *See* Tr. 452:17 to 453:2. Mblox's CEO, Tom Cotney, also testified that StarStar numbers compete with SMS/Text messages. *See* Tr. 71:23-25, 77:1-4.

This abundance of evidence coupled with Dr. Aron's persuasive testimony further supports the Court's conclusion that Dr. Sullivan's market definition was not credible.

### 11.     Importance of Evidence Re Other Restraining Forces

Sumotext asserts that although Defendants argued at trial that "a vast buffet" of "call to action" technologies compete in the same market as StarStar numbers, "Dr. Sullivan expressly rejected this assertion based on his market analysis." Mot. at 21-22, ECF 495. According to Sumotext, "the Court must now weigh the evidence and determine if, as Defendants assert, there was evidence to suggest that these 'call to action' technologies act as restraints on the defendant's power to set prices as it pleases because customers could switch to them if defendant sets its own

prices too high." Mot. at 22, ECF 495.  Sumotext goes on to argue that the record is devoid of such evidence "because, as Defendants admit, their own expert failed to conduct a market analysis." *Id.*

Sumotext's arguments are without merit.  Again, the Court's task is not to determine whether Defendants presented evidence sufficient to prove that one or more call to action technologies should be included in the relevant market.  Defendant had no burden to prove anything at trial.  Nor was Defendants' expert, Dr. Aron, required to conduct a market analysis. Sumotext had the burden to prove the relevant markets by a preponderance of the evidence. Because Sumotext asserted that the relevant markets were limited to StarStar numbers, Sumotext had the burden to show that all other call to action technologies must be excluded.  The jury determined that Sumotext failed to meet its burden of proof.  And this Court agrees.

### 12. Conclusion

The Court concludes for the reasons discussed herein that Sumotext has not shown that the jury's verdict is against the clear weight of the evidence, and it therefore DENIES Sumotext's motion for a new trial on this basis.

### B. Defense Counsel's Asserted Misconduct Does Not Warrant a New Trial

As a separate basis for a new trial, Sumotext argues that defense counsel engaged in misconduct that infected the jury's deliberations.  To obtain a new trial on this basis, Sumotext must show that defense counsel's misconduct "substantially interfered" with its interests.  *See Jasper*, 678 F.3d at 1129.  Sumotext also must show that the misconduct permeated the entire trial to such an extent that "the jury was influenced by passion and prejudice in reaching its verdict." *Id.* (quotation marks and citation omitted).

Sumotext argues that these standards are satisfied by defense counsel's conduct in repeatedly eliciting testimony from witnesses, and making statements to the jury, indicating that there were alternative relevant market definitions upon which the jury could rely.  *See* Mot. at 23, ECF 495.  Sumotext focuses on statements and testimony referring to a "calls to action" market, a "mobile marketing" market, and a "mobile engagement" market.  As Sumotext correctly points out, Defendants did not present expert opinion establishing any of these as relevant markets.

United States District Court
Northern District of California

Sumotext asserts that defense counsel's purpose in using these terms was to give the jury the false impression that Dr. Aron had done a market analysis and identified an alternative relevant market when in fact she had done neither of these things.  *Id*. at 26.  In opposition, Defendants argue that neither its counsel nor its expert, Dr. Aron, offered an affirmative relevant market definition, and that there was no misconduct.  Opp. at 18, ECF 500.  Defendants argue that even if the Court were to find misconduct, Sumotext had an opportunity to cure any resulting prejudice, because Sumotext reserved substantial time for its rebuttal closing argument and therefore had the last word with the jury.  Opp. at 22, ECF 500.

The Court has reviewed the portions of the trial transcript identified by Sumotext in order to determine whether defense counsel engaged in misconduct and, if so, whether Sumotext had the opportunity to cure any resulting prejudice.  In the Court's view, it is useful to begin its discussion of these issues by briefly highlighting the manner in which both Dr. Sullivan and Dr. Aron used terms such as "mobile engagement," "consumer engagement," and "calls to action" throughout their testimony.  The Court then addresses the specific excerpts of the record that Sumotext offers to show defense counsel's asserted misconduct.  Finally, the Court discusses Sumotext's opportunity to cure any prejudice arising from the asserted misconduct.

### 1.  Experts' Testimony

On behalf of Sumotext, Dr. Sullivan testified that StarStar numbers are an aspect of "mobile engagement," which he also called "consumer engagement."  Tr. 668:3-20, 701:4-7.  Dr. Sullivan identified several other products that he classed as forms of mobile engagement, including ten-digit telephone numbers, 1-800 numbers, short codes, text messaging, and internet access.  Tr. 669:13-670:14, 701:4-17.  In categorizing a myriad of products as "mobile engagement" and "consumer engagement," Dr. Sullivan clearly was not attempting to define a relevant market; to the contrary, he opined that none of the other mobile engagement products belong in the same relevant market as StarStar numbers.  Tr. 694:18-25.  Dr. Sullivan appeared to use the terms "mobile engagement" and "consumer engagement" as a kind of shorthand to identify a group of products that could be viewed as competing with StarStar numbers.

Like Dr. Sullivan, Dr. Aron used the term "consumer engagement" and "mobile

engagement" when referring to products, such as short codes, that could be viewed as competing with StarStar numbers.  Tr. 1537:2-9, 1556:15-18.  Dr. Aron also referred to such products as "call to action mechanisms."  Tr. 1535:3-13.  Dr. Aron appeared to use these terms to loosely identify products that might belong in the same relevant market as StarStar numbers.

### 2.    Defense Counsel's Conduct

Sumotext contends that defense counsel's use of the same terms used by the experts, and similar terms, constituted misconduct.  Specifically, Sumotext asserts that counsel referred to a "Calls to Action Market" in the opening statement; elicited testimony from witnesses regarding a "Mobile Marketing Market"; elicited testimony from Dr. Aron regarding "mobile engagement"; and asserted during closing argument that Dr. Aron had identified a "mobile engagement market." *See* Mot. at 23-26.

### a.    Opening Statement – "Calls to Action Market"

In Defendants' opening statement, defense counsel told the jury that "StarStar numbers compete with a wide variety of calls to action, and virtually every witness that you hear who is in this market in the next two weeks will say that to you."  Tr. 137-5-7.  Defense counsel also stated, "there is no relevant market for StarStar numbers.  StarStar numbers compete in a much larger market for calls to action and consumer engagement."  Tr. 138:23-25.  Defense counsel did not attempt to define the outer boundaries of the "much larger market."

### b.    Witness Testimony – "Mobile Marketing Market"

Sumotext directs the Court's attention to defense counsel's questioning of Bruce Bales of Mblox, a company that owned Zoove for a brief period.  Mr. Bales testified that a StarStar numbers and many other products are "mobile marketing tools."  Tr. 493:16-18.  Defense counsel drew Mr. Bales out on the subject, asking whether 1-800 numbers compete with StarStar numbers, whether vanity numbers compete with StarStar numbers, and whether short codes compete with StarStar numbers.  Tr. 493:19-494:22.  In making those inquiries, defense counsel asked whether each product could be a competitor with StarStar numbers in the "mobile marketing marketplace," also referred to as the "mobile marketing market."  *Id*.  Counsel did not attempt to define the "mobile marketing marketplace" or "mobile marketing market" any further, but instead appeared

to be using the phrases as shorthand for a group of products that potentially compete with StarStar numbers. *Id.*

### c.      Dr. Aron's Testimony – "Mobile Engagement Market"

Sumotext cites to defense counsel's questioning of Dr. Aron, and specifically a question asking whether Dr. Aron believed "there is something called mobile engagement." Tr. 1556:15-18. Dr. Aron answered that question in the affirmative. *Id.* As discussed above, Dr. Sullivan actually used the term "mobile engagement" in his testimony before Dr. Aron was called to the stand. Tr. 701-19. Sumotext nonetheless argues that by asking Dr. Aron about "mobile engagement," defense counsel "laid the poisonous seed" that allowed counsel to assert during closing argument that Dr. Aron had defined an alternative relevant market called "mobile engagement." *See* Mot. at 26, ECF 495. This argument is unpersuasive. Dr. Aron was clear in her testimony that she did not do a market analysis. When asked "Q. Okay. Have you done a market definition analysis in this case?" Dr. Aron responded "A: No, I haven't." Tr. 1533:20-22.

### d.      Closing Argument – "Mobile Engagement Market"

During closing argument, defense counsel argued that Dr. Aron "was very clear that there's some sort of mobile engagement market, that the people who are the customers, they wanted to use this service to reach out to consumers to get them to dial the StarStar number. That's what this is. Mobile engagement." Tr. 1706:16-20. Sumotext contends that counsel's argument was a blatant attempt to mislead the jury into believing that Dr. Aron had defined an alternative relevant market that the jury could credit over the markets defined by Dr. Sullivan.

### e.      Court's Conclusion

In the Court's view, defense counsel used the phrases "calls to action market," "mobile marketing market," and "mobile engagement market" in much the same way as *both* parties' experts, that is, as a shorthand for a group of products that potentially could compete with StarStar numbers. Sumotext argued that those products do not belong in the same relevant market as StarStar numbers, while Defendants argued that Sumotext had not plausibly excluded all of those products from the relevant markets. Viewing the record as a whole, the Court does not find it plausible that defense counsel was attempting to mislead, or did mislead, the jury as to the

existence of a specific alternative relevant market.

With respect to Sumotext's assertion that defense counsel suggested to the jury that Dr. Aron defined an alternative relevant market, Dr. Aron testified expressly that she was not retained to perform a market analysis, she had not performed a market analysis, and she had not offered an alternative market definition.  Tr. 1533:20-1534:1.  When asked whether she was affirmatively opining that all the "call to action technologies" discussed throughout her testimony were in the same relevant antitrust market as StarStar numbers, Dr. Aron answered in the negative.  Tr. 1538:14-22.  Dr. Aron made clear that she was not offering such an opinion, but rather was opining that "it's not plausible that none of these calls to action compete with StarStar numbers." *Id*.

When referencing Dr. Aron's testimony during closing argument, defense counsel reiterated that while Dr. Aron had testified that the "two little circles" of products identified by Dr. Sullivan did not properly define the relevant markets, Dr. Aron "didn't draw it and tell you how much bigger is the circle."  Tr. 1706:10-15.  Counsel accurately stated that Dr. Aron's testimony was that the relevant market was "different" from the markets defined by Sumotext.  Tr. 1706:14-16.

The Court expressly ruled that Dr. Aron was permitted to offer such opinion when Sumotext sought an *in limine* ruling, the day before Dr. Aron testified, precluding Dr. Aron from offering an alternative market definition.  The Court ruled that although Dr. Aron could not offer an affirmative alternative market definition, she could offer the opinion that Dr. Sullivan had not adequately excluded all products that potentially could be in the relevant market.  Tr. 1217:12-21. The Court does not find that defense counsel engaged in misconduct.  To the extent counsel may have crossed the line in closing argument, the Court is satisfied that the effect of his argument was minor when compared to Dr. Aron's clear testimony that she did not develop an alternative opinion on the contours of the relevant market.

Accordingly, the Court DENIES Sumotext's motion for a new trial on the basis of defense counsel's asserted misconduct.

### 3. Sumotext's Opportunity to Cure

Because it concludes that Sumotext has not established that defense counsel engaged in misconduct, the Court need not determine whether Sumotext had an opportunity to cure any resulting prejudice.  The Court notes, however, that to the extent defense counsel's closing argument suggested that Dr. Aron offered an opinion on an alternative market definition, the effect of such suggestion was minor, and the jury clearly was instructed that "[a]rguments and statements by lawyers are not evidence."  Jury Instr. 3, ECF 468.  Moreover, Sumotext reserved ample time for rebuttal to address the issue, and in fact did address it by arguing expressly that Dr. Aron did *not* conduct a market analysis or offer an affirmative market definition.  *See* Tr. 1721:17-1722:7.

## IV.   ORDER

(1)   Sumotext's motion for a new trial is DENIED;

(2)   This order terminates ECF 495.


Dated:  November 6, 2020

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

28